**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

---

UNITED STATES OF AMERICA, *et al.*,

                Plaintiffs,

    v.

CHIEF JUDGE GEORGE L. RUSSELL III, in his
official capacity, *et al.*,

                Defendants.

No. 1:25-cv-02029

---

## MOTION FOR A PRELIMINARY INJUNCTION
## AND MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

    I.      Detention and Removal Procedures for Aliens in Maryland ................................. 2

    II.     Statutory Framework for Review of Immigration Proceedings............................ 4

    III.    The Standing Order and Amended Standing Order ................................................. 5

    IV.    The Orders' Impact on Federal Immigration Enforcement..................................... 8

ARGUMENT ...................................................................................................... 10

    I.      Plaintiffs Are Likely to Succeed on the Merits. ...................................................11

         A.    The Orders Require Preliminary Equitable Relief To Be Granted Without Satisfying the Minimum Legal Requirements. ........................................ 12

         B.    The Orders Exceed District Courts' Authority in Immigration Matters. .. 16

         C.    The Orders Violate Procedural Requirements for Local Rules................. 18

    II.     Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction. ........... 19

    III.    The Equities and the Public Interest Favor a Preliminary Injunction. ................... 21

CONCLUSION...................................................................................................... 23

**INTRODUCTION**

Like other government officials, judges sometimes violate the law. When a judge or court does so in a standing order that harms the federal government's sovereign interests on a repeated and ongoing basis, the government—like any other litigant—may and often does seek relief from that order through the judicial process. *See, e.g.*, *Sheldon Whitehouse v. U.S. Dist. Ct. for Dist. of R.I.*, 53 F.3d 1349 (1st Cir. 1995). This action seeks judicial resolution of a pure legal question: the facial validity of standing orders that issue automatically to bar the federal government from removing an alien, whether or not the District of Maryland has jurisdiction over the case and whether or not the alien has a colorable claim to relief. The government now seeks immediate preliminary relief from further issuance of the challenged standing orders.

This case involves an extraordinary form of judicial interference in Executive prerogatives. Defendants have crafted a novel means of issuing avowedly *automatic* injunctions against the federal government. They entered a Standing Order and Amended Standing Order (together, the "Orders") requiring these automatic injunctions despite the Supreme Court's express instruction that, in immigration cases and otherwise, a "stay is *not a matter of right*, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (emphasis added) (citation omitted). The Orders thus do precisely what the Supreme Court has forbidden.

Indeed, the Orders are invalid on multiple levels. They defy the requirements for issuing a preliminary injunction or a temporary restraining order. They violate congressional limits on district courts' jurisdiction over immigration matters. And they disregard the procedural and substantive requirements for issuing a local rule. They are also fundamentally inconsistent with the judicial role, which is not to "exercise general oversight of the Executive Branch" but to "resolve cases and controversies consistent with the authority Congress has given them." *Trump v. CASA, Inc.*, --- S. Ct. ---, 2025 WL 1773631, at *15 (June 27, 2025).

1

As purported justification, the Orders describe Defendants' "frustrati[on]" with hearings related to the Administration's immigration enforcement actions and a desire to avoid handling cases outside regular business hours. But a sense of frustration and a desire for greater convenience do not give Defendants license to flout the law. Nor does their status within the judicial branch. As the Supreme Court emphasized only last week, the "admonition" that "everyone, from the President on down, is bound by law" applies to "judges too." *Id.* at \*14.

The Orders are not just unlawful. They also exact irreparable harm on the Executive Branch by intruding on its "sovereign prerogative" over immigration enforcement. *See Miranda v. Garland*, 34 F.4th 338, 365-66 (4th Cir. 2022). Every unlawful injunctive order entered by a district court robs the Executive Branch of its most scarce resource: time to put its policies into effect. In the process, such orders diminish the votes of the citizens who elected the head of the Executive Branch. The equities and public interest thus favor enjoining the Orders. By contrast, Defendants face no comparable harms if they are preliminarily enjoined from entering the Orders.

Every factor thus supports a preliminary injunction here. This Court should preliminarily enjoin Defendants from implementing or effectuating the facially invalid Orders.

## BACKGROUND

### I.    Detention and Removal Procedures for Aliens in Maryland

Plaintiff United States of America regulates immigration under its constitutional and statutory authorities, and it enforces federal immigration laws through its Executive agencies, including the Department of Homeland Security (DHS), as well as DHS's component agencies U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP). Plaintiff DHS is an executive agency that enforces federal immigration laws, including by arresting and detaining individuals in Maryland.

In the United States, removal of aliens is handled by ICE. Ex. A, Baker Decl. ¶ 5. ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. *Id.* Within ICE, Enforcement and Removal Operations (ERO) manages the logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the pendency of immigration proceedings. *Id.* ERO also manages the physical removal of aliens from the United States pursuant to final orders of removal. *Id.*

Detention is an important and necessary part of immigration enforcement. *Id.* ICE detains aliens to secure their presence both for immigration proceedings and for their removal, with a special focus on those who represent a risk to public safety or for whom release is prohibited by law. *Id.* ERO makes operational determinations regarding custody status based on an individualized assessment of each case, which requires considering a number of factors. *Id.* ¶ 7. These factors include, but are not limited to, the status of removal proceedings, applicable statutory requirements, any prohibitions on release, criminal history, and availability of bed space. *Id.*

Maryland's "Dignity Not Detention" Act restricts Maryland state and local governments' ability to detain aliens in cooperation with ICE. *See* Md. Corr. Servs. Code § 1-102. As a consequence, aliens apprehended in Maryland are generally transported to detention facilities outside Maryland within varying timeframes. Baker Decl. ¶ 8. While the ERO Baltimore Field Office may initially have responsibility for managing an apprehended alien's case, once an alien is transferred to a detention facility within the jurisdiction of another ERO Field Office, the receiving office assumes responsibility for managing that alien's case. *Id*. An alien may enter and exit ICE custody on more than one occasion from the time he is first encountered until he is either removed from the United States or granted relief or protection from removal. *Id.* ¶ 9.

