**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA et al.,

    *Plaintiffs*,

    v.         Case No. 1:25-cv-2029

CHIEF JUDGE GEORGE L. RUSSELL III,
in his official capacity et al.,

    *Defendants*.

**MEMORANDUM OF LAW SUPPORTING DEFENDANTS' MOTION TO DISMISS &
OPPOSING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................................ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ............................................................................................................ 3

    A.    Factual Background ............................................................................... 3

    B.    Procedural Background.......................................................................... 8

SUMMARY OF ARGUMENT ..................................................................................... 10

ARGUMENT .............................................................................................................. 14

I.     The Case Is Nonjusticiable ................................................................................. 14

    A.    This Facial Attack Is Not a Proper Vehicle to Challenge the Standing Orders....................................................................................................... 14

    B.    The Executive Lacks a Cause of Action to Bring This Suit ................................. 19

    C.    Defendants Are Immune From Suit .................................... 25

II.    Even If This Controversy Is Justiciable, The Executive's Claims Fail, As The Standing Orders Are Valid Exercises Of Federal Courts' Inherent Authority To Afford Themselves Time To Determine Their Own Jurisdiction ..................................... 28

III.   The Remaining Preliminary-Injunction Factors Strongly Counsel Against Relief............................................................................................................... 37

CONCLUSION............................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*A.A.R.P. v. Trump*,
  137 F.4th 391 (5th Cir. 2025) ............................................................................ 2

*A.A.R.P. v. Trump*,
  145 S.Ct. 1364 (2025) ............................................................... 6, 29, 31, 37

*Abrego Garcia v. Noem*,
  2025 WL 1021113 (4th Cir. Apr. 7, 2024) ................................. 2, 8, 40

*Akinro v. Blake*,
  2007 WL 3020186 (D. Md. June 8, 2007) ....................................... 28

*Alam v. Nielsen*,
  312 F.Supp.3d 574 (S.D. Tex. 2018) ................................................ 28

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ........................................................................ 23

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
  326 F.3d 505 (4th Cir. 2003) ........................................................... 15

*AmSouth Bank v. Miss. Chem. Corp.*,
  465 F.Supp.2d 1206 (D.N.M. 2006) ................................................ 26

*Appalachian Voices v. U.S. Dep't of the Interior*,
  78 F.4th 71 (4th Cir. 2023) ............................................................. 34

*Arizona v. United States*,
  567 U.S. 387 (2012) ........................................................................ 22

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ........................................................................ 22

*Atchison v. U.S. Dist. Cts.*,
  190 F.Supp.3d 78 (D.D.C. 2019) ..................................................... 26

*Belbacha v. Bush*,
  520 F.3d 452 (D.C. Cir. 2008) ......................................................... 28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................ 14

*Berger v. United States*,
  295 U.S. 78 (1935) .......................................................................... 39

*Bolin v. Story,*
225 F.3d 1234 (11th Cir. 2000) ........................................................................... 28

*Bowsher v. Synar,*
478 U.S. 714 (1986) ............................................................................................. 24

*Clinton v. City of New York,*
524 U.S. 417 (1998) ............................................................................................. 15

*Cordon-Salguero v. Noem,*
No. 1:25-cv-1626 (D. Md. filed May 20, 2025) ...................................................... 7

*Cruz-Medina v. Noem,*
No. 1:25-cv-1768 (D. Md. filed June 3, 2025) ........................................................ 7

*Davis v. Passman,*
442 U.S. 228 (1979) ....................................................................................... 19, 21

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.,*
108 F.4th 194 (3d Cir. 2024) ............................................................................... 39

*Delemos v. Gonzales,*
2006 WL 2567991 (S.D. Ga. Sept. 5, 2006) ........................................................ 21

*Dellinger v. Bessent,*
766 F.Supp.3d 57 (D.D.C. 2025) ......................................................................... 32

*Dellinger v. Bessent,*
2025 WL 561425 (D.C. Cir. Feb. 12, 2025) ......................................................... 32

*Denver & Rio Grande R.R. Co. v. United States,*
241 F. 614 (8th Cir. 1917) ................................................................................... 19

*Dep't of Com. v. U.S. House of Representatives,*
525 U.S. 316 (1999) ............................................................................................. 23

*Dugan v. Rank,*
372 U.S. 609 (1963) ............................................................................................. 26

*Fernandez v. Keisler,*
502 F.3d 337 (4th Cir. 2007) ............................................................................... 17

*Flores v. Bondi,*
No. 1:25-cv-1950 (D. Md. filed June 17, 2025) ..................................................... 8

*Forrester v. White,*
484 U.S. 219 (1988) ............................................................................................. 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)................................................................................................ 23

*FTC v. Dean Foods Co.*,
  384 U.S. 597 (1966)................................................................................................ 31

*Gonzalez-Pablo v. Mason*,
  2025 WL 1648366 (S.D. W. Va. June 10, 2025)................................................ 29

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004)................................................................................................ 34

*Harris Cnty. v. MERSCORP Inc.*,
  791 F.3d 545 (5th Cir. 2015).................................................................................. 22

*Heckman v. United States*,
  224 U.S. 413 (1912)................................................................................................ 22

*Hernandez Escalante v. Noem*,
  No. 1:25-cv-1799 (D. Md. filed June 6, 2025) .................................................... 8

*Hernandez v. Baker*,
  No. 1:25-cv-1663 (D. Md. filed June 24, 2025) .................................................. 7

*In re Debs*,
  158 U.S. 564 (1895)................................................................................................ 22

*In re McDonald*,
  489 U.S. 180 (1989).......................................................................................... 31, 39

*In re Morrisey*,
  305 F.3d 211 (4th Cir. 2002).................................................................................. 19

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951)................................................................................................ 39

*Kanawha Valley Labor Council v. Am. Fed'n of Labor & Cong. of Indus. Orgs.*,
  667 F.2d 436 (4th Cir. 1981).................................................................................. 22

*King v. United States*,
  301 F.3d 1270 (10th Cir. 2002).............................................................................. 21

*Lancaster v. Sec'y of Navy*,
  109 F.4th 283 (4th Cir. 2024)................................................................................ 15

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936)................................................................................................ 34

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ................................................................. 26

*M.S.P.C. v. U.S. Customs & Border Prot.*,
  60 F.Supp.3d 1156 (D.N.M. 2014) ....................................... 34

*McCargo v. Hedrick*,
  545 F.2d 393 (4th Cir. 1976) ................................................. 15

*Mistretta v. United States*,
  488 U.S. 361 (1989) ............................................................... 24

*Nat'l Council of Nonprofits v. OMB*,
  763 F.Supp.3d 13 (D.D.C. 2025) ........................................... 29

*Newsome v. Merz*,
  17 F.App'x 343 (6th Cir. 2001) .............................................. 28

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................... 12, 31

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*,
  389 F.3d 973 (10th Cir. 2004) ................................................ 38

*Offutt v. United States*,
  348 U.S. 11 (1954) ................................................................. 39

*OPM v. AFGE*,
  473 U.S. 1301 (1985) ............................................................. 33

*Perez-de Ramos v. Noem*,
  No. 1:25-cv-1673 (D. Md. filed July 1, 2025) ......................... 7

*Pierson v. Ray*,
  386 U.S. 547 (1967) ............................................................... 27

*Printz v. United States*,
  521 U.S. 98 (1997) ................................................................. 23

*Pulliam v. Allen*,
  466 U.S. 522 (1984) ..................................................... 27, 28, 37

*Raines v. Byrd*,
  521 U.S. 811 (1997) ......................................................... 11, 15

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*,
  945 F.2d 765 (4th Cir. 1991) ................................................. 14

*Robinson v. U.S. Dep't of Educ.*,
    917 F.3d 799 (4th Cir. 2019) ................................................................ 26

*S.L.V. v. Rosen*,
    2021 WL 243442 (W.D. Tex. Jan. 25, 2021) ......................................... 29

*Sanitary Dist. of Chi. v. United States*,
    226 U.S. 405 (1925) ............................................................................... 22

*Smith v. Scalia*,
    44 F.Supp.3d 28 (D.D.C. 2014) ............................................................ 26

*Stern v. Supreme Jud. Ct. for Mass.*,
    16 F.Supp.2d 88 (D. Mass. 1998) .................................................... 17, 36

*Stern v. U.S. Dist. Ct. for Dist. of Mass.*,
    214 F.3d 4 (1st Cir. 2000) ..................................................................... 18

*Strickland v. United States*,
    32 F.4th 311 (4th Cir. 2022) ............................................................ 22, 26

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................... 18

*T M Sys., Inc. v. United States*,
    473 F.Supp. 481 (D. Conn. 1979) ......................................................... 21

*Talebinejad v. Baker*,
    No. 1:25-cv-2024 (D. Md. filed June 24, 2025) ..................................... 7

*Texas v. Florida*,
    306 U.S. 398 (1939) ............................................................................... 19

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979) ............................................................................... 19

*Trump v. J.G.G.*,
    145 S.Ct. 1003 (2025) ................................................................... *passim*

*Trump v. United States*,
    603 U.S. 593 (2024) ............................................................................... 27

*U.S. Dep't of Homeland Sec. v. Thuraissigiam*,
    591 U.S. 103 (2020) ............................................................................... 36

*United States v. Agurs*,
    427 U.S. 97 (1976) ................................................................................. 39

*United States v. Am. Bell Tel. Co.*,
    128 U.S. 315 (1888) .................................................................................. 22

*United States v. California*,
    655 F.2d 914 (9th Cir. 1980) ................................................................... 21

*United States v. Denedo*,
    556 U.S. 904 (2009) .................................................................................. 21

*United States v. Lahey Clinic Hosp., Inc.*,
    399 F.3d 1 (1st Cir. 2005) ....................................................................... 21

*United States v. Mitchell*,
    463 U.S. 206 (1983) .................................................................................. 26

*United States v. Morgan*,
    313 U.S. 409 (1941) .................................................................................. 25

*United States v. Raines*,
    362 U.S. 17 (1960) .................................................................................... 20

*United States v. Ruiz*,
    536 U.S. 622 (2002) .................................................................................. 34

*United States v. Salerno*,
    481 U.S. 739 (1987) .................................................................................. 35

*United States v. Shipp*,
    203 U.S. 563 (1906) .................................................................................. 28

*United States v. Texas*,
    144 S.Ct. 797 (2024) ........................................................................ *passim*

*United States v. Windsor*,
    570 U.S. 744 (2013) .................................................................................. 24

*United States v. Zingsheim*,
    384 F.3d 867 (7th Cir. 2004) ................................................... 11, 16, 19

*Vijender v. Wolf*,
    2020 WL 1935556 (D.D.C. Apr. 22, 2020) .......................................... 29

*Vitkus v. Blinken*,
    79 F.4th 352 (4th Cir. 2023) ................................................................... 40

*Whitehouse v. U.S. Dist. Ct. for the Dist. of R.I.*,
    53 F.3d 1349 (1st Cir. 1995) ................................................................... 17

*Williams v. United States*,
   50 F.3d 299 (4th Cir. 1995).................................................................. 26

