**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Case No. 1:25-cv-02029-TTC |
| CHIEF JUDGE GEORGE L. RUSSELL, III, | ) |
| in his official capacity, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**BRIEF OF AMICI CURIAE RETIRED FEDERAL JUDGES IN SUPPORT
OF DEFENDANTS**

PETER J. KAHN (No. 00579)
LISA S. BLATT (D.C. Bar No. 429544) (*pro hac vice pending*)
MATTHEW B. NICHOLSON (D.C. Bar No. 1013418) (*pro hac vice pending*)
JAMES N. SASSO (D.C. Bar No. 90009725) (*pro hac vice pending*)
ERIN M. SIELAFF (D.C. Bar No. 90022139) (*pro hac vice pending*)
MADELINE C. PREBIL (No. 30308)
WILLIAMS & CONNOLLY LLP
  680 Maine Ave S.W.
  Washington, DC 20024
  (202) 434-5000
  *pkahn@wc.com*
  *lblatt@wc.com*
  *mnicholson@wc.com*
  *jsasso@wc.com*
  *esielaff@wc.com*
  *mprebil@wc.com*

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ................................................................................................1
INTRODUCTION ......................................................................................................................1
BACKGROUND ........................................................................................................................3
ARGUMENT ............................................................................................................................4
I.    Federal Courts Have Authority To Issue Administrative Stays or Temporary
Injunctions To Preserve Their Jurisdiction ..........................................................5
II.   The District of Maryland's Standing Order Fits Within This Inherent Authority
and Follows Accepted Practice ..........................................................................8
III.  The Government's Challenge to the Standing Order Threatens the Separation of
Powers ..............................................................................................................9
      A.   If Successful, the Government Could Evade Judicial Review of Its Actions ..........9
      B.   Permitting This Lawsuit To Move Forward Would Create Unnecessary
Friction Between the Judiciary and the Executive ..................................12
IV.  The Government's Lawsuit Creates a Host of Practical Problems ....................................14
CONCLUSION ........................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Al Otro Lado v. Wolf*, 945 F.3d 1223 (9th Cir. 2019)....................................................7

*Arnold v. Garlock, Inc.*, 278 F.3d 426 (5th Cir. 2001) ...............................................7

*Bradley v. Fisher*, 80 U.S. (13 Wall) 335 (1871)......................................................14

*Brady v. NFL*, 638 F.3d 1004 (8th Cir. 2011)............................................................7

*Cheney v. U.S. Dist. Ct.*, 542 U.S. 367 (2004)........................................................13

*Cobell v. Norton*, 2004 WL 603456 (D.C. Cir. Mar. 24, 2004)...................................7

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)....................................................13

*Dep't of State v. AIDS Vaccine Adv. Coal.*, 145 S. Ct. 753 (2025) ...........................7

*Dietz v. Bouldin*, 579 U.S. 40 (2016)......................................................................7

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) .........................................................3

*Gallusz v. LLP Mortg., Inc.*, 2025 WL 1360771 (S.D. Cal. Apr. 15, 2025)..................7

*Harris v. Nelson*, 394 U.S. 286 (1969)...................................................................10

*Henry J. v. Green*, 2019 WL 13319444 (D.N.J. Jan. 29, 2019) ...................................8

*In re Abbott*, 800 F. App'x 296 (5th Cir. 2020).........................................................7

*In re Grand Jury Proceedings Subpoena to Testify to Wine*, 841 F.2d 230 (8th Cir. 1988) ...........7

*In the Matter of Immigr. Petitions for Rev. Pending in the U.S. Ct. of Appeals for the
Second Cir.*, 702 F.3d 160 (2d Cir. 2012)...........................................................9

*June Med. Servs., LLC v. Gee*, 139 S. Ct. 661 (2019) ...............................................7

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004)................................6

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936)..............................................................7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ...............11

*Marine Polymer Techs., Inc. v. HemCon, Inc.*, 395 F. App'x 701 (Fed. Cir. 2010) ......7

*Middle E. Broad. Networks, Inc. v. United States*,
2025 WL 1378735 (D.C. Cir. May 7, 2025)........................................................7

*Murthy v. Missouri*, 2023 WL 6763585 (U.S. Oct. 13, 2023)......................................7

*Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13 (D.D.C. 2025) ...................5, 7

*Nken v. Holder*, 556 U.S. 418 (2009)......................................................................6

*Noem v. Abrego Garcia*, 145 S. Ct. 1017 (2025).....................................................10

*Noem v. Abrego Garcia*, 2025 WL 1022673 (U.S. Apr. 7, 2025)..............................7, 12

*Oracle Int'l Corp. v. Rimini St., Inc.*, 2023 WL 5221947 (D. Nev. Aug. 15, 2023) ......7

