# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:25-cv-02029 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CHIEF JUDGE GEORGE L. RUSSELL III, | ) | By:  Hon. Thomas T. Cullen |
| *in his official capacity, et al.*, | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

In May of this year, Chief Judge George L. Russell III of the United States District Court for the District of Maryland issued two standing orders prohibiting federal immigration officials, for just two business days, from removing or altering the legal status of any alien detainee who had filed a petition for a writ of habeas corpus. The court adopted these orders to address the substantial increase in habeas filings by alien detainees in Maryland, many of whom had been targeted by the government for expedited removal from the United States. Apparently, Chief Judge Russell and his colleagues were concerned that, absent a brief stay, many of these habeas petitioners would be transferred to detention facilities outside the State of Maryland—and thus outside the district court's territorial jurisdiction—before a judge even had the opportunity to read their petitions, let alone rule on their claims. The Chief Judge explained as much in the body of the first order, noting that a brief stay was necessary, among other reasons, "to preserve existing conditions and the potential jurisdiction of this Court over pending matters while the Court determines the scope of its authority to grant the request[ed] relief." (D. Md. Standing Order 2025-01, at 1 [ECF No. 14-2] (hereinafter "SO 2025-01").)

In so doing, the District of Maryland effectively borrowed from the playbook of the federal courts of appeal—many of which impose temporary stays of removal when alien detainees file petitions for review of final orders of removal issued by the Board of Immigration Appeals ("BIA"). For instance, when an alien detainee appeals a BIA removal order to the U.S. Court of Appeals for the Fourth Circuit (the appellate court that oversees the District of Maryland), that court typically enters an order staying removal for a period of 14 days "to allow time for responsive filings and to preserve the court's ability to make a considered decision on the motion." 4th Cir. Standing Order 19-01 (Oct. 21, 2019), *available at* https://perma.cc/SC37-V9SA. In limiting its stay to two business days, the District of Maryland's recent stopgap measure appears considerably more modest.[1]

The plaintiffs in this case—the United States of America and the United States Department of Homeland Security (collectively, "the Executive")—nevertheless took umbrage at Chief Judge Russell's actions. The Executive contends that the recent standing orders constitute a direct assault on its plenary authority to police immigration matters and enforce the nation's immigration laws.

According to the Executive, the standing orders are unlawful for three principal reasons. First, the Executive argues that they are inconsistent with the Federal Rules of Civil Procedure because they automatically afford injunctive relief only to a special class of litigants (*i.e.*, removable aliens) without requiring those litigants to satisfy the prerequisites for this type of equitable relief. Second, the Executive contends that the standing orders are *ultra vires*—or beyond the power of the court—given the limited statutory authority of district courts to

---

[1] Which makes sense, given that Congress has limited the authority of federal district courts to review immigration matters.

review immigration matters. Third, the Executive submits that, in issuing the orders, the District of Maryland violated well-established procedures for promulgating local rules of court.

Fair enough, as far as it goes. If these arguments were made in the proper forum, they might well get some traction. And under normal circumstances, it would not be surprising if the Executive raised these concerns through the channels Congress prescribed—that is, by challenging the orders as applied to a particular habeas proceeding through a direct appeal to the Fourth Circuit or, as expressly authorized by federal statute, by petitioning the Judicial Council of the Fourth Circuit, which has the authority to rescind or modify local court rules. *See* 28 U.S.C. §§ 2071(c), 332(d)(4).

But as events over the past several months have revealed, these are not normal times— at least regarding the interplay between the Executive and this coordinate branch of government. It's no surprise that the Executive chose a different, and more confrontational, path entirely.[2] Instead of appealing any one of the affected habeas cases or filing a rules challenge with the Judicial Council, the Executive decided to sue—and in a big way.

On June 24, the Executive filed a complaint in the District of Maryland naming Chief Judge Russell as the lead defendant, but adding, ostensibly for good measure, every other active and senior (*i.e.*, semi-retired) judge in the district (15 in total), the Clerk of Court, and the court itself (collectively, "Defendants"). In casting its wide net, the Executive ensnared an

---

[2] Indeed, over the past several months, principal officers of the Executive (and their spokespersons) have described federal district judges across the country as "left-wing," "liberal," "activists," "radical," "politically minded," "rogue," "unhinged," "outrageous, overzealous, [and] unconstitutional," "[c]rooked," and worse. Although some tension between the coordinate branches of government is a hallmark of our constitutional system, this concerted effort by the Executive to smear and impugn individual judges who rule against it is both unprecedented and unfortunate.

entire judicial body—a vital part of this coordinate branch of government—and its principal officers in novel and potentially calamitous litigation.[3]

Pending before the court is Defendants' motion to dismiss the Executive's lawsuit. Defendants argue that this action must be dismissed because it presents a nonjusticiable dispute between two co-equal branches of government. Specifically, they assert that, because the standing orders are quintessential judicial acts, the named judges are absolutely immune from this—or any other—suit. Defendants also argue that, despite the potential merits of the Executive's argument that Defendants exceeded their power in issuing the standing orders, there is no right—express or implied—to litigate that grievance in this manner.

As explained in detail below, this court agrees—nearly across the board. Any fair reading of the legal authorities cited by Defendants leads to the ineluctable conclusion that this court has no alternative but to dismiss. To hold otherwise would run counter to overwhelming precedent, depart from longstanding constitutional tradition, and offend the rule of law.

All of this isn't to say that the Executive is without any recourse; far from it. If the Executive truly believes that Defendants' standing orders violate the law, it should avail itself of the tried-and-true recourse available to all federal litigants: It should appeal.[4]

---

[3] The mere filing of this suit required the recusal of the entire federal bench in the District of Maryland and the assignment of this out-of-district judge who, by this designation, is *theoretically* empowered to enjoin his fellow district judges and, by extension, hold them in contempt for violating the court's orders. If the case were to survive a motion to dismiss, the parties—the individual judicial defendants and principal officers of the Executive, including the Secretary of Homeland Security and the United States Attorney General—would potentially be required to sit for depositions and produce documents, including emails and other internal communications, relevant to the issuance of the standing orders and the actual reasons for filing suit. These discovery demands, in turn, would almost certainly trigger claims of privilege—executive, judicial, deliberative-process, and the like—and invariably compound this constitutional standoff into epic proportions.

[4] Or pursue other alternatives permitted by the Constitution or Congress.

## I.    STATEMENT OF FACTS

On May 21, 2025, Defendants promulgated SO 2025-01. (Compl. ¶ 31 [ECF No. 1].) As justification, it invokes the All Writs Act, 28 U.S.C. § 1651, and the "limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels" as the sources of its authority. (SO 2025-01, at 1 (quoting *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966)).) By its terms, SO 2025-01 was issued "to preserve existing conditions" and the District of Maryland's "potential jurisdiction" while it "determines the scope of its authority to grant the requested[ed] relief" and to ensure that habeas petitioners "are able to participate in the adjudication of their requests for habeas relief," that the district court "is able to evaluate their respective claims for relief based on their in-court testimony," and that "the Government has a fulsome opportunity to brief and present arguments in its defense." (*Id.*)

A week later, Chief Judge Russell amended SO 2025-01.[5] (Compl. ¶ 39.) Amended Standing Order 2025-01 ("ASO 2025-01") invokes the same sources of authority as SO 2025-01. (Compl. ¶ 41; *see* ASO 2025-01, at 1 [ECF No. 14-3].) In addition to asserting the same stated purposes for its promulgation, ASO 2025-01 pointed to the "recent influx of habeas petitions concerning alien detainees purportedly subject to improper and imminent removal from the United States that have been filed after normal court hours and on weekends and holidays," which "has created scheduling difficulties and resulted in hurried and frustrating

---

[5] This amendment likely rendered SO-2025 defunct. Nevertheless, the Executive continues to challenge both standing orders.

hearings in that obtaining clear and concrete information about the location and status of the petitioners is elusive." (ASO 2025-01, at 1.)