## II.     Statutory Framework for Review of Immigration Proceedings

In general, Congress has channeled review of challenges to final orders of removal away from district courts. Title 8 U.S.C. § 1252(b)(9)—known as the "zipper clause"—channels all review of "any action taken or proceeding brought to remove an alien from the United States" under subchapter II of the Immigration and Nationality Act ("INA") into a petition for review of a final order of removal, filed in a court of appeals. It expressly strips district courts of jurisdiction to review final orders of removal, or otherwise review "such questions of law or fact," including "by habeas corpus" or under the All Writs Act. 8 U.S.C. § 1252(b)(9); *see Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (holding that Section 1252(b)(9) is an "unmistakable 'zipper' clause" that "channels judicial review of *all* [claims arising from deportation proceedings]" to a court of appeals in the first instance).

In a separate, complementary provision, 8 U.S.C. § 1252(g), Congress stripped federal courts of jurisdiction to hear "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien" under the INA, other than in a petition for review under § 1252, "notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code." 8 U.S.C. § 1252(g). Section 1252(g) thus deprives district courts of jurisdiction to issue orders that stay the execution of removal orders and to hear cases challenging the execution of removal orders. *Mapoy v. Carroll*, 185 F.3d 224, 228-29 (4th Cir. 1999).

Several independent provisions further restrict federal district courts' authority to intervene in immigration proceedings. Congress has stripped lower federal courts of "jurisdiction or authority to enjoin or restrain the operation of" many provisions of the INA, including removal proceedings and provisions governing removal of aliens subject to removal orders. 8 U.S.C. § 1252(f)(1); *see, e.g.*, *id.* §§ 1229a (removal proceedings), 1231 (removal). That provision bars

4

courts from issuing "injunctive relief on behalf of an entire class of aliens" because such relief "is not limited to remedying the unlawful 'application' of the relevant statutes 'to an individual alien.'" *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550-51 (2022). An order "'enjoin[s] or restrain[s] the operation' of" a covered provision when it "require[s] officials to take actions that (in the Government's view) are not required by [the provision] and to refrain from actions that (again in the Government's view) are allowed by" the provision. *Id.* at 551.

Yet another provision, 8 U.S.C. § 1226(e), bars judicial review of many "discretionary judgment[s]" regarding "the detention of any alien" and prevents the court from "set[ting] aside any action . . . under this section regarding the detention . . . of any alien." And 8 U.S.C. § 1252(e)(2) "limits the review that an alien in expedited removal may obtain via a petition for a writ of habeas corpus" to just three narrow grounds. *DHS v. Thuraissigiam*, 591 U.S. 103, 111 (2020).

## III.    The Standing Order and Amended Standing Order

On May 21, 2025, Defendants promulgated Standing Order 2025-01 (the Standing Order). *See* Ex. B. The Standing Order was "ORDERED by" Defendant "the U.S. District Court for the District of Maryland," and it was signed by Defendant Chief Judge Russell. *Id.* at 2. It applied to all cases filed on or after 5:00 p.m. on May 20, 2025—the day before it was issued. *Id.*

The Standing Order purported to invoke the All Writs Act and a "limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action." *Id.* at 1. It provided that

> upon the filing of a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on behalf of an alien detainee, the Government/Respondents, including all those acting for them or on their behalf, are ENJOINED and RESTRAINED from removing Petitioners in such cases from the continental United States or altering their legal status, provided that Petitioner's full name and A# have been provided to the Court, either in the Petition or in a separate sealed filing.

*Id.* Furthermore, the Standing Order provided that an order to this effect "shall be entered in every such case upon its filing." *Id.* at 2. Once entered, that order's "terms" were to "remain in effect until 4:00 p.m. on the second business day following the filing of the Petition," unless extended by the judge assigned to the case. *Id.* The Standing Order directed the Clerk to docket the Standing Order in each relevant case and to send a copy of the Standing Order, the habeas petition, and the petitioner's full name and A# to the Civil Division of the U.S. Attorney's Office for the District of Maryland. *Id.*

> The Standing Order stated that it was promulgated
>
> in order to preserve existing conditions and the potential jurisdiction of th[e] Court over pending matters while the Court determines the scope of its authority to grant the request[ed] relief; to ensure Petitioners are able to participate in the adjudication of their requests for habeas relief, including participation in court proceedings and access to legal counsel for such purpose; to ensure the Court is able to evaluate their respective claims for relief based on their in-court testimony that may be offered; and to ensure the Government has a fulsome opportunity to brief and present arguments in its defense."

*Id.* at 1.