*Winter v. NRDC*,
   555 U.S. 7 (2008).................................................................. 14, 37

*Yakus v. United States*,
   321 U.S. 414 (1944).................................................................. 38

*Zadvydas v. Davis*,
   533 U.S. 678 (2001).................................................................. 36

**Statutes**

5 U.S.C. §701(b)(1).................................................................. 26

8 U.S.C. §1101 *et seq.*.................................................................. 3

8 U.S.C. §1252(a)(5).................................................................. 4

8 U.S.C. §1252(e)(2).................................................................. 36

28 U.S.C. §1651.................................................................. 21, 28

28 U.S.C. §2071(c)(1).................................................................. 9, 11, 16, 36

28 U.S.C. §2071(e).................................................................. 13, 36, 37

28 U.S.C. §2106.................................................................. 15

28 U.S.C. §§2201-2202.................................................................. 21

28 U.S.C. §452.................................................................. 2

**Rules**

1st Cir. L. R. 18.0.................................................................. 4, 36

6th Cir. L. R. 18.................................................................. 5

Fed. R. Civ. P. 4(i)(1)-(2).................................................................. 25

Fed. R. Civ. P. 65(b)(2).................................................................. 32

**Other Authorities**

9th Cir. Gen. Ord. 6.4, https://perma.cc/RDA5-QNNC.................................................................. 4

Appellant Br., *Blumenthal v. Trump*, 2019 WL 4857260
(D.C. Cir. Oct. 1, 2019) .................................................................. 24

Appellee Br., *Short v. Comm'r of Soc. Sec.*, 2013 WL 2470382
(6th Cir. May 31, 2013) ................................................................. 20

Appellees' Initial Br., *Coal River Energy, LLC v. Sec'y of the Interior*,
2013 WL 6115705 (D.C. Cir. Nov. 20, 2013) .................................... 20

Rachel Bayefsky, *Administrative Stays: Power and Procedure*,
97 Notre Dame L. Rev. 1941 (2022) .................................... 5, 29, 30, 31

Br. for U.S. as Amicus Curiae, *FD Credit Opportunities Corp.
v. Saba Cap. Master Fund, Ltd.*, No. 24-345 (U.S. May 22, 2025) ........... 22

Br. for U.S., *Sandoz Inc. v. Amgen Inc.*, 2017 WL 727753 (U.S. Feb. 17, 2017) .......... 22

Emergency Mot. for Stay Pending Appeal, *Dellinger v. Bessent*, No. 25-505
(D.C. Cir. Feb. 11, 2025) ............................................................... 32

Fed. Appellants' Opening Br., *League of Conservation Voters v. Trump*,
2019 WL 5849891 (9th Cir. Nov. 7, 2019) ........................................ 23

John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* (1905) ........... 20

Letter from Honorable Judge Jon O. Newman to David McConnell, Director,
Off. of Immigr. Litig., U.S. Dep't of Just. (Mar. 16, 2009), *attached to*
Decl. of Brandon M. Waterman, *Rone v. Shanahan*, No. 16-1541
(2d Cir. Aug. 19, 2016) ................................................................... 5

Ord., *Ghamelian v. Baker*, No. 1:25-cv-2106 (D. Md. July 1, 2025) ............. 7

Reply Br., *Clinton v. City of New York*, 1998 WL 181947 (U.S. Apr. 13, 1998) ......... 21

Reply in Supp. of Emergency Mot. for a Stay Pending Appeal,
*Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 12, 2025) ................. 32

Resp. to Plaintiffs' Mot. for Additional Relief, *Abrego Garcia v. Noem*,
No. 8:25-cv-951 (D. Md. Apr. 13, 2025) ............................................. 1

Standing Ord. 19-01 (4th Cir. Oct. 21, 2019),
https://perma.cc/9Q4F-J4SL ............................................................ 4

Standing Ord. Regarding Immigr. Cases (3d Cir. Aug. 15, 2015),
https://perma.cc/U68M-XGXF ........................................................... 4

U.S. Mot. to Dismiss, *Okla. Dep't of Rehab. Servs. v. United States*,
No. 18-cv-1197 (W.D. Okla. July 30, 2019) ........................................ 22

U.S. Resp. & Reply Br., *Alaska v. Dep't of Educ.*, 2024 WL 3730386
(10th Cir. July 31, 2024) ........................................................................... 39

Wright & Miller, *Fed. Prac. & Proc.* (3d ed. 2025) ..................................................... 39

Wright & Miller, *Fed. Prac. & Proc. Juris.* (4th ed. 2025) ......................................... 21

## INTRODUCTION

This unprecedented lawsuit is fundamentally incompatible with the separation of powers. It has already profoundly disrupted the operation of an entire judicial district and necessitated the intervention of the Fourth Circuit and the assignment of an out-of-district judge. If allowed to proceed, the tensions between the branches produced by such a suit would only escalate, with executive depositions of judicial officers (and vice-versa) and cross-examinations exploring judicial motivations and executive necessities in open court. And if this suit succeeds, it will not be the last—and the next suit could name the Fourth Circuit and cause greater disruption still. But this suit is unprecedented for good reason: It is neither justiciable nor meritorious.

The Executive's suit is premised on the truism that judges, "[l]ike other government officials, … sometimes violate the law." Dkt.14 ("PI.Mot.") at 1. That is fair enough—and it is why we allow both appeals and challenges to judicial rules in individual cases and controversies. But it is equally true that immigration officers sometimes violate the law. And when they do, the consequences can be stark—and potentially irreversible, by the Executive's own admission. *See* Resp. to Plaintiffs' Mot. for Additional Relief, *Abrego Garcia v. Noem*, No. 8:25-cv-951 (D. Md. Apr. 13, 2025), Dkt.65. It is little surprise, then, that numerous courts around the country, including the Fourth Circuit, enter automatic temporary stays as a matter of course for a short period when an alien seeks emergency relief from an impending removal. That brief interval enables a court to ensure that it does not lose all chance of granting meaningful relief before it can make even a preliminary assessment of whether it has a basis to intervene.

Those routine, brief pauses do not reflect a "consideration of the merits," but rather allow the court the brief interval necessary to consider the merits. *United States v. Texas*, 144 S.Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to vacate stay). In the immigration context in particular, they reflect the commonsense judgment that "the relative consequences" "of

erroneously" removing an alien are far "worse than those of erroneously" staying removal for a brief time to ensure that a court can give the matter at least a preliminary look before it is too late to do so. *Id.* at 798-99. They also reflect the reality that, despite being open as a matter of law at all hours, 28 U.S.C. §452, a federal court "is … not a Denny's," *A.A.R.P. v. Trump*, 137 F.4th 391, 394 (5th Cir. 2025) (Ho, J., concurring); judges need some modicum of time and adverse presentation to properly assess their jurisdiction and make an informed decision, while also giving aliens a reasonable opportunity to request emergency relief.

That explains why default temporary stays in immigration cases seeking emergency relief have long been the law in at least five circuits, including this one. And it is why, as the locus of immigration litigation has shifted to district courts in the wake of the Supreme Court's recent holding that "[c]hallenges to removal under the" Alien Enemies Act "must be brought in habeas," *Trump v. J.G.G.*, 145 S.Ct. 1003, 1005 (2025) (per curiam), the United States District Court for the District of Maryland recently adopted a similar, albeit more modest, approach. The Court's Standing Order 2025-01 (along with Amended Standing Order 2025-01) permits the entry of a default stay that lasts only "until 4:00 p.m. on the second business day after" an alien files a habeas petition, "to preserve existing conditions and the potential jurisdiction of this Court … while the Court determines the scope of its authority to grant the requested relief." Far from marking any "extraordinary" interference with executive prerogatives, *contra* PI.Mot.1, that modest effort to preserve the Judiciary's ability to perform *its* constitutionally assigned role reflects "reciprocal respect for the roles of the Executive and the Judiciary." *Abrego Garcia v. Noem*, 2025 WL 1021113, at *8 (4th Cir. Apr. 7, 2024) (Wilkinson, J., concurring). Indeed, the Court's roughly two-business-day default stay is far less of an intrusion on the operations of a coordinate branch than the 14-day stay the Fourth Circuit has imposed for years without objection.

2

The Executive nevertheless responded to this altogether ordinary exercise of the Court's inherent power with a truly extraordinary lawsuit. Instead of challenging the standing orders as applied in an individual case or controversy, the Executive sued the United States District Court for the District of Maryland itself—and every single judge on it, as well as the clerk of court—seeking to enjoin the entry of any such stays going forward. That novel effort finds no support in our historical tradition. One need look no further than the caption to see the obvious separation-of-powers problems with such a suit. A suit denominated Executive v. Congress or vice-versa would be plainly nonjusticiable; Executive v. Judiciary fares no better. The obvious and proper way to address the validity of judicial rules is for the Executive to raise its objections in individual cases, which would not require the recusal of the entire district, the retention of private counsel, or the intervention of the Fourth Circuit. Perhaps for that reason, the Executive fails to identify a cause of action or any waiver of the district court's sovereign immunity or abrogation of judicial immunity, and its suit fares no better on the merits. The whole point of an administrative stay is to give the courts a brief interval to consider the traditional four-factor test for more permanent relief. Thus, faulting an administrative stay for not applying the four-factor test ignores the *raison d'être* for such temporary orders, and ultimately devalues the judicial role and the Great Writ, neither of which can function if judges lack the time to discharge their constitutionally assigned role. This Court should make clear that this lawsuit has no proper place in our constitutional separation of powers, and that the standing orders do no more—or less—than preserve the Judiciary's essential ability to ensure that justice is done to all who seek relief from the courts.

## BACKGROUND

### A.    Factual Background

1. For decades, the Executive channeled most of its immigration enforcement through the administrative scheme created by the Immigration and Nationality Act, 8 U.S.C. §1101 *et seq.*

("INA"), which generally funnels judicial review to the courts of appeals in the first instance by assigning them jurisdiction over petitions for review of final orders from the Board of Immigration Appeals ("BIA").  *See* 8 U.S.C. §1252(a)(5).  Courts of appeals, in turn, have long employed procedures to impose an automatic temporary stay of removal when an alien petitions for judicial review of such an order and requests a stay of removal pending resolution of the petition.  Such procedures give courts a reasonable interval to docket the case and evaluate the stay request without fear that the Executive will take action effectively mooting the stay request.

Some circuits accomplish that end via standing orders.  For instance, the Fourth Circuit directs its clerk to "enter an administrative order staying removal for a period of 14 days" "[u]pon the filing of an initial motion for stay of removal or deportation in an immigration case," "to allow time for responsive filings and to preserve the court's ability to make a considered decision on the motion."  Standing Ord. 19-01 (4th Cir. Oct. 21, 2019), https://perma.cc/9Q4F-J4SL.  The Third Circuit likewise "direct[s]" its clerk "to administratively stay removal" "in immigration matters" "until such time as a motions panel can consider" a "timely filed" "motion for stay of removal." Standing Ord. Regarding Immigr. Cases (3d Cir. Aug. 15, 2015), https://perma.cc/U68M-XGXF. The Ninth Circuit has a similar order under which, "[u]pon the filing of an initial motion or request for stay of removal or deportation, the order of removal or deportation is temporarily stayed until further order of the Court."  9th Cir. Gen. Ord. 6.4, https://perma.cc/RDA5-QNNC.