*Planned Parenthood Monte Mar, Inc. v. Ford*,
2025 WL 1210968 (D. Nev. Apr. 25, 2025).........................................................7

*Procup v. Strickland*, 792 F.2d 1069 (11th Cir. 1986) (en banc) ................................6

*Rodriguez v. Berryhill*, 2019 WL 7403978 (S.D.N.Y. Jan. 22, 2019).............................8

*Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4 (1st Cir. 2000) .........................4

*Texas v. DHS*, 2024 WL 5454617 (E.D. Tex. Aug. 26, 2024) ...............................5, 6, 7

*Trump v. J.G.G.*, 145 S. Ct. 1003 (2025)................................................................10

*Trump v. Vance*, 2019 WL 5703884 (2d Cir. Oct. 7, 2019) ........................................7

*Turtle Mountain Band of Chippewa Indians v. Howe*,
2025 WL 1943858 (U.S. July 16, 2025)............................................................12

*Twelve John Does v. District of Columbia*, 841 F.2d 1133 (D.C. Cir. 1988)................7

*U.S. Doge Serv. v. Crew*, 145 S. Ct. 1981 (2025)....................................................13

Page

Cases—continued:

*United States v. Briggs*, 2020 WL 3077171 (E.D. Pa. June 10, 2020) ...........................................8
*United States v. Eaton Corp.*, 2024 WL 4513277 (6th Cir. Sept. 3, 2024) ...................................7
*United States v. Langley*, 2016 WL 3855634 (D. Md. July 15, 2016) .........................................8
*United States v. McGowan*, 2020 WL 3867418 (6th Cir. June 28, 2020) ....................................7
*United States v. McLaughlin*, 2021 WL 684044 (E.D. Pa. Feb. 22, 2021)....................................8
*United States v. Taylor*, 2020 WL 7264070 (D.D.C. Dec. 10, 2020).........................................8
*United States v. Texas*, 144 S. Ct. 797 (2024) ...........................................................5, 6, 7
*Whitehouse v. U.S. Dist. Ct. for Dist. of R.I.*, 53 F.3d 1349 (1st Cir. 1995)................................4
*Yeshiva Univ. v. YU Pride All.*, 2022 WL 4127422 (U.S. Sept. 9, 2022)....................................7
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................................12

## CONSTITUTION, STATUTES, AND RULE

U.S. Const. art. I, § 9, cl. 2...........................................................................................10
28 U.S.C.
　§ 1651.............................................................................................................3, 5
　§ 2071.................................................................................................................5
50 U.S.C. § 21..........................................................................................................10
Fed. R. Civ. P. 37......................................................................................................13

## OTHER AUTHORITIES

1st Cir. R. 18.0 (May 7, 2018) ....................................................................................9
3d Cir. Standing Order Regarding Immigration Cases (Aug. 5, 2015) ...........................9
4th Cir. Standing Order 19-01 (Oct. 21, 2019)............................................................9
9th Cir. Gen. Order 6.4 (July 1, 2002)........................................................................9
Amy Coney Barrett, *Procedural Common Law*, 94 Va. L. Rev. 813 (2008) ................5
Rachel Bayefsky,
　*Administrative Stays: Power and Procedure*, 97 Notre Dame L. Rev. 1941 (2022)................5
D. Md. Am. Standing Order 2025-01 (May 28, 2025) .....................................3, 8, 9, 10
D.C. Cir. Handbook of Practice and Internal Procedures (2024) ...................................7
Defs' Mem. Law in Opp. to Plfs' Mot. TRO,
　*Abrego Garcia v. Noem*, No. 8:25-cv-951 (D. Md. Mar. 31, 2025), Dkt. 11 .........................10
The Need for Additional Judgeships: Litigants Suffer When Cases Linger, U.S. Cts.
　(Nov. 18, 2024), https://tinyurl.com/ydm9tuuu ...................................................6
Roscoe Pound, *The Rule-Making Power of the Courts*, 12 A.B.A. J. 599 (1926)........................12
U.S. District Courts – National Judicial Caseload Profile,
　U.S. Cts., https://tinyurl.com/2usw46pm ...............................................................6

## INTEREST OF AMICI CURIAE

Amici curiae are eleven retired federal judges from the U.S. District Court for the District of Maryland and other district courts and courts of appeals, as set out in the Appendix. Amici have decades of experience adjudicating disputes and handling the administrative challenges associated with the massive docket of federal court cases. Amici were appointed by Republican and Democratic presidents and hold a variety of jurisprudential views. But amici all have a strong interest in defending the independence of the judicial branch and its ability to resolve cases or controversies falling within its jurisdiction.