ASO 2025-01 comprises three separate directives. First, it orders the Clerk of Court to docket a copy of the order after the filing of a petition for writ of habeas corpus on behalf of an alien detainee and "simultaneously send a copy of [ASO 2025-01], the Petition, and the Petitioner's full name and A# to the Chief and Deputy Chief of the Civil Division of the United States Attorney's Office for the District of Maryland, and then file a Notice that the documents have been transmitted." (*Id.* at 2.) Second, "effective upon the filing of the Notice" in a case, ASO 2025-01 "enjoin[s] and restrain[s]" the Executive from removing the habeas petitioner "from the continental United States or altering their legal status." (*Id.*) That directive remains in place "until 4:00 p.m. on the second business day after the filing of the Notice," unless its terms "are further extended by the presiding judge." (*Id.*) Finally, ASO 2025-01 orders the Executive to "notify appropriate officials of this Order promptly" after it is docketed in a particular case "and provide all necessary information and documents to effectuate compliance with this Order." (*Id.*)

The Executive alleges that it "raised [its] concerns" about the standing orders "to the Judicial Conference," but that "Defendants have made apparent that they intend to keep [ASO 2025-01] in place indefinitely." (Compl. ¶ 48.) It further contends that "[i]mplementation of the [o]rders is operationally challenging and interferes with [the Executive's] mission to administer and enforce the immigration laws and protect public safety and national security." (*Id.* ¶ 52.) Since they were issued, the standing orders have been docketed in multiple cases. (*Id.* ¶ 66; *see also id.* ¶ 58 (citing *Hernandez Escalante v. Noem*, No. 25-1799 (D. Md.)).)

- 6 -

The Executive filed suit against Defendants on June 24, 2025, seeking declaratory and injunctive relief to invalidate the standing orders. Because every district judge serving in the District of Maryland is named as a defendant in this case, the Chief Judge of the United States Court of Appeals for the Fourth Circuit assigned this out-of-district judge to sit by designation and decide this case. (*See* ECF No. 6.) On July 3, the Executive filed a motion for a preliminary injunction. (ECF No. 14.) Defendants countered with a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction based on justiciability issues, and 12(b)(6), for failure to state a claim. (ECF Nos. 24–25.) Both motions have been fully briefed, and the court heard argument on the motions on August 13. After having fully considered the record and the parties' arguments, the court will grant Defendants' motion to dismiss, which renders the Executive's motion for a preliminary injunction moot.

## II.    STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(1) challenge the court's jurisdiction over the subject matter of the complaint. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). A defendant can successfully challenge the court's subject-matter jurisdiction by asserting that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### III. ANALYSIS

Defendants argue that the Executive's lawsuit should be dismissed at the threshold for three independent reasons. The court agrees, for the most part. The court finds that (A) the Executive lacks standing to bring its claim for injunctive relief, but even disregarding that critical flaw, its entire complaint is subject to dismissal because (B) Defendants are immune from suit and, (C) alternatively, the Executive fails to identify a legitimate cause of action that allows it to bring this lawsuit. Because these irreconcilable defects mandate dismissal of the entire suit, the court does not reach the merits question of whether the standing orders are a proper exercise of judicial power.

To start, this is "an extraordinarily unusual lawsuit." *United States v. Texas*, 599 U.S. 670, 686 (2023). So before explaining the specific reasons for dismissal, the court takes a moment to ground itself in two simple, but fundamental, constitutional precepts that guide much of its analysis. First, the executive branch is not the sole sovereign in the United States of America. Second, the federal judiciary does not have plenary power, unmoored from a justiciable case or controversy or cause of action, to review any allegation of constitutional misconduct.

As the Supreme Court has explained, the "Framers of the Constitution sought to provide a comprehensive system" that made the United States of America—not a single branch—the sovereign, by "dividing and allocating the sovereign power among three co-equal branches." *United States v. Nixon*, 418 U.S. 683, 707 (1974). The coordinate branches together form the government of the United States of America, and *together* they are the sovereign in this Nation.

Regrettably, this lawsuit effectively pits two of those branches against one another. But it is important to remember that, at bottom, all branches—and the public officials who serve in them—share the same core sovereign interest: To support and defend the Constitution. *See* U.S. Const. art. II, § 1, cl. 8 (President's Oath); U.S. Const. art. VI, § 1, cl. 3 (Legislative and Judicial Officers' Oath).

An allegation by one branch that another has encroached on its constitutional prerogative is undoubtedly serious. It is essential to our constitutional structure that "[e]ach branch 'exercise[] . . . the powers appropriate to its own department,' and no branch can 'encroach upon the powers confided to the others.'" *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 191 (1881)) (ellipses in original). "This system prevents '[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands,'—an accumulation that would pose an inherent 'threat to liberty.'" *Id.* (alteration in original) (first quoting The Federalist No. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961), and then quoting *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring)).

The federal judiciary is, obviously, not above those rules. "In the Judicial Branch's case, it is vested with the 'ultimate and supreme' power of judicial review[,]" which, awesome though it may be, can be "wielded only in specific circumstances and to limited ends" as allowed by the Constitution. *Moody v. NetChoice, LLC*, 603 U.S. 707, 754 (2024) (Thomas, J., concurring) (quoting *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892)). Among other constitutional prerequisites for the exercise of judicial power, the legislative branch must generally authorize it. *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245 (1845) ("[T]he judicial power

of the United States . . . is (except in enumerated instances, applicable exclusively to [the Supreme Court]) dependent for its distribution . . . , and for the modes of its exercise, entirely upon the action of Congress[.]"); *cf. Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (defining jurisdiction as "whether a federal court has the power, under the Constitution or laws of the United States, to hear a case," and a cause of action as "whether a particular plaintiff . . . may, as a matter of law, appropriately invoke the power of the court").

This court can appreciate the Executive's concern that Defendants have encroached on its duty to police core matters of immigration. *See Texas*, 599 U.S. at 679 ("[T]he Executive Branch . . . retains discretion over whether to remove a noncitizen from the United States."). And at this early stage, it accepts those allegations as true. *See Iqbal*, 556 U.S. at 678. To be sure, "'[e]nergy in the [E]xecutive is much to be respected,'" and "[c]ourt rulings are not above criticism." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025) (second alteration in original) (quoting The Federalist No. 70, at 423 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). Like any other branches' actions, a court's orders can "overstep, and they can further intrude upon the prerogatives of other branches." *Id.*

But those disputes, weighty as they may be, must be resolved within the constitutional structure and with due respect for the Judiciary's *co-equal* standing with the executive branch. The Constitution does not give courts "general oversight" of other branches; rather, it permits courts to adjudicate only cases and controversies to the extent Congress allows. *Cf. Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) ("[F]ederal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them."). One branch's alleged infringement on another's exclusive power

does not license a constitutional free-for-all, so this court must ensure that it has the constitutional authority to entertain the Executive's lawsuit. *Id.* ("When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too."). In so doing, the court's allegiance is to the Constitution. *Cf. Massachusetts v. Laird*, 400 U.S. 886, 894 (1970) (Douglas, J., dissenting) ("It is far more important to be respectful to the Constitution than to a coordinate branch of government.").