On May 28, 2025, Defendants promulgated Amended Standing Order 2025-01. *See* Ex. C. Like the Standing Order, the Amended Standing Order was "ORDERED by" Defendant "the U.S. District Court for the District of Maryland," and it was signed by Defendant Chief Judge Russell. *Id.* at 2. The Amended Standing Order does not specify to which cases it applies.

The Amended Standing Order, like the Standing Order, purported to invoke the All Writs Act and a "limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action." *Id.* at 1. It provides that, after the filing of "(1) a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on behalf of an alien detainee located in the District of Maryland, and (2) the Petitioner's full name and A#," the Clerk shall "docket this Order in the case and simultaneously send a copy of this Order, the Petition, and the

Petitioner's full name and A# to the Chief and Deputy Chief of the Civil Division of the United States Attorney's Office for the District of Maryland, and then file a Notice that the documents have been transmitted." *Id.* at 2. The Amended Standing Order then provides that, "effective upon the filing of the Notice," "Government/Respondents, including all those acting for them or on their behalf, are ENJOINED and RESTRAINED from removing Petitioners from the continental United States or altering their legal status." *Id.*

The Amended Standing Order, like the Standing Order, provides that it "shall remain in effect until 4:00 p.m. on the second business day [following] the filing of the [Petition]," unless extended by the judge assigned to the case. *Id.* It also provides that "Government/Respondents shall notify appropriate officials of this Order promptly and provide all necessary information and documents to effectuate compliance with this Order." *Id.* Like the original Standing Order, the Amended Standing Order states that it was promulgated

> in order to preserve existing conditions and the potential jurisdiction of th[e] Court over pending matters while the Court determines the scope of its authority to grant the requested relief; to ensure Petitioners are able to participate in the adjudication of their requests for habeas relief, including participation in court proceedings and access to legal counsel for such purpose; to ensure the Court is able to evaluate their respective claims for relief based on their in-court testimony that may be offered; and to ensure the Government has a fulsome opportunity to brief and present arguments in its defense.

*Id.* The Amended Standing Order additionally states that "[t]he recent influx of habeas petitions concerning alien detainees purportedly subject to improper and imminent removal from the United States that have been filed after normal court hours and on weekends and holidays has created scheduling difficulties and resulted in hurried and frustrating hearings in that obtaining clear and concrete information about the location and status of the petitioners is elusive." *Id.*

IV.     **The Orders' Impact on Federal Immigration Enforcement**

Implementation of the Orders interferes with ICE's mission to administer and enforce the immigration laws, protect public safety, and promote national security. The Orders threaten to adversely impact the operational planning necessary to coordinate a removal, especially a removal of an alien to a country that may be recalcitrant about accepting the alien. Baker Decl. ¶ 11. Removals can take months of sensitive diplomacy to arrange and often do not completely come together until the last minute. A delay can undo all of those arrangements and require months of additional work before removal can be attempted again. Similarly, aliens often have travel documents with expiration dates. A judicially imposed delay can halt removals until after those travel documents have expired and removal is thus no longer possible without securing new travel documents.

In addition to restricting movement of covered aliens, the Orders also preclude "Government/Respondents" from "altering [the alien's] legal status." Ex. B at 1; Ex. C at 1. The Orders thus bar ICE from implementing final orders of removal by removing the alien. The Orders even bar immigration judges from proceeding in the alien's immigration proceedings, including by entering a removal order or adjudicating any applications for relief, such as asylum, withholding of removal, protection under the Convention Against Torture, and voluntary departure. *See* Baker Decl. ¶ 12. The Orders also bar the alien from receiving other immigration-related benefits that would change the alien's legal status, including temporary protected status, discretionary parole, work authorization, and the like. The Orders may even bar courts of appeals from acting on a pending petition for review, which could change the alien's legal status. And they preclude DHS from implementing an order resolving a petition for review.

The Orders also impede ICE's work by fostering bad litigation incentives. As noted above, the lack of bed space in Maryland means that ERO must often transport aliens apprehended in

8

Maryland to detention facilities outside of Maryland. *Id.* ¶ 8. But the Orders do not afford any opportunity to contest the alien's assertion of being "located in the District of Maryland" at the time of a habeas filing before ERO is automatically enjoined and restrained under one of the Orders. *Id.* Consequently, the Orders incentivize aliens to allege that they were in Maryland at the time of filing. The Orders also invite opportunistic litigators to make filings "on behalf of" of an alien, even though the filer may not know the alien's location at the time of filing. And by the time the Clerk files the required Notice that triggers the Orders' protections, even an alien who was previously in the District of Maryland upon the filing of the habeas petition may have since been moved elsewhere, creating operational difficulties and interfering with ICE's ability to fairly administer and enforce the immigration laws. *Id.* ¶¶ 10-11.