Other circuits have accomplished the same end via their local rules or arrangements with the Executive.  For example, First Circuit Local Rule 18.0 directs the clerk to "enter an administrative order staying removal for ten business days" upon a "motion for stay of removal," "[i]n order to ensure the orderly presentation of issues … in immigration cases and to preserve the Court's ability to make considered decisions in such cases."    1st Cir. L. R. 18.0,

https://perma.cc/LZV4-BQRF.    Citing "[a]n immediate need," the Sixth Circuit recently announced an amendment to its Circuit Rule 18 to create a similar procedure effective immediately. *See* 6th Cir. L. R. 18, https://perma.cc/SW4J-Q6ZM.  Under the Sixth Circuit's new rule, "[w]hen filing a motion for a stay of removal in immigration proceedings, a petitioner shall include any known information regarding the status and timing of the removal." *Id.*  "Within 24 hours," the Executive must "file … a notice stating whether" it "has scheduled the petitioner's removal and, if so, the earliest date upon which the petitioner will be removed." *Id.*  The court will then "decide … whether to administratively stay the order of removal pending resolution of the motion." *Id.*  The Second Circuit has effectuated a default stay via a longstanding "forbearance agreement" with the Executive under which "no alien who has filed a petition for review and has also filed a motion for a stay of removal will be removed until the Court of Appeals has made a ruling" on the stay motion.  Letter from Honorable Judge Jon O. Newman to David McConnell, Director, Off. of Immigr. Litig., U.S. Dep't of Just. at 2 (Mar. 16, 2009), *attached to* Decl. of Brandon M. Waterman, *Rone v. Shanahan*, No. 16-1541 (2d Cir. Aug. 19, 2016), Dkt.21-3.

Whatever the precise mechanisms, these measures are quintessential administrative stays: "a flexible, short-term tool" that "buys the court time to deliberate" on a request for time-sensitive relief.  *Texas*, 144 S.Ct. at 798-99 (Barrett, J.) (quoting Rachel Bayefsky, *Administrative Stays: Power and Procedure*, 97 Notre Dame L. Rev. 1941, 1942 (2022)).  Rather than "reflect the court's consideration of the merits," administrative stays allow the courts the time necessary to consider the merits, as well as the other stay factors, before a request for relief is overtaken by events.  *Id.*

2.  While district courts had less occasion over the past few decades to confront a significant volume of immigration litigation, that has changed in recent months, as the current Administration has increasingly sought to effectuate removals promptly via statutory schemes beyond the INA.

Most notably, the Executive has made considerable use of the Alien Enemies Act of 1798 ("AEA"), which the Supreme Court recently held requires aliens who wish to challenge their removal to seek judicial review in district court by filing a petition for writ of habeas corpus under 28 U.S.C. §2241. *J.G.G.*, 145 S.Ct. at 1006. As immigration litigation has shifted to district courts, so too has the need for modest measures to assist them in addressing time-sensitive petitions for review— especially since the Executive has frequently sought to execute removals under the AEA on an extraordinarily expeditious basis. *See, e.g.*, *A.A.R.P. v. Trump*, 145 S.Ct. 1364, 1366 (2025) (per curiam) (noting that, mere "hours" after "the District Court denied the detainees' motion for a [TRO] against summary removal under the AEA," many of the detainees "were served notices of AEA removal and told that they would be removed 'tonight or tomorrow'").

A few weeks after *J.G.G.* was decided, the District Court for the District of Maryland issued Standing Order 2025-01, which provides a mechanism to temporarily bar the Executive "from removing … or altering the[] legal status" of alien detainees who file "a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2241" and provide their "full name and A# … to the Court." Standing Ord. 2025-01, https://perma.cc/5MN6-M59G. Once the order is entered on the docket of a particular case, that bar will "remain in effect until 4:00 p.m. on the second business day following the filing of the Petition," unless extended or shortened by the presiding judge. *Id.* at 2. Like the courts of appeals before it, the Court explained that this brief pause is necessary:

> to preserve existing conditions and the potential jurisdiction of this Court over pending matters while the Court determines the scope of its authority to grant the request[ed] relief, to ensure Petitioners are able to participate in the adjudication of their requests for habeas relief, including participation in court proceedings and access to legal counsel for such purpose; to ensure the Court is able to evaluate their respective claims for relief based on their in-court testimony that may be offered; and to ensure the Government has a fulsome opportunity to brief and present arguments in its defense.

*Id.* at 1.

6

A week later, the Court superseded Standing Order 2025-01 with Amended Standing Order 2025-01. The amended order provides additional context about "[t]he recent influx of habeas petitions concerning alien detainees purportedly subject to improper and imminent removal" and the "difficulties" the judges of the Court had been facing in reaching "hurried" decisions based on "elusive" information. Amended Standing Ord. 2025-01 at 1, https://perma.cc/L29A-VNRX. The amended order also requires the clerk of court to serve the standing order and underlying petition on "the Chief and Deputy Chief of the Civil Division of the United States Attorney's Office for the District of Maryland," and stipulates that no stays will take effect until the clerk provides notice "that the documents ha[d] been transmitted." *Id.* at 2.

3. The Executive identifies 12 cases in which (it claims) "the Standing Order or Amended Standing Order has been entered." PI.Mot.9.[1] While the Executive describes those docket-management tools as an "[e]xtraordinary … judicial interference" with its immigration-enforcement prerogatives, PI.Mot.1, the course of proceedings in those cases tells a very different story. In some, the stay lapsed on its own terms after a prompt status conference revealed that removal was not imminent, so it never interfered with executive prerogatives at all. *See, e.g.*, *Cruz-Medina v. Noem*, No. 1:25-cv-1768 (D. Md. filed June 3, 2025); *Talebinejad v. Baker*, No. 1:25-cv-2024 (D. Md. filed June 24, 2025); *Hernandez v. Baker*, No. 1:25-cv-1663 (D. Md. filed June 24, 2025). In one, the stay lapsed when the alien voluntarily dismissed her petition, again causing no interference at all. *See Perez-de Ramos v. Noem*, No. 1:25-cv-1673 (D. Md. filed July 1, 2025). In another, the court extended the stay "without objection from the" Executive. Ord., *Ghamelian v. Baker*, No. 1:25-cv-2106 (D. Md. July 1, 2025), Dkt.5.

---

[1] In fact, neither the standing order nor the amended standing order was entered in one of those cases, *Cordon-Salguero v. Noem*, No. 1:25-cv-1626 (D. Md. filed May 20, 2025).

Even in cases where proceedings have taken slightly longer, moreover, judges have given them utmost priority and advanced them with alacrity.  *See, e.g.*, *Flores v. Bondi*, No. 1:25-cv-1950 (D. Md. filed June 17, 2025) (court denied TRO June 20, but extended the administrative stay; court dismissed the case on July 2, after receiving motion-to-dismiss briefing and holding a hearing).  Indeed, what the Executive describes as the most "extraordinary example," PI.Mot.9 (citing *Hernandez Escalante v. Noem*, No. 1:25-cv-1799 (D. Md. filed June 6, 2025)), featured a highly expedited procedure in which the Executive promptly prevailed.  The petitioner there filed a petition on a Friday, *Escalante* Dkt.1, and the Executive moved to dismiss on Monday, *Escalante* Dkt.4.  The presiding judge held a telephone conference Tuesday morning, during which she concluded that she needed to see adverse briefing to make an informed judgment, so she exercised her power to extend the stay and set a highly expedited briefing schedule:  The petitioner's opposition was due six days later; the Executive's reply was due four days after that; and the judge held a hearing the next business day.  *Escalante* Dkt.9.  Two days later, the judge dissolved the TRO and granted the Executive's motion to dismiss.  *Escalante* Dkt.18.  All told, the entire proceedings lasted only a few days longer than the 14 days the Fourth Circuit's standing order allows in every case.

In short, the judges of this Court are responding to a demanding and nearly unprecedented situation exactly as one would hope:  with conscientious commitment to speedy and equal justice under law, and "reciprocal respect for the roles of the Executive and the Judiciary."  *Abrego Garcia*, 2025 WL 1021113, at *8 (Wilkinson, J., concurring).

### B.    Procedural Background

To the extent the Executive takes issue with this modest exercise of docket management, it has tools at its disposal to press those concerns through traditional means.  It could have challenged application of the standing orders in a particular case (perhaps the one it identified as most

"extraordinary") and invoked the capable-of-repetition-yet-evading-review exception to mootness. Or it could have petitioned "the judicial council of the" Fourth Circuit to "modif[y] or abrogate[]" the standing orders. 28 U.S.C. §2071(c)(1). Instead, the Executive resorted to the extraordinary and essentially unprecedented measure of challenging the original and amended standing orders in a lawsuit that names as defendants each of the judges of this Court, the clerk of court, and the Court itself, necessitating the hiring of private counsel and the designation of an out-of-District judge. Dkt.1 ("Compl."). Equally remarkable, the lawsuit claims that giving the Judiciary roughly *48 hours* to conduct its constitutionally assigned role and evaluate whether some measure of relief from allegedly unlawful government action is appropriate "robs the Executive Branch of … time to put its policies into effect." *Id.* ¶8. The complaint alleges three claims—(1) "Violation of Requirements for Injunctions"; (2) "Violation of Jurisdictional Bars"; and (3) "Violation of Requirements for Local Rules"—and seeks "preliminary and permanent injunctions that prohibit the Defendants … from implementing or effectuating the Standing Order and Amended Standing Order and from enforcing their terms in any case." *Id.*, Prayer for Relief, ¶2. The complaint identifies no law creating a cause of action that allows anyone (the United States or otherwise) to file a suit naming the entire judicial district and seeking such relief.

The Executive promptly followed its complaint with a motion to recuse all the judges of this Court. Dkt.2 at 2. Once the case was reassigned, the Executive moved for a preliminary injunction "prohibiting the Defendants … from implementing or effectuating the Standing Order and Amended Standing Order going forward." PI.Mot.23. The motion argues, quite remarkably, that the 48-hour pauses the standing orders effectuate "diminish the votes of the citizens who elected" the current President. *Id.* at 20. Even more remarkably, it asserts that courts have no

"legitimate" interest in taking steps *either* to determine whether they have "'jurisdiction … over pending matters'" *or* "'to preserve'" the jurisdiction they do have. *Id.* at 22.

## SUMMARY OF ARGUMENT

Facing a rising tide of last-minute immigration petitions resulting from the Executive's recent efforts to promptly execute removals on timelines that leave little room for orderly proceedings, the United States District Court for the District of Maryland borrowed a page from the Fourth Circuit and issued a standing order to ensure that the district and its judges would have a brief interval to docket and resolve habeas petitions seeking immediate relief in the immigration context before the requested relief was overtaken by events. Far from marking any extraordinary departure from historical tradition or judicial norms, that eminently reasonable and responsible step followed a path charted by courts of appeals across the country for years, with the principal difference being that the district court accustomed to emergency actions gave itself two days, rather than two weeks. Yet the Executive now asks this Court to hold that the Executive's prerogative over immigration enforcement is so absolute that allowing the courts even a few days to assess whether there is a basis for further judicial relief amounts to an assault on the separation of powers. With respect, the only assault on the separation of powers here is the Executive's unprecedented lawsuit, naming an entire judicial district as a defendant, severely disrupting the normal operations of the district, and attempting to deprive the Judiciary of a modest interval to discharge their core constitutional responsibility.