The government's lawsuit—which targets every sitting judge in the District of Maryland—threatens the judicial role to its core. The government seeks to enjoin the district's judges from employing a commonplace docket-management technique—the administrative stay—that courts at all levels of the Judiciary routinely use to preserve their jurisdiction and to provide time for courts to consider the parties' submissions before they are mooted by the government's actions. The government's suit also threatens to place two coequal branches of government at loggerheads, undercutting core separation-of-powers principles, threatening the rule of law, and opening a Pandora's Box of practical problems.[1]

## INTRODUCTION

The government filed this suit against the entire District of Maryland bench, the Clerk of Court, and the Court itself, attempting to enjoin the Court from implementing a routine standing order that imposes a temporary two-business-day administrative stay on habeas cases brought by potential deportees. Amici write in support of Defendants to emphasize four points.

---

[1] No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money to fund the preparation or submission of this brief.

*First*, it is well established that federal courts have the power to issue short administrative stays to preserve their jurisdiction. As amici can attest, these orders are essential to ensuring that overburdened courts can manage their dockets by briefly preserving the status quo to provide time to rule on requests for emergency relief.

*Second*, the District of Maryland's standing order fits well within this authority. The order temporarily preserves the status quo for just two business days so that the Court can decide if it has jurisdiction over a given petition for habeas corpus before the petitioner is removed from the country. The order also aligns with the practice of several courts of appeals, which impose automatic stays on immigration-related habeas petitions for even longer periods of time.

*Third*, the government's suit unabashedly interferes with the Court's authority to manage its docket and assure itself of its jurisdiction by briefly preserving the status quo. As a result, the suit raises numerous separation-of-powers problems. Those problems are all the more severe given that the government's suit, if it proceeds, could result in coequal branches of government seeking discovery from each other—an unprecedented outcome that would place the Executive and Judiciary on a collision course. Indeed, amici were never subject to such far-reaching discovery during their judicial service.

*Fourth*, the government's suit creates myriad practical problems. In amici's judgment, suing every district judge in a district severely drains judicial resources, as already overburdened judges must sideline their judicial responsibilities to defend themselves. Moreover, the nature of the government's suit requires appointing an out-of-district presiding judge, which drains the resources of another district as well. And the government's lawsuit also places judges in the difficult position of finding conflict-free counsel willing to represent them against the Executive.

For all these reasons, and those in Defendants' brief, amici respectfully submit that the government's motion for a preliminary injunction should be denied and the case dismissed.

## BACKGROUND

In recent months, the District of Maryland has been inundated with an "influx of habeas petitions" from "alien detainees" claiming they are "subject to improper and imminent removal." D. Md. Am. Standing Order 2025-01, at 1 (May 28, 2025).  To manage this flood of cases, the Court issued a standing order on May 21, 2025, and amended it one week later.  *Id.* at 1-2; *see also* Compl. ¶¶ 32-36, 39.  The amended standing order automatically and temporarily enjoins the government from removing habeas petitioners from the continental United States or from altering their legal status for just two business days after the Clerk notifies the government that the alien has filed a habeas petition.  D. Md. Am. Standing Order 2025-01, at 1-2.

In the standing orders, the Court noted that the All Writs Act, 28 U.S.C. § 1651(a), permits courts to "issue all writs necessary or appropriate in aid of their respective jurisdiction and agreeable to the usages and principes of law."  D. Md. Am. Standing Order 2025-01, at 1.  The Court further noted that the Supreme Court has recognized "a limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels."  *Id.* (quoting *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966)).  Consistent with that authority, the Court issued the orders to "preserve existing conditions and the potential jurisdiction of [the] Court over pending matters while the Court determines the scope of its authority to grant the requested relief" and "to ensure the Court is able to evaluate" the claims.  *Id.*

Roughly one month later, the Department of Justice, suing on behalf of the United States and the Department of Homeland Security, filed an action in the District of Maryland, facially challenging the standing orders.  Compl. ¶¶ 70-101.  In a highly unusual move, the government

named as defendants every judge in the District of Maryland, the Clerk of Court, and even the District Court itself.  *Id.* ¶¶ 14-30.  The government then filed a motion requesting that "each judge of this Court recuse himself or herself from this matter" and that the case be referred to the U.S. Court of Appeals for the Fourth Circuit for transfer to another district or assignment of an out-of-district judge.  Dkt. 2 at 1.  The Chief Judge of the District referred the motion to the Chief Judge of the Fourth Circuit, who appointed a judge from another district to preside over the case.  Dkt. 6; July 2, 2025, Dkt. Order Reassigning Case.  Thereafter, the government moved to preliminarily enjoin Defendants from implementing the standing orders in any case.  Dkt. 14.