With those constitutional principles front of mind, and for the specific reasons laid out below, the court finds the Executive's suit must be dismissed in its entirety.

### A. Justiciability

Defendants' first basis for dismissal is that the court lacks subject-matter jurisdiction over the Executive's lawsuit because it does not present a justiciable case or controversy, but many of their arguments do not strike the court as going towards justiciability.[6] That said, when independently reviewing jurisdiction over the Executive's claims (as it must), this court "did not immediately find it" everywhere. *Wells v. Johnson*, --- F.4th ---, ---, No. 24-1829, 2025 WL 2315981, at *2 (4th Cir. Aug. 12, 2025) (published). And so, the court undertakes its initial duty to ensure that the Executive has presented a justiciable case or controversy. *Id.* ("[F]ederal

---

[6] These arguments essentially make the case that the unprecedented nature of this lawsuit means that it is nonjusticiable because there are other ways to achieve what the Executive seeks here. (*E.g.*, Mem. Supp. Mot. Dismiss at 10 [ECF No. 24-1] ("Under our system of government, the Executive does not just haul off and sue the Judiciary.").) The court agrees that this interbranch lawsuit is novel, and that the Executive has other means to achieve its desired end of invalidating the standing orders. But that does not necessarily mean that such a lawsuit can never present a justiciable controversy, and the court does not read any of the cases cited by Defendants to hold to the contrary. *See* Michael Herz, *United States v. United States: When Can the Federal Government Sue Itself?*, 32 Wm. & Mary L.R. 893, 896, 910–914 (1991) (recognizing that "the Supreme Court has *never* dismissed an action as nonjusticiable because it could be characterized as *United States v. United States*," and opining that "[A]rticle III creates no obstacle to a lawsuit between two branches merely because they are both part of the federal government" (emphasis in original)). As will be discussed, that an interbranch lawsuit may be justiciable "does not mean that such litigation contains no [A]rticle III difficulties or that litigation is the most appropriate way to resolve interbranch disputes. In some circumstances, the Constitution may require the unhappy branch to take a nonjudicial route." *Id.* at 913.

courts must confirm for themselves that they have jurisdiction. That duty includes ensuring that a plaintiff has standing.") On this initial review, a justiciability concern emerged in the form of standing.

"Article III standing is a 'bedrock constitutional requirement'" that "is 'built on . . . the idea of separation of powers.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quoting *Texas*, 599 U.S. at 675). Its importance to that fundamental idea is plain; by limiting who can invoke the judicial branch's power to those who have actually been aggrieved, in a way that a court can redress, the doctrine ensures that federal courts exercise the awesome power of judicial review only to the extent the Constitution allows—to adjudicate cases or controversies. *See id.* at 378–80; *Wells*, 2025 WL 2315981, at *3.

"To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Wells*, 2025 WL 2315981, at *3 (alteration in original) (quoting *Food & Drug Admin.*, 602 U.S. at 380). Importantly, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (holding that a litigant lacked standing to sue for an injunction but appeared to have it to sue for damages).

Here, "[i]njury-in-fact and causation seem clear." *Wells*, 2025 WL 2315981, at *3. Though the court has not found case law to that effect, it is no great leap to conclude that an alleged constitutional intrusion on the Executive's broad "enforcement discretion" in the

immigration context, including the "discretion over whether to remove a noncitizen from the United States," causes an injury to the Executive. *Texas*, 599 U.S. at 679; *cf. id.* at 686 (rejecting a State's "extraordinarily unusual lawsuit" asking "a federal court to order the Executive Branch to alter its [immigration] arrest policies"). That this alleged constitutional violation was committed by members of the Judiciary does not make the injury any less concrete. And that injury was allegedly caused by the standing orders.

Redressability, though, is another question. To satisfy the final element of standing, "a plaintiff must show that the court has the power to grant the plaintiff's requested relief, and that such relief would redress the plaintiff's injury." *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 568–69 (1992). Though the first two elements are most frequently at issue, "[r]edressability can still pose an independent bar in some cases. For example, a plaintiff who suffers injuries caused by the government still may not be able to sue because the case may not be of the kind 'traditionally redressable in federal court.'" *Food & Drug Admin.*, 602 U.S. at 381 n.1 (quoting *Texas*, 599 U.S. at 676); *see Texas*, 599 U.S. at 690 (Gorsuch, J., concurring) ("Ordinarily, to remedy harms like those the [plaintiffs] demonstrated in this suit, they would seek an injunction. . . . But even assuming an injunction . . . would redress [the plaintiffs'] injuries, that form of relief is not available to them . . . . because of 8 U.S.C. § 1252(f)(1).").

That's the fundamental problem here, at least with respect to the Executive's claim for injunctive relief: the court lacks authority to enjoin Defendants. "The Judiciary Act of 1789 endowed federal courts with jurisdiction over all suits . . . in equity" and is the statutory authority that permits "federal courts to issue equitable remedies." *Trump*, 145 S. Ct. at 2551

(internal quotations omitted, alteration in original). As the Supreme Court recently instructed, that "statutory grant encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *Id.* (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). In so many words, if the kind of equitable relief requested was not available at the time of the founding, federal courts lack the authority to award it today. So, to determine whether this court has the authority to enjoin Defendants at the Executive's request, the relevant question is "whether the relief [the Executive] requested here was traditionally accorded by courts of equity." *Grupo Mexicano*, 527 U.S. at 319.

The answer is a resounding no. The Supreme Court's recitation of history in *Pulliam v. Allen*, 466 U.S. 522 (1984), provides that answer. There, an otherwise fractured Supreme Court agreed that "[a]t the common law itself, there was no such thing as an injunction against a judge." *Pulliam*, 466 U.S. at 529; *Pulliam*, 466 U.S. at 549 (Powell, J., dissenting) ("[S]uits for injunctive relief against a judge could not be maintained either at English common law or in the English courts of equity."). And even the equitable remedy that the Court found to be a "common-law parallel to the § 1983 injunction at issue [t]here"—"the King's prerogative writs"—were never used against judges on the sovereign's courts. *Id.* at 529, 536 ("[T]he King's Bench was successful in insulating its judges from collateral review."). At bottom, it appears that "[n]othing like" injunctions against a federal court or judge "was available at the founding," so "under the Judiciary Act, federal courts lack authority to issue them." *Trump*, 145 S. Ct. at 2560. The requested equitable relief is, in other words, "a forbidden one in this case," giving the Executive an insurmountable redressability problem. *Texas*, 599 U.S. at 690

(Gorsuch, J., concurring). Accordingly, the Executive lacks standing to pursue an injunction, and its claim for relief to that effect will be dismissed for want of subject-matter jurisdiction.[7]

That said, the same flaw does not extend to the Executive's prayer for a declaratory judgment, which is a congressionally created remedy that could redress its injury here. *See* 28 U.S.C. § 2201(a); *Wells*, 2025 WL 2315981, at *7–11. That means the court will not dismiss the Executive's suit on this basis alone.

Even if the Executive had standing to pursue the requested injunction, however, its entire suit—including its request for declaratory judgment—would be dismissed under the doctrines of sovereign and judicial immunity for the reasons discussed below. Accordingly, the court's ensuing discussion on immunity doctrines (and, after that, the Executive's lack of a cause of action) applies to the Executive's entire suit.

## B. Immunity

Apart from their justiciability concerns, Defendants argue that this suit can go no further because "[t]he district court itself possesses sovereign immunity, and the judges and clerk of court have immunity for their official acts." (Mem. Supp. Mot. Dismiss at 25.) The court agrees.