The Orders have been entered in multiple cases. Most remarkably, Defendants entered, and later extended, the Amended Standing Order in a case in which the petitioner had undisputedly already arrived at a detention facility in Texas the day before his lawyer filed a habeas petition alleging that he was detained in Maryland. *Hernandez Escalante v. Noem*, No. 25-1799 (D. Md.). Despite this undisputed fact, the Court entered and even extended the Amended Standing Order. *Id.*, ECF Nos. 4, 9, 11. Although *Hernandez Escalante* presents an extraordinary example of the Orders' incentives and effects, it is only one instance of at least twelve in which the Standing Order or Amended Standing Order has been entered so far.[1]

---

[1] *See Bonilla Martinez v. Baker*, No. 25-2027 (D. Md.), ECF No. 2; *Talebinejad v. Baker*, No. 25-2024 (D. Md.), ECF No. 3; *Quintana Flores v. Bondi*, No. 25-1950 (D. Md.), ECF No. 2; *Cruz-Medina v. Noem*, No. 25-1768 (D. Md.), ECF No. 2; *Cordon-Salguero v. Noem*, No. 25-1626 (D. Md.), ECF No. 2; *Melgar Hernandez v. Baker*, No. 25-1663 (D. Md.), ECF No. 8; *Ramos v. Noem*, 25-1673 (D. Md.), ECF Nos. 3, 5; *Portela-Hernandez v. Trump*, No. 25-1633 (D. Md.), ECF Nos. 5, 10; *Umanzor Chavez v. Noem*, No. 25-1634 (D. Md.), ECF Nos. 2, 6; *Ghamelian v. Baker*, No. 25-2106 (D. Md.), ECF No. 2; *Zavvar v. Scott*, No. 25-2104 (D. Md.), ECF No. 3.

Defendants have continued to enter the Amended Standing Order in habeas cases initiated after the June 24, 2025 filing of the complaint in this case. *See Bonilla Martinez*, ECF No. 2; *Ghamelian*, ECF No. 2; *Zavvar*, ECF No. 3. And, absent relief, the Amended Standing Order is certain to be entered in additional cases in the future.

Before filing the complaint in this case, Plaintiffs raised their concerns with the Orders to the Judicial Conference. But Defendants have made apparent that they intend to keep the Amended Standing Order in place indefinitely, despite its manifest legal and practical flaws.

## ARGUMENT

A preliminary injunction is warranted when the movant is likely to succeed on the merits, the movant will suffer irreparable harm absent an injunction, the balance of harms between the movant and the opposing party favors the movant, and the public interest favors a preliminary injunction. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Each factor favors a preliminary injunction here. *First*, the government is likely to succeed on the merits because the Orders violate substantive and procedural requirements for issuing preliminary relief, exceed the limits Congress has placed on district courts' review of immigration matters, and function as a local rule without having gone through mandatory procedures for promulgating a local rule. *Second*, the Orders are imposing and will continue to impose irreparable harm on the government. That is because the Executive Branch suffers irreparable injury every time an erroneous ruling prevents the Executive from exercising its sovereign prerogative to enforce immigration law. *See CASA*, 2025 WL 1773631, at *15 (holding that "the Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed" their "authority"). *Third* and *fourth*, the public interest and the equities favor an injunction. The public, like the Executive Branch, has a strong interest in enforcement of the nation's immigration laws. And Defendants have no legitimate countervailing interest strong enough to outweigh those harms. The Court should therefore grant the motion.

I.        **Plaintiffs Are Likely to Succeed on the Merits.**

"[T]he proper method for mounting a facial challenge to the validity of [a local rule] . . . is through an action for declaratory and/or injunctive relief filed in the district court." *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 11 (1st Cir. 2000) (second and third alterations in original) (quoting *Sheldon Whitehouse*, 53 F.3d at 1353). The same is true for facial challenges to standing orders. *See, e.g.*, *Russell v. Hug*, 275 F.3d 812, 816-23 (9th Cir. 2002) (lawsuit against district court judges to challenge validity of court's "general order"). Courts have thus repeatedly entertained similar lawsuits, filed by both government and private plaintiffs, challenging the enforcement of local rules and orders by naming the court, clerks, and judges as defendants.[2]

As the District of Massachusetts summarized in one such case, this "approach" "ha[s] the sanction of precedent." *Stern v. Supreme Jud. Ct. for Commonwealth of Mass.*, 16 F. Supp. 2d 88, 90 (D. Mass. 1998) (U.S. Attorney and DOJ official challenging a local rule by suing each judge in a district). And issuing injunctive relief in such cases faces no immunity barrier: "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984) (suit against judge challenging judge's pretrial detention practices); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 42 (2021) (noting that in *Pulliam*, "the plaintiff sought an injunction only to prevent the judge from enforcing a rule of her own creation").

---

[2] *See, e.g.*, *Stern*, 214 F.3d at 9-10 (U.S. Attorney and DOJ official challenging local rule by suing district court); *Sheldon Whitehouse*, 53 F.3d at 1353-54 (U.S. Attorney challenging local rule by suing district court); *Carter v. Clark*, 616 F.2d 228, 231 (5th Cir. 1980) (class of private plaintiffs challenging local rule by suing district court clerk); *Thaw v. Lynch*, No. 2:15-CV-01703, 2016 WL 1045527, at *1 (D. Ariz. Mar. 16, 2016) (plaintiffs challenging local rule by suing district court judges); *Nat'l Ass'n for the Advancement of Multijurisdiction Prac.* [NAAMJP] *v. Roberts*, 180 F. Supp. 3d 46, 55-56 (D.D.C. 2015) (same); *NAAMJP v. Holder*, No. 1:14-CV-2110, 2015 WL 13158479, at *3-4 (D. Md. Aug. 18, 2015) (same); *cf. Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 809 F. Supp. 2d 754, 769 (N.D. Ohio 2011) (private plaintiff challenging juvenile court's standing order), *aff'd and remanded*, 724 F.3d 687 (6th Cir. 2013).