**I.** This lawsuit fails at the jurisdictional threshold. The caption itself betrays that this is not a justiciable controversy. Under our system of government, the Executive does not just haul off and sue the Judiciary. Instead, the Executive takes care that the laws are faithfully executed. If a judicial rule or standing order interferes with that faithful execution and is *ultra vires*, there is a tried-and-true avenue for challenging that order in the context of an ordinary and actual case and

controversy. Such a suit does not name the entire judicial district as a defendant or necessitate the retention of private counsel and the assignment of out-of-district jurists. But it does provide a well-trod path for potentially vindicating the Executive's views about the lawfulness of a standing order. What the Executive cannot do, however, is bring a facial challenge seeking "[a] Writ of Erasure" to "blot the standing order[s] from the books." *United States v. Zingsheim*, 384 F.3d 867, 870 (7th Cir. 2004). The federal courts do not resolve inter-branch disputes in the abstract (or at all, if they can help it). A lawsuit captioned Congress v. Executive or vice-versa would be dismissed in a heartbeat. *Cf. Raines v. Byrd*, 521 U.S. 811 (1997). A suit effectively captioned Executive v. Judiciary fares no better. This manufactured suit falls well outside Article III's ambit. Indeed, that is doubly true. Not only is the proper vehicle for this an ordinary case or controversy involving application of the order, but if the Executive has a preference for the exotic, Congress has already provided an alternative: Under 28 U.S.C. §2071(c)(1), the Executive could petition to have the standing orders (to the extent they qualify as rules promulgated pursuant to delegated authority) "modified or abrogated by the judicial council of the relevant circuit."

The threshold difficulties with this lawsuit do not end there. No cause of action authorizes it. As the Executive itself often reminds other litigants, a plaintiff must possess a cause of action to judicially enforce the statutory rights or obligations it seeks to vindicate. Yet the Executive does not purport to identify any law that allows it to sue for the relief it seeks here. The Executive instead invokes only statutes conferring jurisdiction on federal district courts and recognizing courts' equitable authority. But—as the Executive also often reminds other litigants—none of those statutes creates a cause of action as a general matter, and none comes anywhere close to supplying one for this suit in particular. Finally, sovereign immunity bars this suit as to the district court itself, and judicial immunity bars it as to the judges and clerk in their official capacities.

**II.** Even if this suit somehow were justiciable, it would fail on the merits.  The Executive fails to state a claim on which relief can be granted, and thus fails, *a fortiori*, to demonstrate a likelihood of success on the merits for purposes of securing an injunction.  While the Executive strains to portray the standing orders as some novel overreach, in reality, they are just routine exercises of the Article III courts' inherent power to "ensur[e] that [they] can responsibly fulfill their role in the judicial process."  *Nken v. Holder*, 556 U.S. 418, 427 (2009).  The standing orders play the same modest and salutary role as administrative stays and the Fourth Circuit's own standing order for immigration petitions.  They create a brief interval for the courts to docket a new case and evaluate whether immediate relief is appropriate before the possibility of that relief is overtaken and foreclosed by events.  The standing orders here fall squarely within that long tradition and are just a very junior-varsity version of the Fourth Circuit's 14-day standing order, the propriety of which, to our knowledge, has never been questioned by the Executive.  These are not injunctions (or TROs) that fail to comply with the four-factor test; they are standing administrative stays that allow the courts the time necessary to apply the four-factor test and determine whether a TRO, stay, or preliminary injunction is appropriate.  The Executive's attempt to shoehorn the square peg of the standing orders into the round hole of the four-factor test is doomed to fail.  That suffices to defeat Count I ("Violation of Requirements for Injunctions").

Count II ("Violation of Jurisdictional Bars") has even less merit.  The premise of the Executive's second claim is that "Congress has stripped" district courts of the "ability to intervene in immigration matters" through habeas petitions *at all*.  PI.Mot.16.  That would be an excellent argument to make in seeking the dismissal of an individual habeas action, but for the fact that its premise is obviously wrong.  For one thing, the Supreme Court just held in *J.G.G.* that "[c]hallenges to removal under the AEA" not only can but "*must* be brought in habeas."  145 S.Ct.

at 1005 (emphasis added).  For another, while the INA broadly strips district courts of jurisdiction, it does not do so entirely; district courts have recognized jurisdiction to entertain habeas petitions filed by aliens in detention in a number of contexts.  The Executive thus cannot come close to establishing that the standing orders on their face exceed the Court's jurisdiction.

As for Count III, the Executive's claim fails coming and going.  At the threshold, the express terms of 28 U.S.C. §2071(c)(1) preclude all efforts to use federal litigation to facially invalidate local rules promulgated pursuant to power delegated by Congress.  And while the Executive contends that the standing orders were promulgated without proper procedure, that argument too ignores the plain text of the statute:  Under 28 U.S.C. §2071(e), a court may prescribe a new rule "without public notice and opportunity for comment" if it "determines that there is an immediate need for a rule."  That is precisely, and properly, what transpired here—as the standing orders make evident *in haec verba*.  *See* Amended Standing Ord., at 1.

**III.**  The remaining preliminary-injunction factors strongly and uniformly counsel against granting the Executive the extraordinary relief it seeks.  Although the Executive repeatedly asserts that the standing orders deprive it "of time to enforce its policies," PI.Mot.19-20, it has no credible claim to a cognizable injury from simply being unable to deny individuals "reasonable time … to actually seek … relief" before being removed.  *See J.G.G.*, 145 S.Ct. at 1006.  Furthermore, the Executive routinely argues that it is not enough for a plaintiff seeking a preliminary injunction to show that the defendant exceeded its statutory authority or that the rule at issue is illegal.  Now that the shoe is on the other foot, the Executive ignores that principle.  But the Executive cannot have it both ways—and especially not at the expense of another coordinate branch of government.  For similar reasons, the very fact that the Executive is seeking to use its prerogatives to trump those of the Judiciary underscores that the equities do not favor the Executive here.  The Executive

certainly has an interest in enforcing the Nation's immigration laws. But that is not the Executive's paramount interest. The Executive's paramount interest is the same as the Judiciary's: that justice shall be done. The standing orders are a modest effort to serve that end that fit comfortably within a long tradition of comparable orders. The Executive's lawsuit, by contrast, is a deviation from the normal order that would set a dangerous precedent.

## ARGUMENT

Federal courts must dismiss cases under Federal Rule of Civil Procedure 12(b)(1) "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law," *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991), and must dismiss cases under Federal Rule of Civil Procedure 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Both conditions are met here.

Separately, a party seeking a preliminary injunction must show that it "is likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief," and that the equities favor injunction relief. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). For a multitude of reasons, the Executive can make none of those showings here.

## I.    The Case Is Nonjusticiable.

### A.    This Facial Attack Is Not a Proper Vehicle to Challenge the Standing Orders.

This case fails at the jurisdictional threshold. Indeed, the very caption of the case announces that it is no ordinary lawsuit, but an affront to the separation of powers and an invitation for an advisory opinion issued outside the normal confines of an individual case or controversy.

1. The Executive does not lack permissible routes to challenge the standing orders in justiciable cases or controversies. A habeas petition is a classic case or controversy, and to the extent the Executive believes that the standing orders are *ultra vires* or interfere with the

Executive's statutory or constitutional authority, there is no obstacle to the Executive challenging the standing orders in such a case. Instead of challenging the orders in that way, *see Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003), or appealing a particular application of the standing orders to seek an authoritative ruling from the Fourth Circuit that would apply to all cases, *see* 28 U.S.C. §2106, the Executive took the extraordinary step of suing every judge in the jurisdiction *en masse*, effectively forcing them to recuse and retain private counsel, while obligating the Chief Judge of the Fourth Circuit to take the burdensome step of finding a judge from another jurisdiction to be appointed to hear this case by designation. *See* Dkt.6. None of that was remotely necessary. Although the Executive invokes mootness concerns as a potential justification, *see* PI.Mot.21, this case is the posterchild for the capable-of-repetition-yet-evading-review exception to mootness. *See Lancaster v. Sec'y of Navy*, 109 F.4th 283, 290-91 (4th Cir. 2024). And one need not look beyond the Fourth Circuit to find a challenge to a local rule that was not just possible, but successful. *See McCargo v. Hedrick*, 545 F.2d 393, 402 (4th Cir. 1976).

But the primary vice of this extraordinary lawsuit is not that it is unnecessary, but that it is impermissible. It is an effort by one branch in its institutional capacity to sue another branch in its institutional capacity seeking what amounts to an advisory opinion unmoored from any specific case or controversy. The courts have confronted similar efforts by legislators to sue in their official capacity, and have routinely rejected them on nonjusticiability grounds, *see Raines*, 521 U.S. 811, preferring instead to address the same issues in ordinary private cases and controversies, *see Clinton v. City of New York*, 524 U.S. 417 (1998). The same principles apply to this extraordinary action by the Executive. While the Executive enjoys the distinct power to sue in the name of the United States to enforce laws and ensure that they are faithfully executed, it does not enjoy any

15

free-floating authority to sue a coordinate branch of government. Such a suit is nonjusticiable, and the fate of the standing orders can and should be resolved in an ordinary case or controversy.

2. The Executive suggests that the standing orders cannot be challenged in an ordinary case because they represent an exercise of rulemaking authority delegated by Congress. *See* Compl. ¶¶95-101; PI.Br.18-19. That is wrong—the standing orders state on their face that they are exercises of the Court's power to preserve its jurisdiction and manage its dockets, not any delegated power to make rules, *see supra* pp.6-7—and doubly unavailing in all events. Under 28 U.S.C. §2071(c)(1), "[a] rule of a district court prescribed under" the rulemaking power delegated by Congress instead "shall remain in effect unless modified or abrogated by the judicial council of the relevant circuit." That provision does not prevent a district court from refusing to apply a rule in a particular case on the ground that it is unlawful or unconstitutional; nor does it prevent the Fourth Circuit from invalidating the rule on appeal. It does, however, appear to prevent a district court from hearing a facial challenge to a rule or ordering vacatur of the rule as a remedy, which is precisely how the Seventh Circuit has construed this rarely invoked provision. *See Zingsheim*, 384 F.3d at 870. Yet that is exactly what the Executive seeks here.