## ARGUMENT

The government's challenge to the District of Maryland's modest standing order is an extraordinary, if not entirely unprecedented, broadside against the Judiciary's authority to preserve its jurisdiction, manage its docket, and briefly maintain the status quo of pending controversies.  Despite the government's assurances to the contrary (at 1, 11), launching a "facial" challenge to a district court's administrative order (rather than challenging the order as applied in a particular case) is not something that the United States "often does."  Aside from a pair of stray lawsuits brought by inferior officers, it is something the government rarely, if ever, does.[2]  *See Whitehouse v. U.S. Dist. Ct. for Dist. of R.I.*, 53 F.3d 1349 (1st Cir. 1995) (U.S. Attorney challenging district court's local rule); *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 11 (1st Cir. 2000) (same).  Indeed, amici—who have among them decades of judicial experience—have never seen nor been subject to such a lawsuit.  And for good reason.  As Defendants correctly argue in their opposition brief, this lawsuit is not even justiciable because it effectively is a suit by the United States against

---

[2] The remaining authorities mustered by the government (at 11 & n.2) do not support its depiction of this lawsuit as run-of-the-mill:  Private persons, not a coequal branch of government, brought those challenges.

the United States.  Dkt 25 at 3, 15-16.  Justiciability aside, however, amici write to emphasize that the government's lawsuit seriously disrupts the separation of powers between this Nation's coequal branches, imperils the Judiciary's authority to preserve its jurisdiction and resolve controversies arising therein, and portends a host of practical problems.[3]

## I.    Federal Courts Have Authority To Issue Administrative Stays or Temporary Injunctions To Preserve Their Jurisdiction

Although the government attacks the amended standing order as exceeding the bounds of judicial power, standing orders—including those that impose administrative stays—are standard instruments of judicial management.  Indeed, amici themselves used standing orders and administrative stays consistently throughout their judicial service.  And there is no dispute that federal courts have always been able to order brief stays when doing so serves the administration of justice.  *See* Amy Coney Barrett, *Procedural Common Law*, 94 Va. L. Rev. 813, 844 & nn.90, 91 (2008) (collecting cases).  This power arises out of courts' inherent authority to manage their dockets and is codified in the All Writs Act, 28 U.S.C. § 1651, which recognizes that federal courts may issue writs to preserve their jurisdiction.  *See, e.g.*, *United States v. Texas*, 144 S. Ct. 797, 798 n.1 (2024) (Barrett, J., concurring) (citing Rachel Bayefsky, *Administrative Stays: Power and Procedure*, 97 Notre Dame L. Rev. 1941, 1960-64 (2022)); *Texas v. DHS*, 2024 WL 5454617, at *1-2 (E.D. Tex. Aug. 26, 2024); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13, 16-17 (D.D.C. 2025).  As discussed below, administrative stays (i) allow courts to briefly preserve the

---

[3] To the extent the government wishes to challenge a standing rule, it has other potential avenues for doing so besides filing a standalone lawsuit against a district's judges.  As Defendants note, the government may challenge a standing rule in the context of an actual case or controversy, whether by appeal or via mandamus in extraordinary cases.  Dkt. 25 at 27.  And to the extent the government is concerned about mootness, it could invoke the exception for issues that are capable of repetition yet evade review.  *Id.* at 15.  Also, the government could petition the judicial council of the relevant circuit for review of the rule under 28 U.S.C. § 2071(c)(1).

status quo so that they can exercise their jurisdiction, (ii) give judges the time necessary to deliberate on emergency motions, and (iii) have become a routine aspect of case management. *Texas*, 144 S. Ct. at 798-99 (Barrett, J., concurring).

*First*, administrative stays enable courts to preserve their jurisdiction over emergency applications. By prohibiting parties from altering the status quo in "ongoing [or] potential future proceedings," *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004), administrative stays allow courts to "protect their jurisdiction from [external] conduct" that would interfere with their "ability to carry out Article III functions," *Procup v. Strickland*, 792 F.2d 1069, 1073 (11th Cir. 1986) (en banc). These temporary stays thus ensure that, should relief ultimately be warranted, the court retains jurisdiction to grant it. *Texas*, 2024 WL 5454617, at *3.

*Second*, administrative stays give judges the time necessary to consider emergency applications. Ordinarily, granting a stay requires consideration of four factors, including the applicant's likelihood of success on the merits. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Those factors, however, are "not always easy to evaluate in haste, and an administrative stay buys the court time to deliberate." *Texas*, 144 S. Ct. at 798 (Barrett, J., concurring).