---

[7] To be clear, though Defendants never argued that the Executive's suit was nonjusticiable for this reason, the court's independent review of standing was prompted by both parties' discussion of *Grupo Mexicano* and *Trump v. CASA* at the August 13 hearing. Defendants cited the rule emanating from those cases in the context of its argument that the Executive lacks a cause of action and judicial immunity, and the Executive did the same when arguing the merits of why Defendants' standing orders were unlawful. Even though this rule was never raised in the standing context, it nevertheless requires the court, under its independent duty to ensure that it may use its judicial power, to find that the Executive lacks standing to pursue the injunctive relief it requested here.

In addition to the court's inherent equitable powers, the Executive asserts in its Complaint that this court has the statutory authority to issue the requested injunction under the All Writs Act, 28 U.S.C. § 1651 (*see* Compl. ¶ 11), but the Supreme Court rejected the same type of argument in *Grupo Mexicano*, 527 U.S. at 326 n.8.

### 1. Sovereign Immunity

The United States District Court for the District of Maryland, as an entity of the sovereign United States, is immune from suit and the Executive's claims against it must be dismissed.

Few rules are more settled in this Nation's body of law than the jurisdictional rule that "the United States may not be sued without its consent." *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *see Cotton v. United States*, 52 U.S. (11 How.) 229, 231 (1850). As a federal court created by Congress, a United States District Court is part of that combined sovereign that may not be sued absent congressional waiver. *See Atchison v. U.S. Dist. Cts.*, 190 F. Supp. 3d 78, 89 (D.D.C. 2016) (collecting cases); *cf. Glob. Mail Ltd. v. U.S. Postal Serv.*, 142 F.3d 208, 210 (4th Cir. 1998) (observing that "a governmental entity . . . is entitled to sovereign immunity unless Congress waives that immunity and authorizes consent to suit").

Rather than attempt to identify a statutory waiver, the Executive's arguments against sovereign immunity here rely on a logical fallacy and half-true citations to case law.[8] Accordingly, the court comes to the unsurprising conclusion that the United States District Court for the District of Maryland is entitled to sovereign immunity and will dismiss the Executive's claims against it.

---

[8] The Executive argues that because it can identify cases where federal courts were sued and those cases were *not* dismissed on sovereign-immunity grounds, that means the District Court here is necessarily not entitled to sovereign immunity. (*See* Mem. Opp'n Mot. Dismiss at 10 [ECF No. 52].) That is an elementary logical fallacy. *Cf. Long v. Hooks*, 972 F.3d 442, 491 (4th Cir. 2020) (en banc) (Richardson, J., dissenting) ("The absence of evidence is not proof of absence."). The court rejects that argument here (and everywhere else the Executive makes it).

The court also rejects the Executive's reliance on *Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022), in this context. It argues that "the Fourth Circuit held in *Strickland* that the court itself and its chief judge did not enjoy sovereign immunity from claims that they had 'acted beyond the scope of their powers and/or in an unconstitutional manner.'" (Mem. Opp'n Mot. Dismiss at 10 (quoting *Strickland*, 32 F.4th at 366).) That's only half right. *Strickland*'s quoted holding applied to "[t]he Official Capacity Defendants," which did not include the court itself. 32 F.4th at 366.

### 2. Judicial Immunity

"Judicial immunity is strong medicine. When it applies it is absolute. It not only protects judges from ultimate liability in a case, but also serves as a complete bar to suit." *Gibson v. Goldston*, 85 F.4th 218, 223 (4th Cir. 2023) (citing *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (per curiam)). "Such potent medicine is justified by the gravity of the illness it is meant to guard against—namely, a judiciary composed of judges afraid to act on their convictions." *Id.*

Before the court can consider whether these judges merit a prescription, however, the Executive says that judicial immunity is not available at the threshold under *Pulliam*. The Executive cites *Pulliam*'s blanket statement that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity" to argue that these federal judges are not immune from this suit seeking injunctive and declaratory relief. 466 U.S. at 541–42. To be fair, some courts have agreed with the Executive's position, seemingly taking the Supreme Court's statement at face value. *See, e.g.*, *Smith v. Scalia*, 44 F. Supp. 3d 28, 43 (D.D.C. 2014). Others seem less persuaded that *Pulliam* bars the application of judicial immunity to equitable suits against federal judges. *See Akinro v. Blake*, No. 07-cv-1450, 2007 WL 3020186, at *1 (D. Md. June 8, 2007) (Davis, J.) ("[F]ederal judges possess absolute judicial immunity from liability for . . . injunctive relief for their judicial duties conducted within their jurisdiction."), *aff'd*, 235 F. App'x 75 (4th Cir. 2007). The Fourth Circuit has not issued published authority on this issue.

The court does "not parse judicial opinions as if they were statutes" insofar as the Supreme Court's statements must be taken in context. *Frazier v. Prince George's Cnty.*, 140 F.4th 556, 565 (4th Cir. 2025) (citing *Nevada v. Hicks*, 533 U.S. 353, 372 (2001)). And so, the court

looks to that context to determine whether *Pulliam*'s holding is a broad edict that controls in this context.

In *Pulliam*, the Supreme Court granted certiorari to decide "[w]hether Judicial Immunity Bars the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988 Against a Member of the Judiciary Acting in his Judicial Capacity." 466 U.S. at 527 (alteration in original). The answer to the larger question of whether judicial immunity protected a state judge who had been successfully sued under § 1983 from paying fees depended "on whether judicial immunity bars an award of injunctive relief under § 1983" because "[t]here [was] no indication . . . that Congress intended to provide for a fee award if the official was immune from the underlying relief on which the award was premised." *Id.* at 527–28. But the court framed that subsidiary issue more broadly than the § 1983 context, asking "whether a judicial officer acting in her judicial capacity should be immune from prospective injunctive relief." *Id.* at 528. After examining English common law, its own precedent, and congressional intent, the Court "conclude[d] that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Id.* at 541–42. Returning to the question presented, the Court ultimately held that "[j]udicial immunity is no bar to the award of attorney's fees under 42 U.S.C. § 1988." *Id.* at 544.

Despite the admittedly sweeping nature of its recitation of the principles at play, this court thinks *Pulliam*'s holding is limited to judicial immunity as applied to *state* judges sued in *federal* court.

- 18 -

For starters, the Supreme Court's rules appear to have constrained it to consider judicial immunity only in the context of state judges sued under § 1983.[9] As the Court noted in assessing whether it could address the underlying judicial-immunity question in the first place, its rules permitted it only to determine "subsidiary question[s]" to the overarching question presented. *Pulliam*, 466 U.S. at 528 n.5 (internal quotations omitted). Because the overarching question presented there involved whether one could seek attorney's fees from a state judge under § 1988 after a successful § 1983 lawsuit, the court reasoned that "[t]he question whether judicial immunity should have barred the injunctive relief awarded *in this case*" was fair game to consider. *Id.* (emphasis added).