In this facial challenge, the government is likely to succeed in showing that the Orders are invalid, for several independent reasons.

**A.    The Orders Require Preliminary Equitable Relief To Be Granted Without Satisfying the Minimum Legal Requirements.**

Standing orders are permissible only if they are consistent with federal law and the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 83(b); *McCargo v. Hedrick*, 545 F.2d 393, 402 (4th Cir. 1976) (holding that local rule was "void and of no effect as being inconsistent with Rule 16 of the Federal Rules of Civil Procedure"); *Tucker v. Colo. Dep't of Pub. Health & Env't*, 104 F. App'x 704, 707 (10th Cir. 2004) (holding that standing orders must be "consistent with federal law and the Rules of Civil Procedure"); *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1008 (11th Cir. 1992) (emphasizing that district courts "*must not* circumvent the Federal Rules of Civil Procedure by implementing local rules or 'procedures' which do not afford parties rights that they are accorded under the Federal Rules").[3] The Orders are inconsistent with both of those sources of authority.

*First*, the Orders flout basic requirements for issuing preliminary equitable relief under federal law. Just as the Court must consider the familiar four-factor test before issuing a preliminary injunction in this case, it must consider that test before granting relief in the cases in which the Orders apply. There is no alien-habeas-petitioner exception to the traditional equitable principles that the four-factor test reflects. *See Nken*, 556 U.S. at 426; *Winter*, 555 U.S. at 20. But the Orders violate the requirement to apply that test by purporting to issue equitable relief automatically and without consideration of *any* of the required factors.

---

[3] *See also Frazier v. Heebe*, 482 U.S. 641, 645-49 (1987) (holding that district court "was not empowered" to adopt local rules that "arbitrarily" limited bar admission); *Miner v. Atlass*, 363 U.S. 641, 647 (1960) (holding that court lacked authority to enact local admiralty rule inconsistent with General Admiralty Rules); *United States v. Cole*, 496 F.3d 188, 195 (2d Cir. 2007) (vacating sentence imposed under standing order that was "inconsistent with the Federal Rules of Criminal Procedure"); *Baylson v. Disciplinary Bd. of Sup. Ct. of Pa.*, 975 F.2d 102, 108 (3d Cir. 1992) (holding that local rule was invalid as inconsistent with a Federal Rule of Criminal Procedure).

The Orders cannot be categorically justified under the traditional equitable considerations, either. As explained below, the habeas petitions to which the Orders apply are, if anything, *unlikely* to succeed on the merits in view of the interlocking jurisdictional limitations on district courts' consideration of and ability to grant relief in immigration matters. Even if unalleged hypothetical harm to potential alien habeas petitioners could be considered in this calculus, the habeas petitioners who benefit from the Orders are, if anything, *unlikely* to be irreparably harmed absent preliminary relief. The Supreme Court has held that "[a]lthough removal is a serious burden for many aliens, it is *not* categorically irreparable." *Nken*, 556 U.S. at 435 (emphasis added). Instead, the alien petitioner must establish harm in his or her individual case. By allowing the hypothetical potential of removal to create an automatic entitlement to an injunction, the Orders either ignore the considerations *Nken* prescribed or evaluate them in a way *Nken* prohibits by treating removal as "categorically irreparable." *Id.* Meanwhile, the harms the Amended Standing Order *does* cite, "frustrating hearings" and "scheduling difficulties," are not harms (let alone irreparable harms) to the *parties* at all. They reflect interests of the *courts*. "Parties' procedural rights cannot be sacrificed in the interest of moving busy dockets." *Brown*, 960 F.2d at 1008 n.7.

*Second*, the Orders are impermissible, whether they are understood as directing entry of a TRO, a preliminary injunction, or some other novel form of equitable interim relief. To the extent they direct the entry of a TRO or a preliminary injunction, the Orders skip past key requirements of the Federal Rules. And to the extent they purport to direct entry of some other kind of relief, the Orders exceed courts' authority under the All Writs Act and principles of equity.

*TRO*. To the extent the Orders are understood as directing entry of a TRO, they fail to meet the procedural and substantive requirements in Federal Rule of Civil Procedure 65. TROs that— as the Orders direct—issue without pre-order notice to the opposing party may be issued only upon

(1) the court's receipt of specific facts in an affidavit or verified complaint that clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and (2) certification in writing by the movant's attorney of any efforts made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b)(1). An *ex parte* TRO must also state the date and hour it was issued, describe the injury and state why it is irreparable, and state why the order was issued without notice. *Id.* R. 65(b)(2).

The Orders purport to direct issuance of *ex parte* TROs without meeting any of those requirements. They do not require any specific showing of immediate and irreparable harm, let alone set out in an affidavit or verified complaint; do not require a written certification about efforts to provide pre-order notice and why notice should not be required; and do not provide for any description by the court of the injury or reasons for issuing it without notice. The Orders also do not satisfy the requirement of a description by the court of the immediate and irreparable injury the movant would experience without the order, or the requirement of reasons for issuing the order without notice. Nor can the Orders constitute a case-specific finding that an irreparable injury is imminent and notice is not required. The Orders are therefore facially unlawful.