Thus, even if the Executive were correct that the standing orders were an exercise in delegated rulemaking, that would only highlight that the Executive has brought the wrong suit in the wrong place. As the Seventh Circuit explained, the proper way for the Executive to take issue with a rule promulgated as an exercise in delegated rulemaking would be to file an application with "[t]he Judicial Council, which is the judiciary's administrative body, and holds the authority to review local rules for conformity with national law, [to] evaluate these concerns on application by the Executive Branch." *Id.* The Executive asserts that it "raised [its] concerns with the Orders

16

to the Judicial Conference," PI.Mot.10, albeit apparently informally—which only makes it more curious that it did not pursue a remedy in conformity with §2071(c).

3. The Executive claims that this extraordinary action has "the sanction of precedent," citing various cases—albeit none from the Fourth Circuit—in which plaintiffs brought a pre-enforcement challenge to a local rule seeking declaratory and injunctive relief. PI.Mot.11 (quoting *Stern v. Supreme Jud. Ct. for Mass.*, 16 F.Supp.2d 88, 90 (D. Mass. 1998)). But those cases largely distinguish themselves. Some pre-date the 1988 enactment of §2071(c); others challenge only a single judge's practices, rather than a court-wide standing order; and none involves actions brought by the Executive in the name of the United States or grapples with the text of §2071(c)(1). Moreover, the few that include a district court itself among the list of defendants do not grapple with the sovereign-immunity principles discussed below.[2] Simply put, none of those out-of-circuit cases resembles, let alone justifies, this extraordinary lawsuit.

At the outset, the rules challenged in many of those cases were formal rules purporting to directly regulate the actions of nonjudicial actors, rather than standing orders aimed at internal judicial management and designed to ensure that courts have time to exercise the judicial power in a given case. *Whitehouse v. U.S. District Court for the District of Rhode Island*, 53 F.3d 1349 (1st Cir. 1995), for instance, involved a challenge to "a local rule that requires a federal prosecutor, at either the grand jury or trial stage, to obtain judicial approval before serving a subpoena on counsel to compel evidence concerning a client." *Id.* at 1353. Nor were those suits brought in the

---

[2] To the extent any even hints at either point, it either acknowledges serious "concern[s] about whether [a] 'United States District Court …' [i]s an entity that c[an] be sued," *Stern*, 16 F.Supp.2d at 90, or merely parrots an unsourced quotation from *Whitehouse v. U.S. District Court for the District of Rhode Island*, 53 F.3d 1349, 1353 (1st Cir. 1995). Needless to say, that is no match for §2071(c)(1)'s text. *Cf. Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007) ("*stare decisis* is not applicable unless the issue was 'squarely addressed' in the prior decision").

name of the United States purporting to sue on behalf of the Executive.  Instead, they were brought by particular officers to whom the rule was specifically directed.  *See, e.g.*, *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4 (1st Cir. 2000) (challenge to District of Massachusetts local rule, brought by the U.S. Attorney of that district as well as a senior DOJ attorney barred in Massachusetts).  Those officials thus could—and did—establish Article III standing in their own names by submitting declarations alleging both "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" the rule and "a credible threat of prosecution thereunder."  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  That enabled the court to consider the challenge not as an abstract battle of the branches, but in the context of a specific party that intended to violate the rule at issue.

Thus, to the extent these out-of-circuit cases are relevant at all, they only underscore the problems with this extraordinary complaint.  This is not a suit by a distinctly vexed federal official; it purports to be a suit brought by the United States, which heightens the separation-of-powers stakes and raises distinct justiciability concerns.  Moreover, here the Executive does not claim that the standing orders injure it in all applications; nor could it when indisputable facts prove otherwise.  *See supra* pp.7-8.  Nor does the Executive claim that it has any intention of violating the standing orders in any particular case, or explain why the ability to ask the presiding judge to modify the order is uniformly insufficient to address its concerns about particularly time-sensitive removals.  It instead launches a broadscale attack on the power of Judiciary to manage its docket *at all*.  (That blunderbuss approach fails on the merits, as explained below.  *See infra* Part II.)

To be clear, the question is not whether there are limits on a district court's ability to enter administrative stays or promulgate local rules.  There plainly are.  If a district court wields its inherent authority to manage its internal affairs in a way that "[i]s irregular or flagrantly improper,"

18

it would be subject to appeal and reversal in an individual case or controversy.  *See In re Morrisey*, 305 F.3d 211, 217 (4th Cir. 2002).  And if a district court exercised its delegated rulemaking authority without, for instance, notice-and-comment procedures, then it would be incumbent on the relevant judicial council to step in and abrogate the rule on application of the Executive.  The question here is whether the Executive can sidestep those available mechanisms and collaterally attack district-wide orders or rules, divorced from the facts of a concrete case or controversy and (at least as to local rules) contrary to Congress' clear command.  The answer is no.

**B.     The Executive Lacks a Cause of Action to Bring This Suit.**

1. This lawsuit faces yet another fatal threshold defect:  The Executive lacks a cause of action.  If the Executive had chosen the tried-and-true path of challenging the standing orders in the context of an individual habeas case, this would not be a problem.  The Executive would be playing defense and could raise its objections as a defense to application of the standing orders.  But having declined that traditional option (and bypassed any effort to pursue an application to the Judicial Conference), and instead opted to file an affirmative lawsuit, the Executive needs a cause of action.  Yet there is none.  As the Seventh Circuit has held, there is no "Writ of Erasure" to "blot the standing order[s] from the books."  *Zingsheim*, 384 F.3d at 870.

It is bedrock law that a plaintiff must possess a "cause of action" to "judicially enforce the statutory rights or obligations" it seeks to vindicate.  *Davis v. Passman*, 442 U.S. 228, 239 (1979).  "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."  *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979).  That basic principle does not fall by the wayside just because the plaintiff is a government actor; even the United States needs "a right of action given by some statute" (or "a common-law right of action") to sue in federal court.  *Denver & Rio Grande R.R. Co. v. United States*, 241 F. 614, 616 (8th Cir. 1917); *cf. Texas v. Florida*, 306 U.S. 398, 411 (1939)

19

(federal court cannot award relief to a state unless "a cause of action cognizable in equity is alleged and proved"); 1 John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* §330 (1905) ("When the state as plaintiff invokes the aid of a court of equity, it is not exempt from the rules applicable to ordinary suitors; that is, it must establish … a right to the particular relief demanded.").

Consistent with that understanding, when the Executive sues in the name of the United States, it typically invokes a statutory cause of action created by Congress. *See United States v. Raines*, 362 U.S. 17, 27 (1960) (noting that Congress is "perfectly competent … to authorize the United States to be the guardian of th[e] public interest in a suit for injunctive relief"). Yet the Executive does not identify any law that allows it to sue the Judiciary for the kind of declaratory and injunctive relief it seeks here. Nor does it identify a single prior example of the United States even trying to bring suit in its own name against members of the federal judiciary, a clerk of court, or a court itself—let alone of a court countenancing such an extraordinary effort. The Executive instead invokes only statutes conferring jurisdiction on federal district courts, *see* Compl. ¶9 ("This Court has jurisdiction over this action under 28 U.S.C. §§1331, 1345, and 1361."), and statutes granting or acknowledging equitable authority, *see id.* ¶11 ("The Court has the authority to provide the relief from the Orders requested here under 28 U.S.C. §§1651, 2201, and 2202, and the Court's inherent equitable powers."). But a grant of jurisdiction is not the same thing as a cause of action, and nothing the Executive cites creates a cause of action for this suit or anything like it.

As the Executive often reminds private litigants, "28 U.S.C. §1331 does not create a cause of action, but provides jurisdiction to the federal courts only where the plaintiff has a cause of action under other federal law." Appellee Br., *Short v. Comm'r of Soc. Sec.*, 2013 WL 2470382, at *23 (6th Cir. May 31, 2013); *accord, e.g.*, Appellees' Initial Br., *Coal River Energy, LLC v. Sec'y of the Interior*, 2013 WL 6115705, at *15 (D.C. Cir. Nov. 20, 2013); Reply Br., *Clinton v. City of*

20

*New York*, 1998 WL 181947, at *2 (U.S. Apr. 13, 1998).  The same is true of the other jurisdictional provisions the Executive invokes.  Although 28 U.S.C. §1345 "grants broad jurisdictional power to the district courts over suits when the United States is plaintiff," *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 9 (1st Cir. 2005), "Section 1345 does not create a cause of action," 14 Wright & Miller, *Fed. Prac. & Proc. Juris.* §3651 (4th ed. 2025).  *Accord, e.g.*, *King v. United States*, 301 F.3d 1270, 1274 (10th Cir. 2002).  As for 28 U.S.C. §1361, "which confers jurisdiction on the district court over 'any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff,'" it too is just a jurisdictional statute that does not "create new liabilities or new causes of action against the United States government." *T M Sys., Inc. v. United States*, 473 F.Supp. 481, 484 (D. Conn. 1979); *accord, e.g.*, *Delemos v. Gonzales*, 2006 WL 2567991, at *1 (S.D. Ga. Sept. 5, 2006).[3]  In short, "*jurisdiction* is a question of whether a federal court has the power … to hear a case"; "*cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." *Davis*, 442 U.S. at 239 n.18. Statutes conveying the former do not convey the latter.  And "like any other plaintiff, the federal government must first have a cause of action" to sue "in federal court." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980).

The Executive's other statutes do not fill the gap.  Neither the All Writs Act, 28 U.S.C. §1651, nor the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, provides a cause of action.  *See United States v. Denedo*, 556 U.S. 904, 914 (2009); *Harris Cnty. v. MERSCORP Inc.*, 791 F.3d

---

[3] In all events, 28 U.S.C. §1361 is ultimately irrelevant here, because the Executive has filed a complaint seeking injunctive and declaratory relief, not a mandamus petition.  That is presumably no accident, as mandamus relief requires a clear entitlement to relief and the absence of alternative avenues for relief, and the Executive could not show either.

545, 552 (5th Cir. 2015). These, too, are points the Executive often reminds litigants. *See, e.g.*, Br. for U.S., *Sandoz Inc. v. Amgen Inc.*, 2017 WL 727753, at *23 (U.S. Feb. 17, 2017); U.S. Mot. to Dismiss at 9, *Okla. Dep't of Rehab. Servs. v. United States*, No. 18-cv-1197 (W.D. Okla. July 30, 2019), Dkt.40.

Finally, the Executive is no fan of implied causes of action, *see* Br. for U.S. as Amicus Curiae at 8-15, *FD Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, No. 24-345 (U.S. May 22, 2025), but it could not invoke an implied cause of action authorizing "su[its] to enjoin unconstitutional actions by … federal officers" here anyway, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *cf., e.g.*, *Strickland v. United States*, 32 F.4th 311, 365 (4th Cir. 2022) (allowing individual to sue federal officials on this basis). That is because the Executive does not allege that any Defendant has violated a specific constitutional provision that implicitly authorizes its enforcement. Simply alleging that the Judiciary is acting *ultra vires* does not cut it. Thus, "[t]he necessity of a substantive cause of action remains unsatisfied." *Kanawha Valley Labor Council v. Am. Fed'n of Labor & Cong. of Indus. Orgs.*, 667 F.2d 436, 438 (4th Cir. 1981).