Amici know firsthand that these brief stays are particularly important because judges often face "crushing" caseloads. *See* The Need for Additional Judgeships: Litigants Suffer When Cases Linger, U.S. Cts. (Nov. 18, 2024), https://tinyurl.com/ydm9tuuu. For example, in the District of Maryland, judges have an average of 487 pending cases. *See* U.S. District Courts – National Judicial Caseload Profile 20, U.S. Courts, https://tinyurl.com/2usw46pm.

Entering an administrative stay allows a court to manage its imposing docket and make an informed decision on an emergency application while preserving the status quo. *See Texas*, 144 S. Ct. at 798-99 (Barrett, J., concurring). At the same time, an administrative stay "should last no

longer than necessary to make an intelligent decision" in order to minimize any potential harm. *Id.* at 799. Administrative stays are thus a "flexible, short-term tool" to give courts a brief pause to decide emergency motions. *Id.*; *see also Dietz v. Bouldin*, 579 U.S. 40, 45-47 (2016); *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). Without administrative stays, amici submit that effectively adjudicating emergency applications would often become unworkable for judges.

*Third*, contrary to the government's assertions (at 12-15), the administrative stay here is far from an aberration. As the Fifth Circuit has observed, there is nothing "untoward in … entering a temporary administrative stay." *In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020). Indeed, such stays are "routine practice," *id.*, at every level of the Judiciary. The Supreme Court,[4] courts of appeals,[5] and district courts[6] all use administrative stays to preserve the status quo and ensure

---

[4] *E.g.*, *Noem v. Abrego Garcia*, 2025 WL 1022673, at *1 (U.S. Apr. 7, 2025); *Dep't of State v. AIDS Vaccine Adv. Coal.*, 145 S. Ct. 753, 753 (2025) (recognizing past entry of administrative stay); *Murthy v. Missouri*, 2023 WL 6763585, at *1 (U.S. Oct. 13, 2023); *Yeshiva Univ. v. YU Pride All.*, 2022 WL 4127422, at *1 (U.S. Sept. 9, 2022); *June Med. Servs., LLC v. Gee*, 139 S. Ct. 661, 661 (2019).

[5] *E.g.*, *Middle E. Broad. Networks, Inc. v. United States*, 2025 WL 1378735, at *1 (D.C. Cir. May 7, 2025) (en banc); *United States v. Eaton Corp.*, 2024 WL 4513277, at *1 (6th Cir. Sept. 3, 2024); *United States v. McGowan*, 2020 WL 3867418, at *1 (6th Cir. June 28, 2020); *Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019); *Trump v. Vance*, 2019 WL 5703884, at *1 (2d Cir. Oct. 7, 2019); *Brady v. NFL*, 638 F.3d 1004, 1005 (8th Cir. 2011); *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 395 F. App'x 701, 702 (Fed. Cir. 2010); *Cobell v. Norton*, 2004 WL 603456, at *1 (D.C. Cir. Mar. 24, 2004); *Arnold v. Garlock, Inc.*, 278 F.3d 426, 433 (5th Cir. 2001) (recognizing past entry of administrative stay); *In re Grand Jury Proceedings Subpoena to Testify to Wine*, 841 F.2d 230, 232 (8th Cir. 1988) (similar); *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1137 (D.C. Cir. 1988) (similar); *accord* D.C. Cir. Handbook of Practice and Internal Procedures VIII.A (2024) (The special panel "may enter an administrative stay of very short duration before receiving a response to give the Court more time to consider the matter.").

[6] *E.g.*, *Planned Parenthood Monte Mar, Inc. v. Ford*, 2025 WL 1210968, at *5-6 (D. Nev. Apr. 25, 2025); *Gallusz v. LLP Mortg., Inc.*, 2025 WL 1360771, at *2 (S.D. Cal. Apr. 15, 2025); *Nat'l Council of Nonprofits*, 763 F. Supp. 3d at 16-17; *Texas*, 2024 WL 5454617, at *2; *Oracle Int'l Corp. v. Rimini St., Inc.*, 2023 WL 5221947, at *5-6 (D. Nev. Aug. 15, 2023).

the court has time to review the relevant filings. Amici, too, used administrative stays for this purpose during their judicial tenure.