The Court's analysis of English common law also supports this reading. Diving into the history to determine if judicial immunity extended in the case before it, the Supreme Court first recognized that "there was no such thing as an injunction against a judge" at common law. *Id.* at 529. But it did find "a common-law parallel *to the § 1983 injunction at issue here*" in the form of "the King's prerogative writs" to inferior courts. *Id.* (emphasis added). The Court initially noted that judicial immunity, as it was originally conjured up by Lord Coke, "extended only to the higher judges of the King's courts" because of the supremacy of those sovereign courts. *Id.* at 531. Judicial immunity eventually extended to other inferior courts based on principles of judicial independence, the majority wrote, but only to an extent, for those courts remained inferior to the sovereign's courts, and the King's bench could therefore control them, notwithstanding the judicial immunity those judges otherwise enjoyed. *See id.* at 532 ("The King's Bench exercised significant collateral control over inferior . . . courts through

---

[9] Of course, federal officials may not be sued under § 1983.

the use of prerogative writs."); *see also id.* at 535 ("Although the King's Bench exercised direct review of the inferior common-law courts, it also used the writ of prohibition to control those courts.").

*Pulliam*'s survey of common-law judicial immunity makes one thing clear: From the inception of the immunity doctrine, the sovereign courts' judges themselves were immune from collateral review by other courts; they answered only to "God and the King." *See id.* at 530–31, 536 (internal quotations omitted). Nevertheless, it could be argued that the lesson the Supreme Court took from the common law in *Pulliam*—that "there was no inconsistency between a principle of immunity that protected judicial authority from a wide, wasting, and harassing persecution and the availability of collateral injunctive relief in exceptional cases"— is general enough to suggest that the judicial-immunity finding extends to federal judges. *Id.* at 536 (internal quotations omitted). But nothing in the common law discussed in *Pulliam* suggests that the courts of the sovereign ever had to deal with such harassing collateral relief. The Supreme Court said that that "insulat[ion] . . . had less to do with the doctrine of judicial immunity than with the fact that only the superior judges of the King's Bench . . . had authority to issue the prerogative writs," but the insulation nevertheless is part of the doctrine's history. *Id.* at 536.

U.S. District Judge Robert E. Payne's thorough discussion on the topic is persuasive. As he noted, "it appears that the analogy drawn in *Pulliam* between the prerogative writs issued by the King's Bench to inferior and rival courts and the injunctions issued by federal courts to state judges under § 1983 . . . does not apply in the context of" a suit to bring injunctive or declaratory relief against a federal judge. *Stephens v. Herring*, 827 F. Supp. 359, 364 (E.D. Va.

1993). That's because the collateral relief requested here "would be directed by one federal court to another court in the federal system and would not be related to the proper functioning of federal/state relations. In this regard, although the state courts in our federal system are not 'inferior' to the federal courts, the decisions of state courts are subject to federal review in matters involving federally protected rights and, under limited circumstances, are also subject to federal[-]court injunctions." *Id.* (cleaned up) (citing, *inter alia*, 28 U.S.C. § 2254).

Aside from the common-law discussion, other clues in the *Pulliam* majority's opinion support a reading that confines its holding to state judges in the § 1983 context. For one, the Court wrote that, "[a]lthough injunctive relief against a judge rarely is awarded, the United States Courts of Appeals that have faced the issue are in agreement that judicial immunity does not bar such relief." *Id.* at 528. But peeking under the hood, each case cited by the Court involved claims against state judges. *See id.* at 528 n.6 & 537 n.16.

Moreover, much of the Supreme Court's analysis hinged on the fact that Congress apparently intended (at least at that time) to allow for equitable relief against state judges when it provided the cause of action to sue state officials in the form of § 1983. *See id.* at 540–41; *id.* at 529 (noting the general rule that "common-law principles of . . . judicial immunity were incorporated into our judicial system and . . . should not be abrogated absent clear legislative intent to do so"). The Court concluded that "Congress intended § 1983 to be an independent protection for federal rights and [found] nothing to suggest that Congress intended to expand the common-law doctrine of judicial immunity to insulate state judges completely from federal collateral review." *Id.* at 541.

That important imprimatur of congressional approval is obviously missing in this context. "[U]nlike § 1983 claims, which were created by Congress for the very purpose of permitting federal oversight of the conduct of state officials, including judges, to enforce federal constitutional rights," judicially created causes of actions against federal officials carry "no corresponding congressional intent or authorization to permit . . . equitable relief against a federal judge." *Stephens*, 827 F. Supp. at 364.

Another indicator that *Pulliam* does not extend to limit judicial immunity for federal judges is its concern that extending the doctrine to state judges for prospective injunctive relief "would foreclose relief in situations where, in the opinion of a federal judge, that relief is constitutionally required and necessary to prevent irreparable harm." *Pulliam*, 466 U.S. at 539. As Judge Payne and others have noted, that concern simply isn't present when a federal judge acting in his judicial capacity made the alleged error in the first place. *See Stephens*, 827 F. Supp. at 364. "Congress has provided carefully structured procedures for taking appeals, including interlocutory appeals, and for petitioning for extraordinary writs in Title 28 of the United States Code" that allow "a litigant, such as [the Executive], [to] receive[] full federal[-]court review of allegations of deprivations of federal constitutional rights by federal judicial officers acting under color of federal law." *Mullis v. U.S. Bankr. Ct. for Dist. of Nevada*, 828 F.2d 1385, 1394 (9th Cir. 1987); *see* 28 U.S.C. §§ 1291 & 1292 (appeals), § 1651(a) (writs).

Finally, permitting federal injunctive or declaratory relief against a federal judge opens a can of worms that otherwise remains sealed by permitting collateral relief against a state judge. "[A]llow[ing] injunctive relief against federal judges would be to permit a 'horizontal appeal' from one district court to another or even 'reverse review' of a ruling of the court of

appeals by a district court." *Bolin v. Story*, 225 F.3d 1234, 1240 (11th Cir. 2000) (quoting *Mullis*, 828 F.2d at 1392–93). Though the court generally eschews a "parade of dreadfuls," *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 194 n.16 (1999), the Executive offers no principled reason why seeking an injunction against federal judges in this manner would not extend to a future injunction against judges of a higher court. That a district court judge could sit in judgment of the judicial acts of a panel of Circuit Judges or a Supreme Court Justice, for example, is a patently absurd result in the hierarchical federal court system Congress created. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n,* 606 U.S. ---, No. 25A103, 2025 WL 2415669, at *5 (Aug. 21, 2025) (Opinion of Gorsuch, J.) (highlighting the "basic tenet of our judicial system" that federal "judges are duty-bound to respect 'the hierarchy of the federal court system created by the Constitution and Congress'" (quoting *Hutto v. Davis,* 454 U.S. 370, 375 (1982))); *cf. Bolin,* 225 F.3d at 1241 ("[T]he rationale of *Pulliam* does not apply in suits against federal judges. . . . [T]o find otherwise would be to allow a new method of oversight of federal court actions by co-equal or inferior federal courts." (citing *Page v. Grady*, 788 F. Supp. 1207, 1211–12 (N.D. Ga. 1992))). Those problems are not implicated when a federal court is permitted to sit in collateral review of its state-court colleagues.

For all those reasons, the Supreme Court's general admonition not to impart different levels of immunity to state and federal officials for the same constitutional violation in *Butz v. Economou,* 438 U.S. 478 (1978), does little to shake the court's reading of *Pulliam. See also Stephens*, 827 F. Supp. at 362 (distinguishing *Butz*'s lesson because it did not involve judicial immunity). At bottom, none of *Pulliam*'s reasoning supports a "need to carve out an exception

- 23 -

to judicial immunity to permit declaratory and injunctive relief against *federal* judicial officers," so its logic is inapplicable here. *Mullins*, 828 F.2d at 1394 (emphasis in original).