***Preliminary Injunction.*** If the Orders were instead understood to direct entry of a preliminary injunction, they would likewise be unlawful. Preliminary injunctions may be issued "only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). They must be supported by a statement of reasons for the injunction. *Id.* R. 65(d)(1). Preliminary injunctions bind only the parties to the case, together with the parties' officers, agents, servants, employees, attorneys, and others who are in active concert or participation with them—but only if those persons receive actual notice of the preliminary injunction by personal service or otherwise. *Id.* R. 65(d)(2). And preliminary injunctions must require movants to provide security. *See id.* R. 65(c).

To the extent the Orders purport to issue a preliminary injunction, they fail to meet any of those requirements. They do not provide for pre-injunction notice to the adverse party; do not provide for a statement of reasons for the injunction before it issues; purport to bind everyone in the government as soon as the Clerk has emailed the underlying documents to two individuals in the U.S. Attorney's Office; and do not provide for security. Again, this means the Orders are facially impermissible because they direct entry of an order that fails to meet the requirements of a preliminary injunction.

***Something Else.*** The Orders would suffer from two more problems if they purported to be some novel other form of equitable relief. For one, the Orders cite the All Writs Act as their source of authority. But the All Writs Act does not empower courts to circumvent mandatory requirements for issuing relief. A court "cannot use that Act to circumvent statutory requirements or otherwise binding procedural rules." *Shoop v. Twyford*, 596 U.S. 811, 820 (2022). Otherwise, no rule would really be binding; courts could evade the rules' requirements simply by relying on the All Writs Act to enter a similar but slightly less demanding remedy.

For another, courts lack authority to create novel forms of equitable relief, whether under the All Writs Act or otherwise. *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). As the Supreme Court recently reiterated, the 1789 Judiciary Act's grant of "jurisdiction over 'all suits . . . in equity' . . . encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *CASA*, 2025 WL 1773631, at *6. Historical equity practice thus governs both "[t]he substantive prerequisites for obtaining an equitable remedy" and "the general availability of injunctive relief." *Grupo*, 527 U.S. at 318-19. Historical equity practice does not permit the granting of automatic injunctive relief; just the opposite, it requires meeting the four-factor test before injunctive relief can issue.

15

For all of these reasons, the Orders—however conceptualized—violate substantive and procedural requirements under federal law and the Federal Rules of Civil Procedure. They are thus facially invalid.

## B.    The Orders Exceed District Courts' Authority in Immigration Matters.

Separately, the Orders violate several limits Congress has placed on the district courts' ability to intervene in immigration matters.

*First*, the Orders impermissibly direct entry of relief to an entire group of aliens. As explained above, Congress has stripped lower federal courts of "jurisdiction or authority to enjoin or restrain the operation of" many provisions of the INA, including removal proceedings and procedures for removal of aliens ordered removed. 8 U.S.C. § 1252(f)(1); *see, e.g.*, 8 U.S.C. §§ 1229a (removal proceedings), 1231 (removal). The Orders purport to bar entry and execution of removal orders for *all* aliens detained in Maryland who file a habeas petition in the District of Maryland. Therefore, they purport to enjoin and restrain provisions covered by the INA in a non-individualized, quasi-class manner. The Orders thus exceed the Court's jurisdiction and authority as a facial matter. *See Aleman Gonzalez*, 596 U.S. at 550-51.

*Second*, the Orders impermissibly exercise jurisdiction in cases where the court lacks jurisdiction. Congress stripped federal courts of jurisdiction to hear "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien" under the INA, other than in a petition for review under § 1252, "notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28." 8 U.S.C. § 1252(g). Section 1252(g) thus deprives district courts of jurisdiction to issue orders that stay the execution of removal orders and to hear cases challenging the execution of removal orders. *Reno*, 525 U.S. at 492; *Miranda*, 34 F.4th at 355; *Mapoy*, 185 F.3d at 228-29. But under the Orders, the Court purports to exercise

16

judicial power over all habeas petitions filed under 28 U.S.C. § 2241 for aliens located in Maryland at the time of filing. The Orders thus exceed the Court's authority in every case that arises from a decision to "commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). In each of those cases, the Court lacks jurisdiction, so it cannot lawfully enter the Orders.

*Third*, similarly, the Orders purport to exercise jurisdiction in cases in which 8 U.S.C. § 1252(b)(9) deprives the district courts of jurisdiction. Section 1252(b)(9)—known as the "zipper clause"—channels all review of "any action taken or proceeding brought to remove an alien from the United States" under subchapter II of the INA into a petition for review of a final order of removal, filed in a court of appeals. It expressly strips district courts of jurisdiction to review final orders of removal, or otherwise review "such questions of law or fact," including "by habeas corpus under section 2241 of Title 28" or under the All Writs Act. *See Reno*, 525 U.S. at 483; *Miranda*, 34 F.4th at 355. The Orders are unlawful as applied to the many cases in which Section 1252(b)(9) bars the court from entertaining the alien's habeas petition.

*Fourth*, the Orders are unlawful in cases challenging many discretionary judgments regarding an alien, including regarding the alien's detention or release. Title 8 U.S.C. § 1226(e) provides that "discretionary judgment[s]" regarding release and detention of aliens "shall not be subject to review." The statute thus "precludes an alien from challenging a discretionary judgment by the Attorney General or a decision that the Attorney General has made regarding his detention or release." *Jennings v. Rodriguez*, 583 U.S. 281, 295 (2018) (cleaned up); *see also Miranda*, 34 F.4th at 353 (holding that in § 1226(e), "Congress sought to forbid review of the Attorney General's actions and decisions in individual proceedings"). The Orders are thus unlawful in any case in which a habeas petitioner challenges such a discretionary judgment.