To be sure, in a handful of cases over the past 140 years, the Supreme Court has allowed the United States to seek equitable relief vindicating certain uniquely sovereign interests without a statutory cause of action. *See, e.g.*, *United States v. Am. Bell Tel. Co.*, 128 U.S. 315 (1888) (protecting the public from fraudulent patents); *In re Debs*, 158 U.S. 564 (1895) (alleviating burdens on interstate commerce); *Heckman v. United States*, 224 U.S. 413 (1912) (protecting Indian tribes); *Sanitary Dist. of Chi. v. United States*, 226 U.S. 405 (1925) (carrying out the Nation's treaty obligations); *Arizona v. United States*, 567 U.S. 387 (2012) (challenging state measures interfering with an agency's administration of federal law). But those cases involved suits against private parties or inferior sovereigns, and so implicated neither the separation of

powers nor sovereign immunity; none involved one branch of the sovereign attempting to elevate its interests over the prerogatives of another branch.  And Defendants are aware of no case that has implied a cause of action to allow the Executive Branch to sue the Judicial Branch.  That silence speaks volumes, as prior Administrations have had their fair share of frustrations with the Judiciary.  The failure of prior Administrations to attempt to wield such a "highly attractive power" strongly indicates not extraordinary self-restraint, but "that the power" does "not [] exist."  *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 348 (1999) (Scalia, J., concurring in part) (quoting *Printz v. United States*, 521 U.S. 98, 105 (1997)); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) ("Perhaps the most telling indication of the severe constitutional problem … is the lack of historical precedent[.]" (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting))).

With neither a statutory nor a sovereign cause of action, the Executive's only other option is to ask this Court to create a cause of action out of whole cloth.  Any such request should be dead on arrival.  "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals," *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)—which is why the Executive vociferously resists implying new causes of action in all other contexts.  *See, e.g.*, Fed. Appellants' Opening Br., *League of Conservation Voters v. Trump*, 2019 WL 5849891, at *41 (9th Cir. Nov. 7, 2019) ("[C]ourts [do not] recognize a generic right to sue a federal official for acting inconsistently with … general separation-of-powers notions.").  Indeed, when the shoe was on the other foot, and the Legislative Branch asked the D.C. Circuit to imply a cause of action against the Executive Branch, the Executive protested that allowing Congress "to vindicate [its] institutional interest" through litigation would pose grave

"separation-of-powers concerns."  Appellant Br., *Blumenthal v. Trump*, 2019 WL 4857260, at \*29-30 (D.C. Cir. Oct. 1, 2019).  Just so here.

2. The absence of a cause of action authorizing this suit is unsurprising:  Trying to resolve intra-sovereign disputes through inter-branch litigation outside the context of an individual case or controversy has nothing to recommend it and turns separation-of-powers principles on their head. *See Mistretta v. United States*, 488 U.S. 361, 385 (1989) ("refus[ing]" "to resolve disputes that are not justiciable" "help[s]" "preclud[e] debilitating entanglements between the … Branches").  "The Framers provided a vigorous Legislative Branch," "a separate and wholly independent Executive Branch," and an "equally independent" "Judicial Branch," so that ambition could counter ambition, not so that one branch could sue the other.  *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). Indeed, the branches have countless tools to engage with each other outside the context of direct branch-on-branch litigation.  Simply put, if the Executive "car[e]s enough about [this] matter, [it] ha[s] available innumerable ways to compel … action without a lawsuit."  *United States v. Windsor*, 570 U.S. 744, at 790-91 (2013) (Scalia, J., dissenting).  One obvious angle would be to ask Congress to preclude courts from adopting standing orders in this context.  While one might doubt that such legislation would emerge given the widespread practice among courts of appeals of employing far longer administrative stays, pursuing such legislation (or relief in an individual case, or an application to the Judicial Conference) would be far preferable to the disruption this lawsuit has already caused and would cause if it proceeded beyond dismissal.

Needless to say, those disruptions are no small matter.  This lawsuit has already required the recusal of the entire bench in a judicial district, the retention of private counsel, the intervention of the Fourth Circuit, and the assignment of an out-of-district judge.  And that is only the tip of the iceberg.  If this case proceeds past the motion to dismiss stage, the prospect of judicial depositions,

24

or judges being cross-examined by Executive Branch lawyers in live court, would raise separation-of-powers problems of the first order.  *See, e.g.*, *United States v. Morgan*, 313 U.S. 409, 422 (1941) ("prob[ing] the mental processes" "of a judge" in resolving cases "would be destructive of judicial responsibility").  And if the Executive can sue an entire district court, there is no reason in principle that the Executive could not sue a court of appeals.  The prospect of a single district court judge, presumably assigned from outside the circuit, sitting in judgment of the entire Fourth Circuit not only inverts the judicial hierarchy, but underscores the separation-of-powers problems that become inevitable once the Executive starts suing the Judiciary in its institutional capacity, rather than challenging judicial rules within the confines of ordinary, individual cases and controversies. Indeed, in the ordinary case where a judge or clerk is sued for actions taken in his or her official capacity, it is the Justice Department that defends them—an arrangement that reinforces a spirit of cooperation among the branches.  Turning the tables and having the Justice Department sue them in their official capacities (and the district court itself) creates wholly unnecessary friction between the branches and practical problems to boot.[4]

At bottom, the lack of a cause of action here is no oversight.  It reflects Congress' and the Framers' judgment that allowing the Executive to subject the Judiciary to suit in this manner would fundamentally upset our constitutional order.  And it is yet another reason this suit cannot proceed.

### C.     Defendants Are Immune From Suit.

The Executive's claims fail for one more reason:  The district court itself possesses sovereign immunity, and the judges and clerk of court have immunity for their official acts.

---

[4] For example, Federal Rule of Civil Procedure 4 requires that, to serve "a United States officer or employee sued only in an official capacity"—e.g., the judges and clerk of court here—a plaintiff must serve "the United States attorney for the district where the action is brought" as well as "the Attorney General."  Fed. R. Civ. P. 4(i)(1)-(2).  In this case, that would appear to direct the plaintiff United States of America, represented by "the United States Department of Justice," including "the United States Attorney's Office for the District of Maryland," Compl. ¶12, to serve itself.

1. "It is axiomatic that the United States may not be sued without its consent and that the existence of" an express statutory waiver of sovereign immunity "is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  It is also axiomatic that this immunity extends over "U.S. District Courts."  *Atchison v. U.S. Dist. Cts.*, 190 F.Supp.3d 78, 89 (D.D.C. 2019). Regardless of who the plaintiff is, a United States Court can be sued only if "Congress has waived sovereign immunity expressly with respect to the particular claim."  *Smith v. Scalia*, 44 F.Supp.3d 28, 38-39 (D.D.C. 2014).   And the plaintiff, as always, "bears the burden of pointing to … an unequivocal waiver of immunity."  *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

The complaint does not identify any statutory waiver—unequivocal or otherwise—of district courts' sovereign immunity from suits seeking injunctive or declaratory relief, and Defendants are not aware of one.  Even assuming that the waiver of sovereign immunity in 5 U.S.C. §702 covers non-Administrative Procedure Act ("APA") claims, it plainly does not cover claims against courts, because—as the Executive routinely "points out," *AmSouth Bank v. Miss. Chem. Corp.*, 465 F.Supp.2d 1206, 1210 (D.N.M. 2006)—the APA does not apply to "the Courts of the United States," 5 U.S.C. §701(b)(1)(B).  *Accord, e.g.*, *Strickland*, 32 F.4th at 368-69.  As for 28 U.S.C. §1345, which the Executive alternatively invokes, that provision does not waive sovereign immunity *at all*, let alone "unambiguous[ly]."  *Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799, 800 (4th Cir. 2019).  The Court is immune from suit.

2. So, too, are the individual judges and the clerk of court.  To be sure, the Fourth Circuit has held that judicial officers may in some cases be subject to suit under the exception to federal sovereign immunity announced in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949), and *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).  *See Strickland*, 32 F.4th at 363-66. But *Strickland* involved allegations of sexual harassment in the workplace, and neither that court

26

nor any other has ever extended that line of cases to the core exercises of the judicial Power of the United States. That makes sense: Judicial actions undertaken in federal judges' official capacities can be (and are) challenged all the time in the context of actual cases and controversies, i.e., on appeal, or via mandamus in extraordinary circumstances. But when a plaintiff attacks the official acts of members of the Judiciary in a standalone lawsuit, judges generally have absolute immunity.

Judicial immunity is exceptionally well pedigreed, so much so that the Supreme Court relied on it to extend official-act immunity to the President. *See Trump v. United States*, 603 U.S. 593, 611-16 (2024). The doctrine "originated, in medieval times, as a device for discouraging collateral attacks and thereby helping to establish appellate procedures as the standard system for correcting judicial error." *Forrester v. White*, 484 U.S. 219, 225 (1988). "Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction[.]" *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967). And the doctrine is not limited to damages suits. "At the common law itself, there was no such thing as an injunction against a judge." *Pulliam v. Allen*, 466 U.S. 522, 529 (1984).

To be sure, *Pulliam* held that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity" in suits brought under 42 U.S.C. §1983. *Id.* at 541-42. But *Pulliam* drew on history that recognized the authority of a superior tribunal (the King's Bench) to reign in collateral attacks by inferior tribunals. That history supports the authority of *federal* courts to issue injunctions against *state* judges in §1983 suits. But it does not support a federal-court injunctive suit against an entire federal judicial district in lieu of challenging the application of the standing orders via an ordinary appeal. Thus, *Pulliam* is best read as limited to the federal-state context and §1983, not as suggesting that the common-law immunity was limited to damages actions. That is why courts, long after *Pulliam*, consistently

27

have held that "federal judges possess absolute judicial immunity from liability" not just "for monetary damages," but "for injunctive relief for their judicial duties conducted within their jurisdiction" as well. *Akinro v. Blake*, 2007 WL 3020186, at *1 (D. Md. June 8, 2007), *aff'd*, 235 F.App'x 75 (4th Cir. 2007) (per curiam); *accord, e.g.*, *Newsome v. Merz*, 17 F.App'x 343, 345 (6th Cir. 2001); *Bolin v. Story*, 225 F.3d 1234, 1240-42 (11th Cir. 2000). That suffices to resolve this case. This suit is an extraordinary effort to enjoin federal judges (and an entire district), and the Executive points to no Act of Congress abrogating judicial immunity. This suit cannot proceed.[5]

## II. Even If This Controversy Is Justiciable, The Executive's Claims Fail, As The Standing Orders Are Valid Exercises Of Federal Courts' Inherent Authority To Afford Themselves Time To Determine Their Own Jurisdiction.

Even if this case were justiciable, the Executive's claims would fail as a matter of law. As the Supreme Court recognized long ago, "[u]ntil its judgment declining jurisdiction should be announced, [a court] ha[s] authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition." *United States v. Shipp*, 203 U.S. 563, 573 (1906). Similarly, "[i]f a case presents a 'substantial' jurisdictional question, then under the All Writs Act, 28 U.S.C. §1651, a district court may act to preserve its jurisdiction while it determines whether it has jurisdiction." *Belbacha v. Bush*, 520 F.3d 452, 455-46 (D.C. Cir. 2008).