Nor is there anything improper about a court issuing a standing order to address a category of frequently recurring cases in which administrative stays or similar relief are necessary. For example, during past government shutdowns, district courts entered standing orders administratively staying all civil cases involving the U.S. Attorney's Office or the Department of Justice. *See Henry J. v. Green*, 2019 WL 13319444, at *1 n.3 (D.N.J. Jan. 29, 2019); *Rodriguez v. Berryhill*, 2019 WL 7403978, at *2 n.2 (S.D.N.Y. Jan. 22, 2019). During the COVID-19 pandemic, district courts entered standing orders extending speedy-trial deadlines or postponing jury selection or trials in criminal and civil matters. *E.g.*, *United States v. Briggs*, 2020 WL 3077171, at *2 (E.D. Pa. June 10, 2020); *United States v. Taylor*, 2020 WL 7264070, at *2-3 (D.D.C. Dec. 10, 2020). And district courts have entered standing orders staying litigation on certain post-conviction petitions pending the resolution of relevant appeals. *See United States v. McLaughlin*, 2021 WL 684044, at *4 (E.D. Pa. Feb. 22, 2021); *United States v. Langley*, 2016 WL 3855634, at *2 (D. Md. July 15, 2016). In all these instances, courts acted within their authority to manage their dockets by adopting standing orders to address recurring categories of cases.

## II.    The District of Maryland's Standing Order Fits Within This Inherent Authority and Follows Accepted Practice

The District of Maryland's standing order falls squarely within a court's authority to preserve its jurisdiction and manage its docket. The amended order imposes a temporary, administrative stay that bars removing habeas petitioners or altering their legal status for just two business days. D. Md. Am. Standing Order 2025-01, at 2. That short pause ensures that the court has time to decide if it has jurisdiction over the case before the person is removed from the country.

The District of Maryland's amended standing order is far from an outlier. Several courts of appeals have long imposed automatic administrative stays of removal that range from ten business days to the date upon which the court issues a decision.[7] The government identifies no disruption or harm from those circuit orders, which have been in place for years. And, notwithstanding the government's handwringing (at 19-22), the standing order here is even *less* disruptive than those longstanding circuit orders, since it automatically pauses removal proceedings for only two business days. *Id.*

## III.    The Government's Challenge to the Standing Order Threatens the Separation of Powers

### A.    If Successful, the Government Could Evade Judicial Review of Its Actions

Based on their decades of hands-on experience, amici underscore that the government's suit, if successful, would significantly interfere with courts' ability to protect their own jurisdiction and thus raises serious separation-of-powers concerns. If courts are powerless to enter brief administrative stays while they consider emergency applications, then the Executive could defeat judicial review simply by taking swift action to deprive the court of jurisdiction before it renders a decision. That would allow the Executive to insulate its actions from review and prevent courts from fulfilling their constitutionally assigned role.

---

[7] 1st Cir. R. 18.0 (May 7, 2018) (directing clerk to enter an "administrative order staying removal for ten business days"); 3d Cir. Standing Order Regarding Immigration Cases (Aug. 5, 2015) (directing administrative stay "until such time as a motions panel can consider the motion"); 4th Cir. Standing Order 19-01 (Oct. 21, 2019) (directing clerk to "enter an administrative order staying removal for a period of 14 days"); 9th Cir. Gen. Order 6.4(c)(1) (July 1, 2002) ("Upon the filing of an initial motion or request for stay of removal or deportation, the order of removal or deportation is temporarily stayed until further order of the Court."); *cf. In the Matter of Immigr. Petitions for Rev. Pending in the U.S. Ct. of Appeals for the Second Cir.*, 702 F.3d 160, 162 (2d Cir. 2012) (recognizing government's "forbearance policy" pausing removals while an appeal is pending).

This concern is especially acute in the context of habeas corpus petitions. "The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969). The importance of the writ is reflected in the Constitution itself, which generally prohibits suspension of the writ. U.S. Const. art. I, § 9, cl. 2. And the writ plays a particularly significant role in challenges to the Executive's detention and removal of individuals under the Alien Enemies Act (AEA). 50 U.S.C. § 21. Indeed, the Supreme Court recently held that challenges to "confinement and removal under the AEA … fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) (citation omitted). In particular, such core habeas challenges must be brought in the district in which the individual is confined. *Id.* at 1005-06.

The Executive has taken the position, however, that once it removes an individual from the country, federal courts no longer have jurisdiction to rule on that individual's habeas petition. *See* Defs' Mem. Law in Opp. to Plfs' Mot. TRO, *Abrego Garcia v. Noem*, No. 8:25-cv-951 (D. Md. Mar. 31, 2025), Dkt. 11, at 5-8; *but see Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1019 (2025) (Sotomayor, J., statement respecting disposition of application) (challenging that view). Assuming *arguendo* that the government is correct, it could evade habeas review by quickly removing a detainee from the country before the district court has a meaningful opportunity to review the petition. The standing order simply prevents that possibility by ordering a brief two-business-day pause "to preserve existing conditions and the potential jurisdiction of [the] Court over pending matters while the Court determines the scope of its authority to grant the requested relief." D. Md. Am. Standing Order 2025-01, at 1.