Finding no *Pulliam* problem, the court next considers if the federal judges in this case are entitled to judicial immunity. To be sure, the doctrine does not shield any act a judge takes while wearing a black robe; rather, "[j]udicial immunity . . . protects the judicial acts they undertake as part of their public service; it is 'defined by the *functions* it protects and serves, not by the person to whom it attaches.'" *Gibson*, 85 F.4th at 223 (emphasis in original) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)). That these specific defendants are members of the federal bench—or, in the clerk's case, acting at the direction of a judge—starts, but does not end, the inquiry.

Judicial immunity protects judges from suit unless "they act in the 'clear absence of all jurisdiction over the subject-matter' or when they engage in nonjudicial acts," *id.* (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351 (1871)), "*i.e.*, actions not taken in the judge's judicial capacity," *Mireles*, 502 U.S. at 11.

The Executive argues judicial immunity is not available to these defendants (*Pulliam* aside) because "promulgating standing orders and local rules that violate procedural and substantive requirements is not a function traditionally protected by judicial immunity." (Mem. Opp'n Mot. Dismiss at 11–12 (cleaned up).) It does not argue that these acts were taken "in the 'clear absence of all jurisdiction over the subject-matter,'" so the court asks only whether the complained-of act was taken in the judges' judicial capacity. *Gibson*, 85 F.4th at 223 (quoting

*Bradley*, 80 U.S. (13 Wall.) at 351).[10] In so doing, "the relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.'" *Mireles*, 502 U.S. at 13 (quoting *Stump*, 435 U.S. at 362). So here, the issuance of a standing order generally is the relevant act in question, not issuing SO-2025, ASO-2025, or anything contained therein. *Cf. id.* at 13 ("[W]e look to the particular act's relation to a general function normally performed by a judge . . . .").

An act is "judicial" if it is "a function normally performed by a judge." *Stump*, 435 U.S. at 362. There is a "distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Forrester*, 484 U.S. at 227. It is, however, elementary that "[i]ssuing an order is a judicial function," so the defendant judges here have been sued for judicial acts. *Gibson*, 85 F.4th at 224; *see Majerska v. United States*, No. 21-cv-4381, 2021 WL 4739602, at *3 (D.N.J. Oct. 12, 2021) (issuing standing order was a "plainly judicial" act); *Cabrera v. United States*, No. 21-cv-4154, 2021 WL 4311255, at *3 (S.D.N.Y. Sept. 21, 2021) (same).

As pleaded, the defendant judges are entitled to judicial immunity. That necessarily means the defendant Clerk of Court, whose only alleged sin is implementing the standing orders, is protected under the same doctrine. *See Hamilton v. Murray*, 648 F. App'x 344, 345 (4th Cir. 2016) ("[C]ourt clerks enjoy derivative absolute judicial immunity when they act in obedience to a judicial order or under the court's direction." (citing *McCray v. Maryland*, 456

---

[10] Even if it had, the court would not find judicial immunity barred on that ground. This bar to judicial immunity appears high, as even a judge who acts "in excess of his authority" does not necessarily act in "clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978) (internal quotations omitted). Moreover, a judge enjoys immunity "for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Id.* at 359; *see also Gibson*, 85 F.4th at 223 (noting that judicial immunity "protects even actions 'alleged to have been done maliciously or corruptly'" (quoting *Bradley*, 80 U.S. (13 Wall.) at 351)).

F.2d 1, 5 (4th Cir. 1972))). Because all Defendants are absolutely immune from suit, *see supra* III.B.1, this lawsuit must be dismissed.

If neither immunity doctrine discussed above applied, the court would nevertheless dismiss the Executive's suit in its entirety for failure to state a claim.

## C. Lack of Cause of Action

Defendants also move to dismiss the Executive's lawsuit because it does not identify a cause of action that allows it in the first place. The court again agrees. Dismissal of the Executive's suit is appropriate because it has not pointed to a cause of action that permits this court to entertain a lawsuit between two coordinate branches of government, and this court will not be the first to create one.

It is axiomatic that, separate and apart from justiciability and jurisdiction, a plaintiff must have a legally cognizable cause of action to invoke a court's judicial power to review a given case or controversy. *See Davis*, 442 U.S. at 239 n.18 (instructing that the "cause of action" question asks "whether a particular plaintiff . . . may, as a matter of law, appropriately invoke the power of the court"); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction . . . ."). Congress, as the branch responsible for deciding *what* cases or controversies a court may decide, generally creates these causes of actions. *Egbert v. Boule*, 596 U.S. 482, 491 (2022). And though courts have occasionally implied causes of action to allow an aggrieved plaintiff to sue for alleged constitutional violations, that practice has gone by the wayside "'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'" *Id.* (quoting

*Hernández v. Mesa*, 589 U.S. 93, 100 (2020)). For under those constitutional norms, "creating a cause of action is a legislative endeavor," and a court's "authority to do so . . . is, at best, uncertain." *Id.* To that end, the Supreme Court has cautioned that courts—especially inferior courts—should be reticent to create or even extend judicially implied causes of action out of respect to the Constitution. *See id.* ("We have emphasized that recognizing a cause of action under *Bivens* is 'a disfavored judicial activity.'" (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017))). This inferior court will heed that admonition. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n,* 606 U.S. ---, No. 25A103, 2025 WL 2415669, at *3 (Aug. 21, 2025) (Opinion of Gorsuch, J.) ("Lower court judges may sometimes disagree with [the Supreme] Court's decisions, but they are never free to defy them.").

The Executive's three-count complaint generally alleges that the standing orders violate certain federal and local rules, as well as the Immigration & Naturalization Act's jurisdictional bars. It does not, however, identify a statutory cause of action that would allow it to invoke a court's judicial power in the first instance to remedy those alleged violations. Instead, the Executive claims that the United States of America can sue to enjoin any practice that infringes upon a sovereign interest under *In re Debs*, 158 U.S. 564 (1895), and its progeny.

That statement is true, as far as it goes. *E.g., Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) (recognizing that Supreme Court precedent has "established . . . the general rule that the United States may sue to protect its interests"). But that authority stops well short of what the Executive attempts to do in this lawsuit. And the court will not extend that rule to imply a right that allows the Executive, on behalf of the United States, to sue a coordinate branch of government.

Each Supreme Court case cited by the Executive for support of this rule involves a lawsuit brought by the sovereign United States of America against a state, a state entity, or a private party when those inferior parties took actions that allegedly violated the Constitution or federal laws. *See Arizona v. United States*, 567 U.S. 387, 393–94 (2012) (suing a state to enjoin a state law as preempted by federal immigration law); *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 423 & 425 (1925) (suing a state corporation "to remove obstruction to interstate and foreign commerce" and "to carry out treaty obligations to a foreign power"); *Heckman v. United States*, 224 U.S. 413, 415–17 (1912) (suing to invalidate certain tribe members' conveyances of land allotted to them by the United States that cut against the rules of the federal government's guardianship of the tribe); *United States v. Texas*, 143 U.S. 621, 624 (1892) (suing a state to enjoin its possession of land the United States had given to the then-territory of Oklahoma); *United States v. Am. Bell Tel. Co.*, 128 U.S. 315, 350 (1888) (suing a private company to invalidate patents as wrongfully issued under federal law); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 278 (1888) (suing a private company to revoke a fraudulently obtained land patent). None of these cases support the Executive's theory that it can sue federal judges simply because it disagrees with how they carry out their constitutional and statutory duties.