*Fifth*, the Orders are unlawful in cases where an alien in expedited removal seeks review beyond the grounds on which Congress permitted those aliens to seek review via habeas petition. In 8 U.S.C. § 1252(e)(2), Congress "limit[ed] the review that an alien in expedited removal may obtain via a petition for a writ of habeas corpus" to just three narrow grounds. *Thuraissigiam*, 591 U.S. at 111. Yet the Orders grant relief regardless of whether a petitioner is seeking "determinations of" any of those three grounds. *See* 8 U.S.C. § 1252(e)(2). The Court cannot exercise jurisdiction in expedited-removal cases pressing any other arguments, so the Orders are unlawful in such cases.

In sum, the Orders issue without any consideration of whether there is even a colorable basis for the Court to assert jurisdiction—and in many or all cases in which the Orders apply, Congress has chosen to deprive the district courts of authority. The Orders thus defy Congress's judgment about the proper role of district courts in immigration matters, and the government is likely to succeed in showing that the Orders are invalid on this basis too.

### C.    The Orders Violate Procedural Requirements for Local Rules.

The Orders are procedurally invalid for an independent reason: they function as a local rule but did not go through the mandatory procedures for promulgating a local rule. "If the *purpose* of . . . local procedures, practices or policies is to control practice in a district court . . . , such procedures effectively are local rules and must be created in accordance with Rule 83." *Brown*, 960 F.2d at 1008 n.8; *accord Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 108 (6th Cir. 1995). Although the Orders are not styled as local rules, "it matters not at all what" the parties "choose to call" them. *Baylson*, 975 F.2d at 111. In function and effect, the Orders are local rules because they govern "the conduct of [the court's] business" by directing the entry of an injunction in all habeas petitions filed under § 2241 on behalf of alien detainees located in the District of Maryland, regardless of the judge assigned to the case. 28 U.S.C. § 2071(a).

Local rules may be adopted only via notice-and-comment rulemaking. *See* 28 U.S.C. § 2071(b); Fed. R. Civ. P. 83(a)(1); *Hollingsworth v. Perry*, 558 U.S. 183, 193-94 (2010). The Orders have survived no such process, and they have not been submitted to a rules advisory committee, the judicial council of the Fourth Circuit, or the Judicial Conference. *See* 28 U.S.C. §§ 2071(c), 2077. They therefore violate § 2071. *See Baylson v. Disciplinary Bd. of Sup. Ct. of Pa.*, 764 F. Supp. 328, 336 (E.D. Pa. 1991) (holding that amendments to local rules were invalid because district courts "did not utilize advisory committees" or go through notice-and-comment), *aff'd*, 975 F.2d 102 (3d Cir. 1992); *Hollingsworth*, 558 U.S. at 193-94.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Plaintiffs have already suffered irreparable harm, as the Orders intrude on core Executive enforcement prerogatives. They will continue to suffer irreparable harm absent a preliminary injunction. "[T]he Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed" their "authority." *CASA*, 2025 WL 1773631, at *15 (collecting cases). "[A]n injunction that prohibits the enforcement of a statute enacted by a people's elected representatives"—as does every automatic injunction authorized by the Orders—"constitutes an irreparable injury[.]" *USA Farm Labor, Inc. v. Su*, 694 F. Supp. 3d 693, 715 (W.D.N.C. 2023), *aff'd sub nom. USA Farm Labor, Inc. v. Micone*, No. 23-2108, 2025 WL 586339 (4th Cir. Feb. 24, 2025); *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (state's "inability to enforce its duly enacted [redistricting] plans clearly inflicts irreparable harm on" it). And "[a]s the Fourth Circuit has recognized," concern about interfering with Executive authority "weighs particularly heavily with respect to the enforcement of immigration laws, which implicates the government's 'sovereign prerogative.'" *Su*, 694 F. Supp. 3d at 715 (quoting *Miranda*, 34 F.4th at 365-66); *see also Arizona v. United States*, 567 U.S. 387, 394-96 (2012); *Rusu v. INS*, 296 F.3d 316, 321 (4th Cir. 2002). Indeed, "[f]or more than a century," the Supreme Court "has recognized that the admission and

19

exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump v. Hawaii*, 585 U.S. 667, 702 (2018); *see also INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (granting stay of order that required INS to engage in certain immigration procedures, as "an improper intrusion" upon a "coordinate branch").

The Executive Branch takes a preeminent role in immigration enforcement largely because it implicates foreign-policy concerns. *See Harisiades v. Shaughnessy,* 342 U.S. 580, 588-89 (1952). "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications . . . defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Hawaii*, 585 U.S. at 702. Removal to a foreign country necessarily involves relations with that foreign power. An automatic injunction that undermines the Executive Branch's constitutional and statutory authority over immigration thus constitutes "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *see also, e.g.*, *United States v. Texas*, 599 U.S. 670, 679 (2023); *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988); *Haig v. Agee*, 453 U.S. 280, 292 (1981). By disregarding congressional bars on judicial review of immigration decision, the Orders encroach on the Legislative Branch's prerogatives as well. *See Hawaii*, 585 U.S. at 702.