Consistent with that authority, courts routinely impose brief administrative stays in all manner of cases, including immigration cases, to give themselves limited time to assess their own jurisdiction before that question may be rendered moot. *See, e.g.*, *Alam v. Nielsen*, 312 F.Supp.3d 574, 577 (S.D. Tex. 2018) ("In recognition of the jurisdictional question's complexity, the Court has thus far stayed the removal of Alam."); *Vijender v. Wolf*, 2020 WL 1935556, at *1 (D.D.C.

---

[5] *Pulliam* also emphasized that an injunction against a judge could issue only upon "a showing of an inadequate remedy at law." 466 U.S. at 537. But here, as noted, the Executive has the classic remedy of law—an appeal. Thus, not only this suit, but any suit like it, is categorically foreclosed.

Apr. 22, 2020) (granting "temporary stay of removal" to obtain "expedited briefing regarding the court's jurisdiction over the matter"); *S.L.V. v. Rosen*, 2021 WL 243442, at *7 (W.D. Tex. Jan. 25, 2021) (holding that, in immigration cases, a district court is "well within its purview to issue [an] administrative stay to maintain the status quo until it c[an] determine the facts and law necessary to resolve the jurisdictional questions" and collecting examples); *Gonzalez-Pablo v. Mason*, 2025 WL 1648366, at *1 (S.D. W. Va. June 10, 2025) (ordering parties "to (1) maintain the status quo, (2) not remove the Petitioner from the jurisdiction, [and] (3) locate the Petitioner" because the district court's habeas "jurisdiction was unclear"); *see also Nat'l Council of Nonprofits v. OMB*, 763 F.Supp.3d 13, 17 (D.D.C. 2025) (collecting examples).

This practice is especially prevalent in the removal context. Not only have administrative stays "long been applied in … immigration removal cases," but in the "deportation" context specifically they have long been "impos[ed] … automatic[ally]" by "court rules," "with no need for judges to consider each case individually." Bayefsky, *supra*, at 1958-59, 1974 (collecting examples); *see also supra* pp.4-5 (discussing circuit courts' analogous rules). That common practice reflects the bedrock rule that, just as "'detainees must receive notice … that they are subject to removal under the Act … within a reasonable time and in such a manner as will allow them to actually seek … relief' before removal," *A.A.R.P.*, 145 S.Ct. at 1368 (ellipses in original) (quoting *J.G.G.*, 145 S.Ct. at 1006), courts must have reasonable time to decide whether to grant relief (or even whether they have the power to do so).

Against that backdrop, the Executive's attacks on the standing orders are exceedingly unlikely to succeed. Indeed, they are wrong as a matter of law. So not only should a preliminary injunction be denied, but the case should be dismissed in its entirety.

**A.** In its first claim for relief ("Violation of Requirements for Injunctions"), the Executive tries to label the standing orders' two-business-day stay as an "automatic injunction[]," PI.Mot.1 (emphasis omitted), and faults the standing orders for not requiring a full-blown four-factor analysis. *See* Compl. ¶¶70-85. But that ignores both the difference between a true injunction (or stay or TRO) and an administrative stay, and the limited but critical office of the latter. Unlike the former, an administrative stay is not designed to "reflect the court's consideration of the merits." *Texas*, 144 S.Ct. at 798 (Barrett, J.). It is instead a court's "exercise of its docket-management authority," designed to "buy[] the court the time to" consider the merits. *Id.* It is indispensable when exceptionally fast-paced circumstances might otherwise divest the court of jurisdiction before it can even determine whether it has the power or cause to act. *Id.* But such orders typically "last for a shorter period of time than 'regular' stays." Bayefsky, *supra*, at 1952-53. They are just designed to "freeze legal proceedings until the court can rule on a party's request for expedited relief," not to reflect a preliminary assessment of how the court thinks that request should be resolved. *Texas*, 144 S.Ct. at 798 (Barrett, J.) (quoting Bayefsky, *supra*, at 1942).

The standing orders here fit comfortably within that tradition. They seek only "to preserve … the potential jurisdiction of this Court over pending matters while the Court determines the scope of its authority to grant the request[ed] relief[,] to ensure Petitioners are able to participate in the adjudication of their requests for habeas relief[,] … and to ensure the Government has a fulsome opportunity to brief and present arguments in its defense." Amended Standing Ord. 2025-01 at 1. To that end, the standing orders temporarily prevent the Executive, for roughly 48 hours (if that), in habeas cases filed "pursuant to 28 U.S.C. §2241 on behalf of an alien detainee," "from removing Petitioners in such cases from the continental United States or altering their legal status." *Id.* at 2. The standing orders do not purport to resolve or even foreshadow the merits of any case,

and the temporary stay they impose is not tethered to the resolution of any further proceedings; it expires by its own terms at "4:00 p.m. on the second business day following the filing of the Petition" unless the presiding judge affirmatively extends or shortens it.  *Id.*

That is a classic exercise of the Article III courts' inherent power to "ensur[e] that [they] can responsibly fulfill their role in the judicial process."  *Nken*, 556 U.S. at 427 (2009); *see also In re McDonald*, 489 U.S. 180, 184 n.8 (1989) (federal courts possess the "power … to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions").  The Supreme Court has long "recognized a limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels."  *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (collecting cases).  The Supreme Court has also exercised that power itself in recent days:  In *A.A.R.P.*, the Court "grant[ed] temporary injunctive relief to preserve our jurisdiction while the question of what notice is due is adjudicated," but expressly declined to "address the underlying merits of the parties' claims regarding the legality of removals under the AEA."  145 S.Ct. at 1368.  As Justice Kavanaugh explained, the point of that temporary, jurisdiction-preserving measure in *A.A.R.P.* was to "ensure[] that the Judiciary can decide *whether* … detainees may be lawfully removed under the Alien Enemies Act *before* they are in fact removed."  *Id.* at 1370 (Kavanaugh, J., concurring). The standing orders here do no more than that.  Indeed, the standing orders pass with flying colors a leading commentator's suggestion that courts should "set[] a presumptive time limit for these stays (say, *five business days*), subject to alteration if a particular motion … requires especially intensive deliberation."  Bayefsky, *supra*, at 1972-73 (emphasis added).

The need for administrative stays is inherent in a judicial system that can only act when it has jurisdiction but is often asked to act when time is of the essence or in the face of an event that

could render effective judicial relief infeasible. Indeed, one of the only previous times someone questioned a court's authority to enter a purely administrative stay, the district court deemed it "frivolous," *Dellinger v. Bessent*, 766 F.Supp.3d 57, 60 n.1 (D.D.C. 2025), and the D.C. Circuit summarily dismissed "for lack of jurisdiction," 2025 WL 561425, at *1 (D.C. Cir. Feb. 12, 2025); *see also Texas*, 144 S.Ct. at 799 (Barrett, J.) (noting that neither the Supreme Court nor any other "has []ever reviewed" another court's discretionary decision to enter an administrative stay). As Judge Katsas explained, absent a stay so "intrusive" and "long" that it "operates as a preliminary injunction," a court's authority to enter an administrative stay that serves only to briefly maintain the status quo long enough to enable the court to perform its constitutional function is inviolable. *Dellinger*, 2025 WL 561425, at *2 (Katsas, J., concurring). The Executive has previously (and recently) conceded as much. *See, e.g.*, Emergency Mot. for Stay Pending Appeal at 18-20, *Dellinger v. Bessent*, No. 25-505 (D.C. Cir. Feb. 11, 2025). And, of course, the Executive itself frequently requests and enjoys the benefits of administrative stays.

Wherever that outer limit on administrative stays might lie, it cannot seriously be argued that an administrative stay lasting less than two business days and entered for the express purpose of preserving the status quo long enough for a court to docket the case and receive and thoughtfully consider a motion for emergency relief is the "functional equivalent" of a preliminary injunction. *Cf.* Reply in Supp. of Emergency Mot. for a Stay Pending Appeal at 2, *Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 12, 2025). Quite the opposite; to borrow another point from Judge Katsas, the very fact that these administrative stays are so fleeting "cuts strongly against" second-guessing them. *Dellinger*, 2025 WL 561425, at *2 (Katsas, J., concurring). After all, TROs last up to 14 days, *see* Fed. R. Civ. P. 65(b)(2), yet are *prima facie* unreviewable. An appellate court can review an order styled as a TRO only if it "in effect" becomes "a preliminary injunction" by "continu[ing]

beyond the statutory period" or "command[ing] … action irreversibly *altering*" "the status quo." *OPM v. AFGE*, 473 U.S. 1301, 1304-05 (1985) (emphasis added).

The standing orders are far too modest to raise any serious question of being injunctions in disguise. They are truly ephemeral, paling in comparison to a TRO or the Fourth Circuit's default 14-day stay in immigration cases. And far from altering the status quo—let alone doing so irreversibly—the standing orders are expressly designed to preserve it, including the provision barring the Executive from altering an alien's legal status. While that aspect of the standing orders might operate more like a very temporary restraining order than a typical appellate stay, it still has the essential attribute of almost any stay—barring an action that a litigant could otherwise undertake that might moot the case, destroy jurisdiction, or preclude an effective remedy. Moreover, as *A.A.R.P.* demonstrates, the relevant question is not whether an administrative stay has the practical effect of a TRO, but whether it purports to be a resolution (even just preliminarily) of the merits or merely serves to "buy[] the court the time to deliberate" so it can consider the merits at all. *Texas*, 144 S.Ct. at 798 (Barrett, J.). Because the standing orders fall decidedly in the latter camp, the injunction/stay factors "do not control." *Id.* at 799.

The Executive seeks to elevate its own desire to carry out its prerogatives expeditiously against what it derides as the Judiciary's "desire for greater convenience." PI.Mot.2. But that ignores the equities of the habeas petitioners altogether. More fundamentally, it ignores that the modest interval for judicial decisionmaking that the standing orders preserve is not some mere convenience, but essential to preserving the judicial function. The Supreme Court recognized nearly a century ago that a court's power to enter temporary administrative relief to preserve its ability to assess the matter before it "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel,

and for the litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). The judicial role is rarely more essential than in the context of the Great Writ. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) ("[U]nless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions."). And the nature of the Great Writ, and its territorial limits, means that the petitioner is subject to the Executive's total control—and, absent judicial intervention, can be transferred outside the reach of the court. A brief interval to docket a petition and determine whether relief is necessary is not a convenience; it is a critical component of ensuring the promise of the Great Writ.

**B.** The Executive's second count ("Violation of Jurisdictional Bars") likewise fails. At the outset, "'a federal court always has jurisdiction to determine its own jurisdiction'"—"includ[ing] the jurisdiction to review a statute that purports to strip jurisdiction." *Appalachian Voices v. U.S. Dep't of the Interior*, 78 F.4th 71, 76 (4th Cir. 2023) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)). Even if the only question is whether "a statute that purports to strip jurisdiction" *actually does strip jurisdiction*, courts still have the power to enter administrative stays to figure out the answer. *Id.* That explains the multitude of cases in which district courts have issued administrative stays to give themselves time to determine whether they have jurisdiction under the immigration laws. *See supra* pp.28-29. It also explains why the Executive itself has previously conceded that district courts have the power to do so. *See, e.g.*, *M.S.P.C. v. U.S. Customs & Border Prot.*, 60 F.Supp.3d 1156, 1160 (D.N.M. 2014) ("At the hearing, the Government conceded that this Court has jurisdiction to issue a stay of removal while it considers its own jurisdiction.").