Forbidding district courts from employing such a temporary pause would lead to untenable results. Consider a habeas petition filed by a detainee on Friday night. Under the government's

view, it would enjoy practical veto authority over the petition until the court rules. Over the weekend, the government could remove the petitioner from the country. According to the government, that action would require the district court to dismiss the petition on Monday and not resolve a controversy that, when filed, may have fallen within its jurisdiction. The filing of a habeas petition would thus become the starting gun of a race between the government (to transfer the detainee out of the country) and the district court (to execute its constitutional and statutory obligations). Multiply that conflict by the thousands, and the district court would become a hastily run enterprise, rushing between proceedings lest a case suddenly vanish from its jurisdiction. The government's position would thus undermine the separation of powers by hindering the Judiciary's "virtually unflagging" obligation resolve cases within its jurisdiction. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citation omitted).

The government fails to grapple with the implications of its expansive position. It asserts (at 1) that it merely seeks to invalidate a judicial mechanism "that harms the federal government's sovereign interests." But the government (at 22) wrongly dismisses the Judiciary's countervailing interests in (i) ensuring it possesses jurisdiction, (ii) evaluating "respective claims for relief based on [parties] in-court testimony," and (iii) holding considered proceedings that are not "hurried and frustrated" by a party's unilateral conduct. In short, the government ignores the Judiciary's independent constitutional role. Taken to its logical conclusion, the government's theory would allow it to run roughshod over any effort by the Judiciary to preserve its jurisdiction that frustrates the Executive's prerogatives. In amici's judgment, that result would be devastating to the efficacy of the Nation's courts.

Should the government's lawsuit succeed, many longstanding rules maintained by courts across the country would also be vulnerable. As explained, *supra* note 7, various courts of appeals

maintain their own analogous (and often more restrictive) standing rules.  If the government's theory were accepted here, nothing would stop it from suing circuit judges to enjoin their rules. Indeed, the government offers no limiting principle that would prevent it from suing even the Justices of the Supreme Court and the Supreme Court itself.  The Supreme Court routinely issues administrative stays temporarily barring the implementation of circuit court mandates.  These stays sometimes implicate the powers of the Executive, *e.g.*, *Noem v. Abrego Garcia*, 2025 WL 1022673, at *1 (U.S. Apr. 7, 2025), and sometimes include minimal explanation, *e.g.*, *Turtle Mountain Band of Chippewa Indians v. Howe*, 2025 WL 1943858 (U.S. July 16, 2025).  On the government's view, it could sue sitting Supreme Court Justices for using such measures to preserve their jurisdiction on the grounds that such measures momentarily interfere with an executive command.  But the government offers no hint of who would even resolve such a controversy if, for example, every Supreme Court Justice were named as a defendant.  That the government's theory would have such sweeping implications only underscores its infirmity.

### B. Permitting This Lawsuit To Move Forward Would Create Unnecessary Friction Between the Judiciary and the Executive

Permitting the government's suit to proceed also would create unnecessary conflict between the Executive and the Judiciary.  To be sure, some degree of friction between branches is unavoidable, and indeed desirable, in a system of checks and balances.  Yet the government's lawsuit unnecessarily intensifies that "inevitable friction" and risks intruding into the Judiciary's authority.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 614 (1952) (Frankfurter, J., concurring) (citation omitted).  Courts could not "work effectively if" the executive branch "dictated" or interfered with the Judiciary's "procedural operations."  Roscoe Pound, *The Rule-Making Power of the Courts*, 12 A.B.A. J. 599, 601 (1926).

Making matters worse, the government's suit raises the specter that (should the action survive a motion to dismiss) the Executive and Judiciary might take civil discovery from one another, bringing the two branches into further conflict. Pursuant to the Federal Rules of Civil Procedure, the Executive could seek to depose judges, serve interrogatories and requests for admission, and request documents from the judicial branch like emails, text messages, internal memoranda, and meeting minutes. Similarly, the judges could seek discovery relevant to this litigation from Plaintiffs—the United States of America and the Department of Homeland Security. For example, the judges would be within their rights to depose the government's declarant about the alleged difficulties created by the standing order. *See* Baker Decl., Dkt. 14-1. Yet propounding such discovery requests raises separation-of-powers alarm bells, placing the executive and judicial branches on a "collision course." *See, e.g.*, *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 389 (2004); *U.S. Doge Serv. v. Crew*, 145 S. Ct. 1981, 1982 (2025). Indeed, permitting such discovery could lead to inquiries into the subjective motivation behind either the Court's standing order or the government's lawsuit or immigration policies, which would be a "substantial intrusion" that "should normally be avoided" under separation-of-powers principles. *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citation omitted). In their decades of experience serving in the judicial branch, amici have never been subject to such discovery.