Unlike all the cases the Executive cites, this is "a controversy between equals." *Sanitary Dist. of Chicago*, 266 U.S. at 425. And therein lies the rub. *In re Debs* itself, when describing the United States' inherent ability to sue to enforce its interests, says "the *national government* may prevent any unlawful and forcible interference therewith," and "[t]he strong arm of the *national government* may be put forth to brush all obstructions to" sovereign constitutional interests. 158 U.S. at 581–82 (emphasis added). The Executive is the "strong arm" of the sovereign and thus

has authority to sue on behalf of its interests, but that authority does not license attempts to sue a coordinate branch sharing the same sovereign constitutional interest.

Even so, the Executive claims that it alone "has a sovereign interest in its ability to uniformly and expeditiously enforce the nation's duly enacted immigration laws[,]" and that it "may sue in equity to vindicate that interest." (ECF No. 52 at 14.) The Executive fails to grasp that the federal judiciary, as part of the sovereign, shares that interest—and, concomitantly, must ensure that the Executive executes its duties within constitutional and statutory limits. Though it has a prerogative to enforce the country's immigration laws, the Executive is not the only branch that has an interest in immigration and removing illegal aliens in accordance with constitutional and statutory strictures: "The *Government of the United States* has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394 (emphasis added). The federal judiciary's role is certainly more circumscribed than the other branches on this score, but it is nonetheless part of the sovereign United States Government and thus shares the same constitutional interests. *See United States v. Nixon*, 418 U.S. 683, 707 (1974). Nothing in the case law cited by the Executive suggests that it can sue a co-equal branch of government to vindicate a sovereign interest that is shared on both sides of the "v." To hold otherwise would give the Executive unconstitutional leverage over its equal branches of government, eviscerating the principles of checks and balances that are a hallmark of our constitutional order. *See Patchak v. Zinke*, 583 U.S. 244, 250 (2018).

At bottom, the Executive appears to confuse an executive prerogative with a sovereign interest. The court accepts the general rule that the United States of America may sue inferior

parties to enforce its sovereign interests,[11] and the Executive, as the branch of government constitutionally endowed with the duty to enforce laws, regularly does so on its behalf. But that does not imply a cause of action to sue a co-equal branch of government to enforce a constitutional prerogative. And because the Executive is not, itself, the sovereign, its interests are not *ipso facto* the sovereign interest. For all those reasons, the court does not read the Executive's legal authority as permitting a lawsuit against Defendants.

The Executive characterizes that conclusion as an "erroneously miserly view of the *Debs* paradigm" and entreats the court to extend it to interbranch lawsuits. (ECF No. 52 at 14.) Yet "miserly" is an apt way to describe an inferior court's state of mind when weighing requests to extend judicially created causes of action given the Supreme Court's drumbeat admonishment that courts generally ought to be wary of finding new causes of action against federal officials. *Cf. Goldey v. Fields*, 606 U.S. 942, 942–43 (2025) (per curiam) (explaining that the Supreme Court has declined every opportunity to "extend *Bivens* to cover other constitutional violations" because "'in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts'" (quoting *Egbert*, 596 U.S. at 486)).

The court is even less inclined to extend a *Debs*-style cause of action here because Congress has already provided methods to remedy the Maryland federal district court's alleged wrongdoing. The Executive cannot seem to decide what exactly the standing orders are, but whatever they are, Congress has implemented statutes that allow for its challenge. If it is a court order, the Executive has the traditional right to appeal. *See* 28 U.S.C. §§ 1291, 1292; *see*

---

[11] And this makes sense, as the Supremacy Clause, U.S. Const. Art. VI cl. 2, would have little meaning if the sovereign had no legal recourse when a state impeded its sovereign interest. There is no such clause that allows the Executive branch to reign over the Judiciary.

*also United States v. Wood*, 741 F.3d 417, 423 (4th Cir. 2013) (considering a challenge, on appeal, to a district court's standing order). And if it is a local rule, the Executive could petition the Fourth Circuit's Judicial Council for review of its validity. *See* 28 U.S.C. § 2071(c).

The Executive acknowledges these routes are available, but it claims it chose an interbranch lawsuit because those routes are inconvenient. This purported inconvenience does not warrant the judicial branch's infringement on the legislative branch's prerogative of deciding the scope of cases federal courts may review. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 753–54 (2024) (Thomas, J., concurring) ("Our Constitution sets forth a 'tripartite allocation of power,' separating different types of powers across three co-equal branches.' '[E]ach branch [is vested] with an exclusive form of power,' and 'no branch can encroach upon the powers confided to the others.'" (first quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006), then *Patchak*, 583 U.S. at 250) (alterations in original)); *Egbert*, 596 U.S. at 491 ("At bottom, creating a cause of action is a legislative endeavor.").

All signs point towards finding that the Executive lacks a cause of action to sue a federal district court and its officers for acting in their judicial roles. No argument to the contrary explains why this court should be the first to chart a new, and extraordinary, path.

The Executive urges that this kind of lawsuit has the "sanction of precedent," citing out-of-circuit case law which permitted suits against federal district courts and its sitting judges to enjoin local rules. It relies most heavily on First Circuit caselaw that begins with *Whitehouse v. United States District Court for the District of Rhode Island*, 53 F.3d 1349 (1st Cir. 1995). That suit, brought by the executive branch (through the sitting United States Attorney at that time, Sheldon Whitehouse) to challenge a federal district court's local rule incorporating a State

Supreme Court's ethical rule, originated after the First Circuit instructed that "the proper method for mounting a facial challenge to the validity of [Local] Rule 3.8(f) . . . is through an action for declaratory and/or injunctive relief filed in the district court." *Id.* at 1353 (alterations in original).

The Executive perhaps had no other choice but to follow a panel's direct instructions in that case. But in assessing whether *Whitehouse* is persuasive here, the court looks to the provenance of the First Circuit's instruction.

Before he filed suit against the United States District Court for the District of Rhode Island and its judges (and the Rhode Island Supreme Court and its judges), then-U.S. Attorney Whitehouse petitioned the First Circuit for a writ of mandamus asking that his federal prosecutors be exempted from a district court's local rule. *Whitehouse*, 53 F.3d at 1353. That local rule, incorporated from the Rhode Island Rules of Professional Conduct (as promulgated by that state's Supreme Court) to Rhode Island's federal district court, proscribed certain conduct by criminal prosecutors. *Id.* The First Circuit disagreed with the United States Attorney's approach, writing:

> The petition for writ of mandamus is dismissed because we think the proper method for mounting a facial challenge to the validity of Rule 3.8(f) of Rhode Island's Rules of Professional Conduct as incorporated into Rule 4(d) of the Local District Court Rules is through an action for declaratory and/or injunctive relief filed in the district court. *See, e.g., Hollar v. Government of the Virgin Islands*, 857 F.2d 163 (3d Cir. 1988); *United States v. Klubock*, 639 F. Supp. 117 (D. Mass. 1986).

Order, *In re: United States of America*, No. 92-2021 (Sept. 18, 1992).[12] With that full context in mind, the court thinks the *Whitehouse* instruction, even if it were binding on this court, would not authorize the cause of action the Executive brings here.