Even more fundamentally, every unlawful order entered by a district court robs the Executive Branch of time to enforce its policies. The Executive cannot get that time back. Moreover, because the President is "a representative of the people" and holds "the mandate of the people to exercise his executive power," the Orders also diminish the votes of the citizens who elected him. *Myers v. United States*, 272 U.S. 52, 123 (1926).

A preliminary injunction is needed because other methods of curbing the Orders' effects are likely insufficient to prevent the Orders' irreparable harm to the government. Even if the government challenged the Orders on appeal in individual cases, they could still be entered in other cases. And appeals of the Orders' entry in individual cases would face threshold barriers. Appellate jurisdiction would be one potential barrier. *See* 28 U.S.C. § 1292(b); *see also, e.g.*, *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) ("Courts of Appeals generally lack appellate jurisdiction over appeals from TROs."). So would mootness, as the Orders may expire before an appeal can be resolved. *See, e.g.*, *WRAL-TV v. News & Observer Pub. Co.*, 19 F.4th 385, 394 (4th Cir. 2021) (dismissing appeal as moot when parties sought review of district court "orders [that] are no longer in effect"). And courts have at times rebuffed efforts to facially challenge local rules in mandamus petitions. *Sheldon Whitehouse*, 53 F.3d at 1353 (recounting that court dismissed U.S. Attorney's attempt to challenge rule via mandamus petition). Thus, the best and most effective (as well as the most judicially economical) method of preventing irreparable harm is through a preliminary injunction against the Orders as a facial matter. *See id.*

## III.    The Equities and the Public Interest Favor a Preliminary Injunction.

The equities and public interest factors also support the government here. "[C]ourts must be mindful that the Government's role as the respondent in every removal proceeding does not make the public interest in each individual one negligible[.]" *Nken*, 556 U.S. at 435. Indeed, the Fourth Circuit recently emphasized the public interest in efficient removal procedures. In *Miranda*, the Court held that "the equities and public interest [did] not weigh in favor" of a preliminary injunction that, among other things, "effectively require[d] the government to bear the burden to prove that an alien in a removal proceeding is not a flight risk nor a danger to the community, even when the government may know nothing about the alien." 34 F.4th at 365-66.

On the other side of the equation, preliminarily enjoining the Orders would not irreparably harm Defendants. Defendants' stated interests in issuing automatic injunctions are (1) to avoid "scheduling difficulties" occasioned by habeas petitions filed "after normal court hours and on weekends and holidays," (2) to avoid "hurried and frustrating hearings," (3) "to preserve existing conditions and the *potential* jurisdiction of this Court over pending matters," and (4) being "able to evaluate [aliens'] respective claims for relief based on their in-court testimony that may be offered." Ex. C at 1 (emphasis added). None of those interests gives rise to legitimate cognizable harm, let alone irreparable harm. To reiterate, "busy dockets" do not justify "sacrific[ing]" parties' "procedural rights." *Brown*, 960 F.2d at 1008 n.7. And processing applications outside "normal court hours" is simply part of working in the judicial system, whether on immigration cases or otherwise. "By law, federal courts are open and can receive and review applications for relief 24/7/365." *CASA*, 2025 WL 1773631, at *23 (Kavanaugh, J., concurring); *see* 28 U.S.C. § 452 ("All courts of the United States shall be deemed always open for the purpose of filing proper papers . . . and making motions and orders"). The concerns Defendants identified in the Orders simply do not present unique circumstances—much less circumstances justifying a new form of automatic equitable relief.

Moreover, Defendants are not aliens subject to removal, and they do not represent the interests of such aliens in being "able to participate in the adjudication of their requests for habeas relief." Ex. C at 1. But even if they did, those interests would not favor a preliminary injunction. As the Supreme Court has instructed, removal is "*not* categorically irreparable" harm. *Nken*, 556 U.S. at 435 (emphasis added). Even more fundamentally, the Supreme Court has rejected the notion that novel equitable relief could somehow become appropriate even if it were "the only practical way" to protect a group's interests. *CASA*, 2025 WL 1773631, at *12. In sum, the equities

and public interest do not favor overriding settled limitations on the scope of equitable relief. The Orders' severe intrusion on core Executive authority demands redress.

## CONCLUSION

The Court should enter a preliminary injunction prohibiting the Defendants as well as their successors, agents, and employees from implementing or effectuating the Standing Order and Amended Standing Order going forward.

Dated: July 3, 2025                          Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General
                                             Civil Division

                                             YAAKOV M. ROTH
                                             Principal Deputy Assistant Attorney General
                                             Civil Division

                                             DREW C. ENSIGN
                                             Deputy Assistant Attorney General
                                             Civil Division

                                             SARAH WELCH
                                             Counsel to the Assistant Attorney General
                                             Civil Division

                                             BRENDAN MOORE (Il. Bar No. 6293415)
                                             ZACHARY CARDIN (Md. Bar No. 21091)
                                             Trial Attorneys
                                             Office of Immigration Litigation

                                             /s/ *Elizabeth Hedges*
                                             ELIZABETH HEDGES
                                             Counsel to the Assistant Attorney General
                                             Civil Division
                                             950 Pennsylvania Avenue NW
                                             Washington, DC 20530
                                             Phone: (202) 616-0929
                                             Fax: (202) 307-8781
                                             Elizabeth.T.Hedges@usdoj.gov

                                             *Attorneys for Plaintiffs*