To the extent the Executive no longer shares that view, it does not explain the basis for its change in position; it just asserts that the standing orders "diminish the votes of the citizens who

elected" the current President. PI.Mot.20. That is a proposition without limits, and with very serious consequences for the rule of law and the separation of powers. In reality, it is the enduring text of the Constitution, not the preference of voters at a moment in time, that establishes the powers of the three branches of the federal government. That text gives the Judiciary a critical role in ensuring that the Executive acts within the bounds of the statutes duly enacted by Congress. And the judicial function depends on the ability to preserve the status quo for the brief interval necessary to address those issues in a considered fashion.

To the extent the Executive claims that administrative stays are categorically improper in this context because "Congress has stripped" district courts of the "ability to intervene in immigration matters" through habeas petitions *at all*, PI.Mot.16, that argument is a nonstarter. The Supreme Court just held in no uncertain terms that "[c]hallenges to removal under the AEA" not only can but "*must* be brought in habeas." *J.G.G.*, 145 S.Ct. at 1005 (emphasis added); *see supra* pp.5-6. The Executive notably never mentions *J.G.G.* or the AEA in its papers, even though they precipitated the recent influx of district court immigration litigation and the need for the standing orders. But whether the Executive acknowledges them or not, those key authorities foreclose any argument that district courts *never* have jurisdiction over habeas petitions in the immigration context, which suffices to defeat the Executive's second claim. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (to prevail on "[a] facial challenge," one "must establish that no set of circumstances exists under which the [order] would be valid").

Even beyond the AEA, moreover, district courts have jurisdiction to entertain habeas petitions filed by aliens in detention. To take just one example, district courts retain limited habeas jurisdiction pursuant to 8 U.S.C. §1252 over expedited removal orders to resolve factual disputes about "whether the petitioner is an alien," "whether the alien was ordered removed," and "whether

the petition has already been granted entry as a lawful permanent resident, refugee, or asylee." *U.S. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 111 (2020) (citing 8 U.S.C. §1252(e)(2)); *see also* PI.Mot.5, 18 (appearing to concede the point).[6]  The Executive may quibble with how best to read these and the other jurisdiction-stripping provisions it invokes.  But that just proves why this broadscale attack is the wrong way to go about challenging the standing orders, and why the orders are not just lawful, but eminently reasonable:  It is not often easy to determine, just by glancing at a caption, whether a habeas petition comes within a district court's jurisdiction. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 700 (2001) (describing the INA as a "complex statute"). Because the Executive cannot come close to establishing that the standing orders "exceed the Court's jurisdiction" on their face, Compl. ¶88, Count Two fails as a matter of law.

**C.**  Count Three ("Violation of Requirements for Local Rules") fares no better.  As explained, *see supra* pp.16-17, to the extent the Executive asserts that the standing orders constitute local rules dependent on the power delegated by Congress "to implement, or fill gaps in, national rules of practice and procedure," *Stern*, 214 F.3d at 13, the Executive has pled itself out of both a remedy and this Court's jurisdiction.  By requiring that such rules "shall remain in effect unless modified or abrogated by the judicial council of the relevant circuit," 28 U.S.C. §2071(c)(1), Congress channeled challenges to them to the judicial council, not the district courts.

That aside, Count III still fails, because to the extent the standing orders are local rules under §2071, they are plainly permissible ones.  Under 28 U.S.C. §2071(e), a court may prescribe a new rule "without public notice and opportunity for comment" if it "determines that there is an immediate need for a rule."  It is difficult to imagine a stronger candidate for §2071(e).  As the

---

[6] That is why, for instance, the First Circuit directs its clerk of court to "enter an administrative order staying removal for ten business days" *both* in "petitions for review" of BIA orders *and* in "appeals from district court habeas proceedings."  1st Cir. L. R. 18.0.

Amended Standing Order explains, the standing orders responded to "[t]he recent influx of habeas petitions concerning alien detainees purportedly subject to improper and imminent removal from the United States … filed after normal court hours and on weekends and holidays."  Amended Standing Ord. at 1.  That "recent influx" is a direct result of the Executive's recent (and heretofore unprecedented) use of the AEA.  *See supra* pp.5-6.  And the standing orders are of a piece with the Supreme Court's own efforts to "ensure[] that the Judiciary can decide *whether* … detainees may be lawfully removed under the Alien Enemies Act *before* they are in fact removed."  *A.A.R.P.*, 145 S.Ct. at 1370 (Kavanaugh, J., concurring).  Just as the immediate need for temporary relief to ensure that a district court's failure to rule on an emergency motion within a few hours, after midnight and on a weekend, would not deprive the courts of jurisdiction was plain to the Supreme Court there, *see id.* at 1368-69 (maj.), "the immediate need for a rule," 28 U.S.C. §2071(e), pausing the status quo to give the judges of this Court two days to assess their jurisdiction is plain here.

*     *     *

In sum, even if it were justiciable, this extraordinary effort to second-guess administrative stays that are well within both historical tradition and the mainstream fails as a matter of law.

## III.    The Remaining Preliminary-Injunction Factors Strongly Counsel Against Relief.

On top of all that, the Executive's preliminary-injunction motion fails to satisfy the very four-factor test it deems essential to any injunctive relief.  Even apart from the four-factor test, the essential prerequisite for any equitable remedy—and *a fortiori* the truly extraordinary remedy of an injunction against a judicial officer—is the lack of any adequate remedy at law.  *See Pulliam*, 466 U.S. at 537.  Here, as shown, the Executive has a perfectly adequate remedy at law in the form of an appeal.  As to the four-factor test, in addition to showing that it "is likely to succeed on the merits," a party seeking preliminary relief must show that it "is likely to suffer irreparable harm in the absence of preliminary relief" and that the equities tip in its favor.  *Winter*, 555 U.S. at 20.  For

all the reasons discussed, the Executive cannot succeed on its claims, which are neither justiciable nor meritorious. The remaining factors likewise counsel against relief.

**A.** Irreparable injury is essential for any preliminary injunction. And here, the Executive can show none. The Executive's papers are long on discussion of executive prerogatives, but short on specifics about how a 48-hour automatic stay or any other element of the standing orders inflicts irreparable harm. And the facts disprove any such suggestion. Take, for instance, the 11 cases its motion identifies in which the standing orders have had effect. In several of them, the Executive concededly was not trying to remove the petitioner within 48 hours, so there could be no injury, irreparable or otherwise. The Executive offers no specific indication that it was trying to do so in the others either—let alone that the brief delay engendered by the automatic stay forever foreclosed a desired outcome (other than delaying it slightly). Nor does the Executive explain why, given its knowledge of the standing orders, it cannot address the rare cases that present truly exigent circumstances by having at the ready a filing explaining to the presiding judge the pressing need to lift the stay immediately. The standing orders impose a default remedy, but they do not foreclose the possibility of a judge acting with greater dispatch in a specific case if the Executive has alerted the clerk's office of a need for extreme expedition. Moreover, any claim to irreparable injury must be taken with a considerable grain of salt given the Executive's willingness to live with 14-day automatic stays in multiple courts of appeals across multiple Administrations.

In all events, even assuming the standing orders could inflict *some* irreparable injury on the Executive in *some* cases, "the prevention of harm … is not the paramount purpose" of preliminary injunctions. *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (Murphy, J., concurring). Notwithstanding any "irreparable injury [that] may otherwise result to the plaintiff," *Yakus v. United States*, 321 U.S. 414, 440 (1944), "[o]nly

when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief," 11A Wright & Miller, *Fed. Prac. & Proc.* §2948.1 (3d ed. 2025). It "is often, perhaps usually, the wiser course"—and the one the Executive itself often trumpets—to "withhold this extraordinary remedy" when, as here, "a plaintiff's alleged injury does not threaten to moot the case." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 201 (3d Cir. 2024), *cited with approval by, e.g.*, U.S. Resp. & Reply Br., *Alaska v. Dep't of Educ.*, 2024 WL 3730386, at *45 (10th Cir. July 31, 2024) (arguing that it is not enough for a plaintiff seeking injunctive relief to show the defendant "exceed[ed] [its] statutory authority" or that the "rule" at issue is "illegal").

**B.** As the party seeking a preliminary injunction, the Executive bears the burden to show "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Executive cannot meet either burden here.

First, the equities weigh decisively against an injunction. The Executive's claimed interest is promptly enforcing the Nation's immigration laws. *See* PI.Mot.21. That is a valid interest, to be sure. But 48 hours is plenty prompt, and acting with even greater dispatch does not trump the Executive's "overriding interest that 'justice shall be done.'" *United States v. Agurs*, 427 U.S. 97, 110-11 (1976) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Nor does it override the rule that "justice must satisfy the appearance of justice," *Offutt v. United States*, 348 U.S. 11, 13 (1954), or the reality that there is no "better way … for generating the feeling … that justice has been done" "than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring). On the other side, federal courts have a "constitutional obligation to protect their jurisdiction," *In re McDonald*, 489 U.S. at 184 n.8—the *raison d'être* of

39

the standing orders. And the short, non-merits-based pauses the standing orders occasion reflect the reality that "the relative consequences" "of erroneously" removing an alien are "worse than those of erroneously" staying removal for a short time. *Texas*, 144 S.Ct. at 798-99 (Barrett, J.).

To be sure, both the government and the public have an interest "efficient removal procedures." PI.Mot.21. But the public also has an interest in "seeing its governmental institutions follow the law." *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023). And the Executive has acknowledged that, in some circumstances, the consequences of a precipitous removal can be a mistake that neither the Executive nor the Judiciary can readily rectify. Under those circumstances, a brief pause so that the courts can do their job is plainly in the public interest. Moreover, any balance of the equities cannot ignore that the Great Writ is one of the principal protections of liberty enshrined in the unamended Constitution. The threat to the public interest of any order making the Great Writ practically inadministrable is too grave to overstate.

In short, as the exceedingly short duration of the standing orders reflects, this is a delicate situation that commands "reciprocal respect for the roles of the Executive and the Judiciary." *Abrego Garcia*, 2025 WL 1021113, at *8 (Wilkinson, J., concurring). The public interest in ensuring that the Executive can carry out its duty to enforce the immigration laws expeditiously is certainly entitled to the utmost respect, but so too is the public interest in allowing the Judiciary to provide a necessary check. The Executive wields truly awesome powers in the immigration context. A brief pause to ensure that those powers are exercised within the Executive's substantial discretion and within the four corners of the law is plainly in the public interest.

## CONCLUSION

The Court should deny the motion for a preliminary injunction and dismiss this case.

Respectfully submitted,

s/Andrew C. Lawrence
PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN*
ANDREW C. LAWRENCE
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendants*

* admitted *pro hac vice*

July 21, 2025

41