Such discovery would transgress the boundaries between two branches, potentially creating flashpoints between the Executive and Judiciary over documents and testimony. Worse still, suppose one of the parties were to refuse to comply with court-ordered discovery. The presiding judge could have to sanction one of the branches of government, *see* Fed. R. Civ. P. 37, further exacerbating separation-of-powers concerns. Amici likewise have never been in a position requiring them to sanction one coequal branch of government in a lawsuit against another.

IV.    **The Government's Lawsuit Creates a Host of Practical Problems**

On top of violating core separation-of-powers principles, the government's decision to challenge the standing orders by suing every judge in the district—as opposed to objecting to the orders in a specific habeas case—could also disrupt federal courts' ability to fulfill their constitutional obligations. For one, this tactic drains scarce judicial resources by diverting judges' time and energy away from deciding cases and toward defending themselves. *Cf. Bradley v. Fisher*, 80 U.S. (13 Wall) 335, 348-49 (1871) (discussing similar policies underlying judicial immunity). For another, the government's suit required appointing a judge from another district to decide the case. *See* July 2, 2025 Dkt. Order Reassigning Case. That result necessarily diverts the appointed judge from deciding cases in his own district, expanding the drain on judicial resources to another district. Given their knowledge of the massive responsibilities of sitting judges, amici can attest that lawsuits against a district's entire bench and the Court itself would be highly disruptive and distracting. And the distraction created by the government's suit harms not only the judicial branch, but also the litigating parties and general public, who have a keen interest in the prompt resolution of disputes.

The government's approach of suing federal judges also creates myriad difficulties for the judges sued. Faced with a similar suit, judges might struggle to find counsel to represent them, as many local attorneys could not accept the representation due to actual or potential conflicts resulting from pending or prospective matters before judges in the district. As happened here, judges would likely need to reach beyond their district to search for conflict-free counsel. *See* Dkt. 8-10 (pro hac vice motions for judges' counsel). In this instance, Defendants were fortunate to retain highly skilled, conflict-free counsel. That likelihood reduces, however, if the government persists in filing facial challenges to standing rules in other district courts. If the government's strategy becomes commonplace, the judges that it later sues will be strained to identify adept,

conflict-free counsel who are willing to oppose a zealous government adversary.  These practical considerations underscore the patent impropriety of the government's lawsuit.

## CONCLUSION

For the foregoing reasons, the government's motion for a preliminary injunction should be denied and the case dismissed.

Dated: July 28, 2025                                                Respectfully submitted,

/s/ *Peter J. Kahn* (00579)
PETER J. KAHN (No. 00579)
LISA S. BLATT (D.C. Bar No. 429544) (*pro hac vice pending*)
MATTHEW B. NICHOLSON (D.C. Bar No. 1013418) (*pro hac vice pending*)
JAMES N. SASSO (D.C. Bar No. 90009725) (*pro hac vice pending*)
ERIN M. SIELAFF (D.C. Bar No. 90022139) (*pro hac vice pending*)
MADELINE C. PREBIL (No. 30308)
WILLIAMS & CONNOLLY LLP
  680 Maine Ave S.W.
  Washington, DC 20024
  (202) 434-5000
  *pkahn@wc.com*
  *lblatt@wc.com*
  *mnicholson@wc.com*
  *jsasso@wc.com*
  *esielaff@wc.com*
  *mprebil@wc.com*

15

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(d) and Local Civil Rule 102(c), I hereby certify that on this 28th day of July 2025, the foregoing was filed with the Court electronically by using the CM/ECF system, and service was effected electronically to all counsel of record.


Dated: July 28, 2025                           */s/ Peter J. Kahn*
                                               Peter J. Kahn

**Appendix: List of Amici**

Judge Robert J. Cindrich, U.S. District Court for the Western District of Pennsylvania (Ret.)

Judge Andre M. Davis, U.S. District Court for the District of Maryland & U.S. Court of Appeals for the Fourth Circuit (Ret.)

Judge Jeremy D. Fogel, U.S. District Court for the Northern District of California (Ret.)

Judge Marvin J. Garbis, U.S. District Court for the District of Maryland (Ret.)

Judge Thomas B. Griffith, U.S. Court of Appeals for the District of Columbia Circuit (Ret.)

Judge Paul W. Grimm, U.S. District Court for the District of Maryland (Ret.)

Judge Benson Everett Legg, U.S. District Court for the District of Maryland (Ret.)

Judge J. Michael Luttig, U.S. Court of Appeals for the Fourth Circuit (Ret.)

Judge William N. Nickerson, U.S. District Court for the District of Maryland (Ret.)

Judge Paul J. Watford, U.S. Court of Appeals for the Ninth Circuit (Ret.)

Judge Alexander Williams, Jr., U.S. District Court for the District of Maryland (Ret.)