Consider the cases that apparently formed the First Circuit's instruction there. *Hollar v. Government of the Virgin Islands* involved a challenge brought by private parties against, among other defendants, the U.S. District Court of the Virgin Islands, challenging a local rule the court promulgated that integrated the Virgin Islands Bar Association to the territorial court, such that attorneys were required to be members of the bar association to practice there. 857 F.2d at 165. The crux of the challenge was that the integrated bar—and therefore the rule implementing that attendant integration—was facially unconstitutional. *See id.* at 166–68. Next, *United States v. Klubock* was an action brought by federal prosecutors in Massachusetts against the members of the Supreme Judicial Court of Massachusetts' ethics counsel for promulgating a rule that governed prosecutorial conduct. 639 F. Supp. at 118. According to the federal-prosecutor plaintiffs, the state Supreme Court's ethical rule violated the United States Constitution's Supremacy Clause because it was inconsistent with certain federal rules of criminal procedure. *Id.* at 119. And though it appears that "[a] preliminary question concern[ed] whether [that rule] ha[d] been incorporated by" the district court's local rules, *id.*, the district court passed on the issue of whether the ethical rule was "a rule of this court and thus federal law," *id.* at 121 (footnote omitted).

---

[12] Tracking down this Order was no easy task, and the court thanks the Fourth Circuit Library for its aid in finding it. The referenced order is attached as an appendix to this opinion.

Despite the fact that neither of those cases involved a lawsuit directly against a federal district court, it makes good sense why *Whitehouse* relied on them: They were, as relevant to the underlying challenge there, similar insofar as both cases also dealt with facial challenges to the constitutional validity of procedural rules, initially promulgated by inferior sovereigns, as they were applied to federal courts. And that is precisely what the original *Whitehouse* instruction said: "We think the proper method for mounting *a facial challenge to the validity of Rule 3.8(f) of Rhode Island's Rules of Professional Conduct as incorporated into* Rule 4(d) of the Local District Court Rules is through an action for declaratory and/or injunctive relief filed in the district court." Order, *In re: United States of America*, No. 92-2021 (Sept. 18, 1992) (emphasis added).

It would not make sense, however, to extend that rule here. *Whitehouse*, *Hollar*, and *Klubock* all dealt with facial challenges to rules that were promulgated by non-Article III courts. The challenged rules in *Whitehouse* and *Klubock* were issued by state courts; *Hollar*'s dealt with a territorial court's rule. *See Barnard v. Thorstenn*, 489 U.S. 546, 551 (1989) ("Both the nature of the District Court of the Virgin Islands and the reach of its [local rules] implicate interests beyond the federal system. . . . [T]he District Court . . . is not a United States district court, but an institution with attributes of both a federal and territorial court. . . . The application of [the local rule] itself similarly extends beyond practice in the federal system."). Here, by contrast, the Executive directly sued an Article III court, challenging the validity of a rule made entirely by the federal district court. That significant difference implicates sovereign constitutional concerns that simply were not at stake in *Whitehouse* or the cases on which the First Circuit relied. The court does not read *Whitehouse* as broadly as the Executive, so it declines to extend it to this context.

Ultimately, the court finds the Seventh Circuit's decision in *United States v. Zingsheim*, 384 F.3d 867 (7th Cir. 2004), far more persuasive, insofar as it demonstrates that Congress has already given any litigant a way to challenge a district court's standing order. There, the Seventh Circuit, like the First Circuit in the original *Whitehouse* decision,[13] held that a petition for writ of mandamus was an inappropriate vehicle to challenge the facial validity of a district court's standing order. *Id.* at 870. Such an extraordinary measure was inappropriate because the Executive branch had two adequate legal remedies at its disposal to challenge the district court's standing order in that case. *Id.*

First was through a traditional appeal.[14] Appellate review, though focused on "application of the standing order[] and not its existence as an abstract matter," still allows an appellate court to "address the legal status of the order in the course of assessing its application to" a particular litigant. *Id.* Second was through a petition to the Judicial Council. The Judicial Council, as "the judiciary's administrative body, . . . holds the authority to review local rules" and procedural standing orders "for conformity with national law," and so "could evaluate [any] concerns on application by the Executive Branch" under 28 U.S.C. §§ 332(d)(4) and 2071(c). *Id.* (internal citations omitted); *see id.* ("Standing orders have much the status of local rules, and the body entitled to decide whether a given rule of procedure (no matter its label) is inappropriate under the Rules Enabling Act . . . is the Judicial Council of the circuit.").

---

[13] It is not lost on the court that the Executive cites *Whitehouse* for support that it can sue a federal district court to enjoin enforcement of local rules or standing orders, but ignores that that statement came in finding that a writ of mandamus was not available, whereas the Executive here claims that it *would* be entitled to a writ of mandamus. The court obviously does not decide whether mandamus would be available here. While it appears that Executive wants to have its cake and eat it, too, cherry-picking what precedent to apply *from within a case* is not something this court will accept.

[14] This approach has the "sanction of precedent" in the Fourth Circuit. The Fourth Circuit has considered, in the ordinary appellate process, challenges to standing orders, *see Wood*, 741 F.3d at 423, as well as local rules (before Congress implemented 28 U.S.C. § 2071(c)), *see McCargo v. Hedrick*, 545 F.2d 393, 402 (4th Cir. 1976).

Of course, the Seventh Circuit's discussion did not address whether the Executive Branch could sue the district court to enjoin application of an allegedly *ultra vires* rule. But its opinion is nonetheless persuasive in explaining why extraordinary remedies are inappropriate to challenge a district court's procedural orders when Congress has already provided other, decidedly less drastic, ways to achieve that end.

The Executive's final position on this issue boils down to a plea that the court should infer the requested cause of action because no authority exists "holding that the *Debs* cause of action is unavailable in such cases . . . ." (ECF No. 52 at 14.) For all the reasons discussed above, the court will not be the first to find that the Executive can sue the Judiciary in this manner based on a lack of authority saying it shouldn't. *See supra* n.8; *cf. Free Enters. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("'[A] page of history is worth a volume of logic.' Perhaps the most telling indication of the severe constitutional problem . . . is the lack of historical precedent. . . ." (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921))).

## IV.   CONCLUSION

In their wisdom, the Constitution's framers joined three coordinate branches to establish a single sovereign. That structure may occasionally engender clashes between two branches and encroachment by one branch on another's authority. But mediating those disputes must occur in a manner that respects the Judiciary's constitutional role. *Cf. Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025). As Judge Wilkinson aptly noted in a case posing a similar—though less direct—clash: "A reciprocal respect for the roles of the Executive and the Judiciary may be too much to hope for in this most fraught and polarized of times, but it

- 36 -

remains the only way that our system of constitutional governance can ever hope to work."

*Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *8 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring).

Much as the Executive fights the characterization, a lawsuit by the executive branch of government against the judicial branch for the exercise of judicial power is not ordinary. The Executive's lawsuit will be dismissed, and its motion for preliminary injunction denied as moot. Whatever the merits of its grievance with the judges of the United States District Court for the District of Maryland, the Executive must find a proper way to raise those concerns.

The Deputy Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 26th day of August, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

# APPENDIX



# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

No. 92-2021

IN RE:
UNITED STATES OF AMERICA, PETITIONER.

---

Before

Breyer, *Chief Judge*,
Torruella and Selya, *Circuit Judges*.

---

ORDER OF COURT

Entered September 18 , 1992

The petition for writ of mandamus is dismissed because we think the proper method for mounting a facial challenge to the validity of Rule 3.8(f) of Rhode Island's Rules of Professional Conduct as incorporated into Rule 4(d) of the Local District Court Rules is through an action for declaratory and/or injunctive relief filed in the district court. See, e.g., Hollar v. Government of the Virgin Islands, 857 F.2d 163 (3d Cir. 1988); United States v. Klubock, 639 F. Supp. 117 (D.Mass. 1986).

By the Court:

Clerk.

(Messrs. Almond, Mueller, III, Gillis, Hon. Boyle, & Misses Curran and Criscitelli)